34

United States District Court

Eastern District of Michigan

Southern Division

Ed D. Foster

Petitioner,

v

Thomas WINN (WARDEN)

Respondent

Case No: 2:15-CV-12265

Hon. Laurie J. Michelson

U.S. District Judge

Hon. Michael J. Hluchaniuk

U.S. Magistrate Judge

FILED
FEB 05 2016
CLERK'S OFFICE
U.S. DISTRICT COURT

**Petitioner ED D. FOSTER, by and through himself,**

**Submit This His Reply To Respondents Answer To**

**Petition For Writ of Habeas Corpus**

Petitions Responds as follow:

I. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

Petitioner Ed D. Foster, filed his habeas petition after April 4, 1996 and therefore, the provisions of the AEDPA apply, Lindh v Murphy, 521 U.S. 320, 336, 138 Led. 2d 481, 1175 S. Ct. 2059 (1997)

Under the "AEDPA", A federal Court may grant a writ of habeas corpus only if the state courts ruled in a way contrary to, or involving an unreasonable, application of, clearly established federal law as determined by the United States Supreme Court, 28 U.S.C. § 2254 (d) (1) See also William v Taylor, 529 U.S. 362, 404-05, 120 S.Ct. 1495, L Ed. 2d 389 (2000)

II. Issue One: **PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE INTRODUCTION OF FALSE AND PERJURED TESTIMONY FROM JH SNITCH, KEITH NICKERSON, A KEY PROSECTION WITNESS**

Respondent argues that it was not objectively unreasonable for the Michigan Court of Appeals to find that Petitioners conviction was not obtained through perjury and applied the correct constitutional standard. Petitioner disagrees.

The Concept of due process as it has become crystallized in the public mind and by judicial pronouncement, is formulated in Mooney v Holohan, 294 U.S.103,112,55 S. Ct. 340, 341,342, 79 L.Ed. 791, 98 A.L.R. 406 (1935). The 14th Amendment cannot tolerate a State Conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle, See Napve v Illinois 360 U.S. 264, 269; 79 S.Ct. 1173; 3 L.Ed. 2d 1217 (1959). Accordingly, the deliberated deception of a courts jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. See Giglio v United States 405 U.S. 150 (1972).

The State Prosecutor under Napue/Giglio requires the he not allow his witness to mislead of falsify evidence and if so, he is to correct the false and or perjured testimony upon its conception during trial. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. United States v Agurs, 427 U.S. 97, 103 (1976), United States v Baglley 473 U.S. 667 (1985)

To prevail on a false testimony claim (in the 6th Cir.) Petitioner must show (1) that the prosecution presented false testimony; (2) that the prosecution knew it was false; and (3) that the false testimony was material. Abdus-Samad v Bell 420F 3d 614(6th Cir. 2005). In order to satisfy the first 2 prongs of this test, Petitioner need not demonstrate that the prosecution presented false testimony that at the time of presentation he knew to be false. Rather, it is sufficient that the petitioner show that the prosecutor used "testimony, whether elicited or left uncorrected, that the prosecution knew or should have know is false." Foley v Parker 488 F 3d 377, 392 (6th Cir. 2007)

The State Prosecutor in this case called Keith Nickerson, a "Jailhouse Snitch" and key prosecution witness as one of its witnesses. In his testimony for the prosecution, he repeatedly denied receiving any benefit or leniency on his federal bank robbery case that would have led to a sentence reduction. See TT XII 225-26, 241 – 42, 43 -247. Specifically, Nickerson testified on direct examination:

(Prosecutor) Q. "Have I offered to do anything on your behalf in regard to your testifying?"

(Nickerson) A. "No"

Q. "Is there any benefit that you know of that you could receive for testifying today?"

A. "No"

Q. Now, I believe you had written a letter to your Attorney, Craig[1]. Do you know if your attorney, Craig mentioned to the judge what was going on here?

A. No, I mean, well, he kind of mentioned it. He is attorney. He knows everything that I do. So, he chose to say something about it, but I didn't personally.

Q. and I asked you at that time and I will ask you again, in March did I indicated to you that I would do nothing for you in regard to any cases that you had pending?

Q. Nothing

A. Okay. Have I done anything on your behalf?

A. Nothing

SEE TTXII pgs 225 -26, 411

On Cross Examination Nickerson was answered as follow: In relevant part:

Q. and you have indicated a number of times that nobody has done anything for you to give a benefit for your testimony; is that right?

A. Correct.

Q. Meaning that as far as you knew, at least at that time, nobody had called and said, Hey give this guy a break, he's helping out in a murder case or nothing like that?

A. True

Q. Today you indicated you didn't say anything about that at your sentencing, but your attorney did, isn't that correct?

A. Correct

Q. Is it true that the United State Attorney's Office filed a specific motion called a 5K motion to give you a departure below your originally scored guidelines?

A. Yes

Q. and as a result of this 5K motion filed by the Federal Government, you received a reduction… is that right?

1 Note: (In a letter written to Nickerson's Attorney "Craig", Nickerson's introduction read: "guess what fell into my lap?") See Preliminary Exam. Transcript pg 24, 25

A. That is not why I got a reduction.

Q. You didn't get a reduction because of the 5K motion?

A. No

See TT XII pg 244 -247

Material from Nickerson's federal sentencing reveals that, contrary to his trial testimony, he did receive a sentence reduction for testifying against petitioner. See United States v Keith Nickerson, No, 1:09-CR-311 (U.S. District Court, W.D. Mi 2009). The federal judge explicitly ruled, that Nickerson's testimony against Mr. Foster was grounds for departing below the federal guidelines, explaining, in relevant part;

First, I recognize the government has filed a 5K motion as it relates to the *defendants cooperation in the prosecution of a still pending unsolved homicide* which is pending in State Court. The defendant has testified at a preliminary examination, *and according to the 5k motion filed by the government, was an important witness in support of the prosecution. As far as the 5K motion is concerned, the court intends to grant it.* See Appendix C pg 20, 25 of Petition.

The Michigan Court of Appeals in its August 8, 2013 decision affirming petitioner's conviction, does not refute the fact that it "is abundantly clear… that Nickerson testified contrary to what was placed on the record at his federal sentencing." And "that in fact he did receive a benefit from the 5K motion" The appeals court went on to concede that it was "abundantly clear from Nickerson's sentencing transcripts that as a result of his cooperation and preliminary examination on testimony in *the instant case, he did receive a three level downward departure in his federal bank robbery sentencing." And that Nickerson unequivocally" testified that he did NOT receive a reduction in his sentence because of his assistance in this instant matter." And finally, "Nickerson's testimony was thus contrary to the actual facts."* See Appendix A at pg 13 of petition.

Prosecution failure to correct false evidence affecting credibility taints a conviction. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. Giglio v U.S. 150, 92 S. Ct. 763 (1972). It is immaterial whether the false testimony directly concerns an essential element of the governments proof or whether it bears only upon the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be terminative of guilt or innocence and it is upon such subtle factors as the possible interest of the witness testifying falsely that a defendant's life or liberty may depend. See U.S. v Barham 595 F 2d 231 (5th Cir)

The State Prosecutor was required under Napue/Giglio to correct the false testimony given and must not allow a government witness to falsify or mislead the jury about the actual or expected sentencing benefits given or offered as a result of his testifying against Petitioner at trial. See TTXII pg 247. Here, it is quite apparent that Nickerson testified falsely when he denied no federal sentencing benefit for his testimony against Foster alone with testifying falsely that the prosecutor had done absolutely nothing on his behalf in his federal case. See TTXII pg. 247 In fact, the State Prosecutor elicited and presented false evidence that gave the jury the false

impression that his witness not only stood to gain absolutely nothing for his testimony against the defendant, but misled the jury that he (state prosecutor) would do "nothing" in regard for Nickerson as well, when in fact he had. See Appdx D pg. 2, the Government Motion for downward departure for substantial assistance in Nickerson sentencing.

In Relevant part; [Mr. Nickerson's] testimony proved to be instrumental in murder charges subsequently brought against five individuals by the Michigan Attorney General in People v Ivory Shaver et al, No. 10-17030-FC (36th Cir 2010) *Undersigned counsel has spoken to Assistant Attorney General Dennis Pheney about [ Mr. Nickerson's] assistance and was advised* that the defendant testified at a preliminary examination *and was an important* witness in the case. The trial is scheduled to commence in June, where defendant is expected *to testify again.*

In order to establish a false testimony claim, the petitioner must show that prosecutor knew or should have known of his usage of tales testimony, whether elicited or left uncorrected. Foley v Parker 488 F3d377, 392 (6th cir 2009). The prosecutor has duty to correct false or perjured guidance not only going to the elements of the offense, but anything that affects the credibility of a witness. However, when it should be obvious to the government that the witness answer, although made in good faith is untrue, the governments obligation to correct that statement is a compelling as if in a situation where the government knows that the witness in intentionally committing perjury U.S. v Harris 468 F 2d 1164,1169 (CA 3, 1974) See also U.S. v Jenkins 294 73d at 296 ( "while the prosecutors questions elicited technically correct answers…they left the jury with the mistaken impression that no plea agreement existed.") that court went on to explain "we can think of no explanation for the prosecutor conduct other than an attempt to reinforce [the witness] false testimony. In Harris a government witness falsely testified during cross examination that in exchange for testimony against the defendant, the prosecutor had made no such promise to help her receive a reduced sentence on pending state charges against her. See Harris 498 F 2d at 1166-67 (Note: This Petitioner does make any assertions that any elicit promises were made as none were discovered on record) Nevertheless, petitioner points to the State prosecutors extensive knowledge of the information he shared with the federal prosecutor concerning Nickerson's value as a witness in order for him to satisfy the 5K motions "substantial Assistance" prong that requires just that; substantial assistance in the conviction of another individual See 5K1.1 United States sentencing Guidelines or Rule 35 of the FR of CP. The Assistance Attorney General's Office was directly involved with the federal prosecutor's motion for downward departure. Asst. Attorney General (and State prosecutor in this case) Dennis Pheney, made no attempt to clarify, deny, or confirm his role or the lack thereof, in Nickerson's favorable treatment.

There is never any promise made by the U.S. Attorney Office that sentence reduction for cooperation is guaranteed. The U.S. Attorney Office always retains the discretion to decide that a defendant was not entirely forthcoming or not helpful enough or any number of reasons that result in no motion being made by the government to the judge to reduce a defendant's sentence. Information about a murder, even those in a State court of course is the "gold standard." Therefore, when Keith Nickerson's first words in a letter he wrote to his attorney were "guess what fell into my lap?" He expected compensation at some juncture for his information.

Notably, although Asst. Attorney General Dennis Pheney did not have any written deal with Nickerson for his testimony against Foster, Nickerson would not have received such favorable treatment which resulted in 60 months deducted from his sentence had not been for the qualitive information provided by Mr. Pheney to the federal prosecutor in Nickerson case. The sentencing judge in Nickerson case went so far as to state that it was only because of the information provided in the government's motion for substantial assistance (5K1.1) that he would grant the motion. Where the federal prosecutor spoke directly of his conversation(s) with Mr. Pheney in open court, that he was informed, at the very least, that Nickerson was an "important witness" to the state prosecutor. See Appdx Dpg 2.

The Sole right involved here is the petitioner's right to a fair trial implicit in the guaranteed that no person shall be deprived of liberty without due process. As part of this general duty, prosecutors are barred from employing false testimony to obtain convictions. Here, in petitioner case, the State prosecutor knew or should have known at the time the testimony was given, that it was false and misleading. If the State prosecutor fails to remedy a material statement he knows or should have know to be false, he has failed and violated his duty to insure petitioner a fair trial. The obligation to avoid presenting false or misleading testimony of its own witness begins and ends with the prosecution and is prudent in the unique Napue context because Napue requires the prosecutor's knowledge of the false or misleading testimony of its own witness. See Napue 360 U.S. at 269. Furthermore, if the jury had knowledge of one of the states key ("important") witness receiving favorable treatment for his testimony and a clear and concise understanding of the role the prosecution played in helping Nickerson receive such compensation, in the form of a Sentence Reduction, would have given the jury a concrete reason to believe that Nickerson might had fabricated testimony in order to receive the benefit to help his cause and to minimize the adverse consequences of being prosecuted in Federal court. The prosecutions subsequent failure to correct the false testimony given Nickerson shielded from the jury, consideration to discount his testimony all together.

Having Nickerson admit that he receives a benefit for his testimony against petitioner was simply not an additional or cumulative grounds for impeaching him. Evidence disclosing that he had in fact, lied to the jury about why and how re received compensation, had a direct impact on the jury's assessment of his credibility and a direct interest in the outcome in a highly contested trial. Only Nickerson and Smith testified that the defendant allegedly "confessed" to actually being involved in Boothby's death. Michael Smith, another "Jailhouse Snitch" was successfully impeached by defense counsel during cross examination, where several letters he had written to Van Buren County Prosecutors Office, were read into Guidance, where requested then demanded some sort of favorable treatment or compensation for his information/testimony See TT XII pgs 191,92; 200, 202,204. The Sixth Circuit, in Bell v Bell 512F 3d 223, 237 (2008) ruled that a witness "is sufficiently impeached....where the jury was apprised of the [informants] status and possible other reasons for his decision to testify, namely, that he wished to secure an early parole, " such as the case with Michael Smith, whose sole purpose was to curry favor in the State of Indiana for his testimony in a murder trial in Michigan. The jury was also made aware that he possessed petitioners numerous police reports and had taken copies notes and recited

certain information contained only in those reports as facts of the case that no one during the course of the trial testified to. See TT XII pg. 188-83, 187, 207-08.

**DISCUSSION**

The Michigan Court of Appeals unreasonably asserted that the "pertinent information" concerning the sentencing benefit Nickerson received was somehow presented to the jury during cross examination by petitioner's defense counsel, despite the judge's instructions to the jury that it was only to consider a witnesses answers as evidence. See Appdx A at pg. 13. While defense counsels questions may have suggested that Nickerson was not truthful, it was Nickerson answers that the jury were instructed to consider as evidence, where he repeatedly and unequivocally denied receiving favorable treatment for his testimony against the defendant. See TT XII pg 244 -247. The trial Court in petitioners case specifically instructed the jury that it could "consider only the evidence that was properly admitted in this case," which consisted "soley of the sworn testimony of witnesses and the exhibits admitted into evidence. See TT XII pg. 18 more importantly, the trial court also specifically instructed the jury that "the layer's questions to witnesses are also NOT evidence," Id at pg. 19. Reed v McQuiggin 2012 U.S. Dist. LEXIS 27140; See also CJI2d 2.5; CJi2d 2.7; CJI2d 3.5 (2), (5). This court must presume the jury followed those instructions to the letter as well. U.S. v Patterson 587 Fed Appx 878 (6th Cir 2014) quoting U.S. v Nevhausser 241F3d 460, 469 (6trh Cir 20010 "WE HAVE OFTEN STATED OUR PRESUMTIN THAT JURORS FOLLOW THEIR INSTRUCTIONS." See also Yates v Evatt III S. C.t. 1884 "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true tan in the belief that it represents a reasonable practical accommodation of the interests of the State and defendant." Quoting Richardson v Marsh 481 U.S. 200 (1987). See Delli Paoli v U.S. 77 SCt. 294, IL.Ed 2d 278 (1957) "It is essential to the jury system that the jury will follow the courts instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them." The Court of Appeals use of an Attorney's questions (rather than the answers to them) as "evidence" that the jury could use to cure an impropriety is an unreasonable application of clearly established federal law. An even and consistent application of those principle establishes by the U.S. Supreme Court and the Sixth Circuit, would completely undermine the Appeals court's objectively unreasonable conclusion that any false testimony claims were somehow corrected or cured. The fifth circuit in U.S. v Barham 595F2d 231 (1979) decided that "the defendant is entitled to a jury that is not laboring under a government – sanctioned false impression of material evidence when it decides the question of guilt or innocence with all of its ramifications."

It is clear and obvious, that false testimony was presented and went uncorrected. This case, as petitioner has already directed, is controlled by Napue v Illinois 360 U.S. 264, 32. Ed 2d 1217, 79S.Ct. 1173 (1959) and Giglio v United States, 405 U.S. 150, 31L. Ed 2d 104, 92 S. Ct. 763 (1971). In reversing, in Napue, a unanimous Supreme Court ruled: "It is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the fourth tenth Amendment… The same result obtains when the State,

although not soliciting false evidence, allows it to go uncorrected when it appears…" 360 U.S. at 269.

Rather than considering either Napue or Giglio, however, the Michigan Court of Appeals addressed the issue as follows:

In affirming petitioners conviction (August 8, 2013) the Court of Appeals conceded to the fact that Nickerson testified falsely and misled the jury. See Appendix A. None the less, it unreasonably held that due process did not require reversal because there was no evidence that the state prosecutor had actually "promised" Nickerson anything, that Nickerson's false testimony was undermined by the jury having been informed that Nickerson received a 60 month reduction (188 months to 128 months) in his federal bank robbery sentence, and because there was "sign cant other evidence concerning defendants participation in at least the breathing of Boothby." Id these assertions are erroneous and objectively unreasonable according to federal and constitutional law set forth by the United States Supreme Court.

To succeed on this claim petitioner must show that (1) the prosecutor presented evidence which was false; (2) the prosecutor knew or should have known of the falsity and (3) the evidence was material See Coe v Bell 161 F3d 320, 343 (6th Cir 1999). (In order to establish a Napue violation, petitioner must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter given with the willful intent to deceive." See Byrd v Collins 209F3d 486, 517 -18 (6th Cir 2000). As the Sixth Circuit has explained, in order for a witness' perjury at trial to constitute a basis for habeas relief the petitioner must show 'prosecutorial involvement in there perjury' Burks v Egeler 512 F2d 221, 229 (6th Cir 1975) Nonetheless, the courts assertion that the lack of evidence of a "promise" from the prosecutor is irrelevant and addresses a "straw man" argument. Again, this petitioner does not make any claim of evidence that promised were made. But what is clear and concise that on direct examination Nickerson specifically testified that the state prosecutor had done absolutely "nothing" for him in his federal case. TT XII pg 225-26, 241 and what the federal record reveals is that infact, this was not true, the State prosecutor was directly involved in Nickersons Sentence Reduction, that he in fact, did do "something" for Nickerson after being contacted or contacting the federal prosecutor. Notifying the federal prosecutor that Nickerson was an "important witness" and providing other information is far from doing "nothing" as the State prosecutor elicited and Nickerson clearly testified to. See Appdx D pg 4; Appdx C pg 4-5 not only does providing such information state the obvious: that the State prosecutor knew or should have known that his witness did not testify truthfully (as the Appeals Court has pointed out in its decision) but that information was the primary motivating force behind the Government's downward departure request. See Appdx D.

The Constitutional guarantee of a fair trial and due process is not satisfied when guilt is premised on a purported "Jail house Snitches" testimony and the government conceals from the jury the Sentence Reduction that its witness has received is a direct result of his testimony against the defendant. See Byrd v Collins 227F3d 756 (2000)" Such reprehensible conduct is not only improper but frequently results in a violation for the Constitutional right to a fair trial [and] is

established beyond dispute." Napue v Illinois 79 S.Ct. 1173. Citing where a prosecutor made no effort to correct known perjuries testimony.

The Michigan Court of Appeals relied upon and made reference to "other" evidence against Mr. Foster that included testimony from convicted perjurer/murder Adrianne Burnette. The prosecution's case hinged on Burnettes version of events after admittedly testified that she had not been truthful throughout the States entire investigation and also continued to lie even while under oath to critical facts of the case during cross examination. Burnette gave at least 12 different, contradictory, inconsistent, and retracted statements to authorities over 12yr investigation. See TTX pg 18-20, 74-75. She repeatedly lied about her and others involvement in Boothby's death, and on several occasions, she pointed the finger at many other people who names she did not mention at trial. TTX pgs 75-79, 88-90, 132, 134-35, 135-40, 150-51, 154-55, 157-60, 194-95, 202-03, 225-26, 228, 251; TT XIII pg 142-43, 145-46. In many of those statements Burnette insisted that she was telling "100%" of the truth to authorities, only to revise, recant, and fundamentally – alter her story to "fit" investigators "theories" of the case. TT X pg 150, 239-41; TT XIII pf. 146-47.

More-ever, In all of the numerous different police statements that Burnette gave from 1998 through Feb 4, 2009, she either did not mention petitioner's name or unequivocally denied he was involved in any way Boothby's assault or death. TTX 74-77, 237-39. It wasn't until her interrogators began insisting and suggesting to Burnette that petitioner was somehow involved in Boothby's death or assault in 2007. Id at 132, 237-40, and it was not until April 22, 2009 that Burnette finally, falsely, implicated this petitioner in this alleged crime. Id. At 78, 240. This was Burnettes 11th statement to police, and was made irresponsive to their continued insistence that petitioner was involved. Id at 78, 240. Even that statement, Burnette conceded, was filled with half-truths, lies, disturbed facts, inconsistencies and inaccuracies Id at 78-79. Petitioner contends during Burnettes cross examination that she too was sufficiently impeached where she admitted that Foster's name was "fed" to her by authorities and despite disagreeing with their notion that Foster was involved, she readily used petitioner's name as an "way out." Petitioner's trial counsel specifically asked

Q: not only did you not bring up *his name*, not only did *you not agree with them, you didn't say anything about Ed Foster?*

*A. Correct*

Q. *It was presented to you a way out and you did take it, correct?*

A. ***correct*** See TTX pgs 238-240

Petitioner contends that it is a strong probality that the jury totally discredited the tainted testimony of Burnette as "untrustworthily." The prosecution relied heavily upon the testimony of two "Jail house snitches" both of "questionable character. Michael Smith, who came forward hoping to receive favorable treatment in the State of Indiana had numerous convictions for crimes of dishonestly, including forgery and theft. Petitioner has already cited that Smith was "sufficiently impeached" on witness bias, where he admitted during trial to "thoroughly reading"

numerous police reports and witness statements from petitioner's belongings while incarcerated, including, but not limited to Adrienne Burnette and having his hand written letters read into evidence, directed towards the Van Buren County prosecutor's office and lead detective Diane Oppenheim See TT XII pgs 188-90, 207: 191, 202-03,05.

Morever, without a believable Nickerson, the prosecution would have had to rely upon a convicted perjury/ murder who agreed in principle to give "truthful" testimony for a plea deal of 8-20 yrs in prison for killing Boothby, that testified that she continued to lie while under during petitioners preliminary examination See TT X pg. 157, 170-71, 245-46. The "other" evidence the Appeals Court makes reference to as "significant" was inconsistent and conflicting accounts of what occurred the night in question, where a complete overview of the facts of petitioner's case shows testimony given of police coercion and intimidation. Where other eyewitness accounts did not see Mr. Foster involved with co-defendants or Boothby. Please See, ground one of Supporting facts of this petition and statement of facts for Appellate Brief.

On cross examination, Petitioner's trial counsel questioned Nickerson extensively to determine whether his testimony was given in return for favorable treatment in his federal bank robbery case. On direct examination of Nickerson had no reason to believe he was being rewarded for his testimony against the defendant and that he had done absolutely "nothing" on the witness' behalf in his federal case. Nickerson was the prosecutors strongest evidence against petitioner; having a witness testify that a defendant has "confessed" of a crime is one of the most probative forms of evidence against the accused, especially in such a highly contested trial, where it boils down to a "credibility contest" witness credibility is paramount.

The Michigan Court of Appeals "side steps" the State prosecutors constitutional obligation that he should have known that a "important" witness in its case had received compensation for his testimony against the defendant. Mr. Pheney spoke directly to the federal prosecutor in Nickerson's bank robbery case, and subsequently, gave the federal prosecutor what he need in order to file the 5K motion and helped Nickerson achieve his goals from the onset; to have his sentence reduced for his testimony against Foster. The State prosecutor's attention should have been readily directed towards the information he gave and its usage. Certainly, there is greater incentive for a witness ("Jail House Snitch") such as Nickerson, to lie about why he did or didn't receive a sentence reduction for his testimony, to try and persuade the jury his testimony believable and not call info question his character, credibility, bias, or incentive for testifying against Foster, coming off more believable and following the State prosecutor's lead depends on his performance before the jury. The State prosecutor and Nickerson knew the truth. The jury did not.

Petitioner testified on his own behalf at trial, and while he acknowledged being at the Blue Star Lounge the night of the incident, he has vehemently, and unequivocally denied any involvement Ms. Boothby's assault, kidnapping or death. And has always and continues to maintain his complete innocence of this crime. See TT IV pg See also Petitioner "final statement

An complete overview of Mr. Foster's trial explain his reasons for asking the U.S. Marshals if someone was present (Scottie Shaver) when someone else committed a murder (Adrienne

Burnette) could that person be charged as well. He allegedly asked a follow up question; that even if a vehicle was involved was it still possible for that individual to be arrested. TT XII pg. 104-05,06, 117-18, 150-51. Petitioner also described for the jury the intense and often violent "beef" (feud) between those from Covert where he was from, and those from South Haven, where his Co-defendants were from. TT XIV pg. 19 -21. Petitioner testified that this bitter feud wasn't just geographical that he and Co-defendant Scottie Shaver had serious hatred for one another and would have never helped in a fight let alone murders someone petitioner did not know, even if he heard someone using racial slurs. TT XIV pg 39-40.

Petitioner Contends that this case was close and a fair and complete overview of his case shows that the Michigan Court of Appeals unreasonably concluded that Foster's conviction was not obtained through false or perjured testimony, and despite its assertion or reference to the "other" testimony or evidence to support its decision. The court failed to view petitioner's case in its entirety, Specifically the testimony of Marie Harris-Black and Danyela Jones both witness recollection of events have been the only consistent testimony given not only throughout petitioner's trial but through the entire investigation, going back to April of 1998 prior to, during and after Ms. Boothby's untimely demise. Please see TT VIII pgs 52-55, 58-59, 62,63, 68-69, 79-80 Danyela Jones was interview along with Marie Black by police 15-20 minutes after Boothby was discovered in the road. TT XIV pg. 48 -51. She also testified contrary to the unreliable testimony of Adrienne Burnette, that she and her friends witnessed Boothby "alive" and "walking" down the road. Id at 51. She also testified that she witnessed a vehicle (white in color) later discovered to be driven by Adrienne Burnette, hitting and running over Boothby. Id at pg 54 Sharon Martinez who also testified for the State, told the jury that she did not see petitioner involved in any assault or kidnapping and upon returning to the bar's parking lot witnessed petitioner and co-defendant Scottie Shavers exchanging words at the exact time she claimed to have witnessed co-defendant Ivory Shaver allegedly run over the victim. See TT XI pg 124-30. Martinez also testified that she witnessed petitioner leaving in his own vehicle as she entered the parking lot area, where Adrienne Burnette placed petitioner in a vehicle driven by co-defendant Ivory Shaver and Chevy Gill at the same exact moment, which totally contradicts Ms. Burnette "story" Id at 139-40, 100, 140-41, 161.

This places an extreme amount of emphasis on a "believable" Nickerson and Smith as "Jailhouse Snitches" who claimed alleged "confessions" of the defendant before a jury. The "other" testimony concerning petitioner was far from overwhelming. Prosecution witnesses gave an arraignment of inconsistent and conflicting testimony, while others for the prosecution gave no accounts of Foster involvement whatsoever, giving considerable doubt as to his guilt of this crime altogether.

Therefore, It is objectively unreasonable for the Michigan Court of Appeals to conclude that Nickerson's false and misleading testimony could not have influenced the verdict in petitioner's case. The Appeals court has failed to take into consideration the difficulty in which the jury had in reaching its verdict. The jury in petitioners trial deliberated for 9-10 hrs before became "deadlocked" after initially receiving the case, and began deliberating again after A 3 day weekend before returning a verdict of guilty. See TTXVIII pg. 16-24; TTXX pg 24.

Clearly, it is reasonable to conclude that Nickerson's false testimony tipped the balance for this otherwise dead locked jury. See United States v. Lusterino 450 F2d 572, 575 (2nd Cir 1971) That the jury had been apprised of other grounds for disbelieving Nickerson's testimony could not turn "what was otherwise a tainted trial into a fair one." Napue supra 360 U.S. at 270, 79 S. Ct. at 1177. Three remains, therefore, the very real possibility that Petitioner is innocent as he appropriately took the witness stand and testified before the jury. TTXV pg 92, 1010-02. Or, at least, that the jury might not have been convinced of Foster's guilt beyond a reasonable doubt if truth about why Nickerson received such a generous deduction in his federal case for his testimony against Foster had been made known or at least clarified.[2]

This case is directly controlled by Napue v Illinois 360 U.S. 264, 3L.Ed 2d 1217, 795 S. Ct. 1173 (1959) and Giglio v United States, 405 U.S. 150, 3L.Ed 2d 104, 92 S. Ct. 763 (1971) in Napue, the principal state witness testified that he received no consideration in return for his testimony. The Illinois State's Attorney who prosecuted the case, knew that the testimony his witness gave was false. I reversing, the Supreme Court set forth the precedence for the known usage of materially false and perjured testimony. Napue at 360 U.S. at 269.

Rather than considering either Napue or Giglio correctly, the Michigan Court of Appeals and respondent agrees, addressed the issue as follows:

The Appeals court's conclusion that any false testimony was "harmless" in light of the "other evidence did not take into account the entire record and mis-applies the harmless error standard. As the United States Supreme Court has set the precedence for the known use of false and or perjured testimony, the Sixth Circuit and many other Federal Courts have followed, that petitioner has applied in this petition.

[2]The state prosecution could have requested a side – bar conference or an in–camea proceeding at which he could address the matter of his involvement in helping Nickerson receive the sentence reduction and why he received it for his cooperation in testifying against the defendant.

Contrary to what the Appeals court has implied, the standard set forth by the U.S. Supreme Court for the known use of false and or perjured testimony in not whether there was sufficient evidence to convict aside from the false testimony. Rather, reversal is required "if there was *any reasonable likelihood that the false testimony could have affected the judgment of the Jury*" United States v Aguars 427 U.S. 97, 103 (1976); Napue, Supra at 271.

The fifth Circuit Appeals Court decided that jurors should not be "laboring" whether what testimony is false and what testimony is not when the prosecution is aware of the falsity but does absolutely nothing to correct it even where there is "sufficient" evidence to "support a verdict of guilty" it held: "There is no doubt that the evidence in this case was sufficient to support a verdict of guilty, but the fact that we would sustain a conviction untainted by false evidence is not the question. After all we are not the body which under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and again under the Constitution the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." U.S. v Barham 595F2d 231 (5th Cir 1979)

A State Court (Appeals) decision is "Contrary to" a decision of the U.S. Supreme Court if "the State Court applies a rule that contradicts the governing law set forth in our cases." See Williams v Taylor 529 U.S. 362 (2000)

A federal Court applying harmless error analysis to a habeas petition must apply the test announced in Brecht v Abrahamson 507 U.S. 619 (1993), namely whether the Constitutional error had a "substantial and injurious effect or influence" on the verdict.

Respondent argues and the Michigan Court of Appeals agreed that Petitioner was not entitled to a new trial because the evidence that Nickerson had received compensation, specifically for his testimony against Foster, did not or would not, contradict substantive evidence of guilt. (The Nickerson's repeated denial to the jury of why he received the sentence reduction was relayed to the jury despite the trial courts instructions that "the lawyers questions to witnesses are also not evidence." TTXII pg 18 -19) This argument, however, was explicitly rejected in Napue, supra, 360 U.S. at 269;

> The principle that a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may not be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

The Michigan Appeals Court placed the burden and responsibility on Petitioners counsel at trial, for failing to have the prosecutions witness come forth with the truth about why he had received

the sentence reduction, where the prosecution knew the truth and so did Nickerson. The Barham court stated: "The defendant gains nothing by knowing that the government witness has a personal interest in testifying, unless he is able to import that knowledge to the jury." U.S. v Barham 595F2d 231, 243-44 n 17 (1959)

Napue and Giglio clearly place the burden on the government which should have known about the apparent perjury and prevented it, United States v Rosner 516 F2d 269, 280 (2nd Cir 1975), cert denied, 427 U.S. 911, 49 L. Ed 2d 1203, 96 S. Ct. 3198 (1976) See also Scott v Foltz 612 F. Supp 50 (1985) E.D. Mich. A conviction must fall where the prosecution, although not soliciting it, allows perjured testimony to go uncorrected when it appears even though it is relevant only on the issue of credibility. Giles v Maryland 386 U.S. 66, 74, 17, C. Ed 2d 737, 87 S. Ct. 793 (1966)

Therefore the court was objectively unreasonable to decide contrary to the standard that has been clearly established by the Supreme Court, In United States v Agurs 427 U.S. 97, 49 L. Ed 2d 342, 96 S. Ct. 2392 (1976). In complete disregard for the precedence set forth by the U.S. Supreme Court, the Michigan Appeals Court, completely ignored the correct standard of review for the known use of perjured testimony. As the Fifth Circuit explained, the "reasonable likelihood" standard presents a low hurdle for relief, and relief is required even if the remaining evidence otherwise was legally or hypothetically sufficient to convict. See U.S. v Barham 595 F2d 321, 242 (4th Cir 1979).

The trial against Petitioner was essentially a "credibility contest," where the credibility of each witness was critical to the prosecution case. The respondent points specifically to the testimony of two "Jail house Snitches" and a convicted perjurer that admitted to lying consistently through the investigation and trial, as the most relevant evidence against petitioner. The State also makes reference to alleged "incriminating statements" made by Petitioner to arresting officers, where Petitioner asked questions about his co-defendants previous arrest and involvement in the crime. There was no physical DNA or Scientific evidence Associated with Petitioner during closing arguments the State Prosecutor revealed that he didn't establish a motive for Foster being involved in a "Murder – Kidnapping – Plot" that involved assisting his "sworn enemies." See TT Petitioner's entire defense was to expose eye witness accounts for them inconsistent and contradictory value and to present to the jury. Burnette, Smith and Nickerson as liars and opportunist that would say and do anything to curry favor for their testimony. That trial strategy was highly successful, with exception to the latter, Keith Nickerson who vehemtly denied before the jury reasons for his receiving a 60 month sentence reduction. Petitioner's jury at one point during deliberations, announced that it could not reach a verdict. There is competing and compelling evidence pointing to reasonable doubt in Petitioner 's case (that was completely ignored by the Michigan Appeals court and respondent), including but not limited to defense expert testimony that Boothby could have died from merely being hit by a car, testimony from the most reliable consistent, independent eye witnesses who saw Boothby conscious, walking, and uninjured moments before she was struck by a car, (later discovered to be driven by Adrienne Burnette), evidence that Petitioner and his co-defendants were on opposite ends of a bitter and often violent "beef" or feud, and evidence that police ignored witnesses favorable to

Mr. Foster and intimidated, coerced, and pressured others to bend their testimony as to incriminate him. Please see TTVIII pg 57-60, 75 TTX pg 75-80, 88-90, 132-140, 240, TT XII pg 197-205, TT XIV pg 47-75. The State Prosecutor in this case by all accounts, went so far as to "vouch" for Nickerson and notified the federal prosecutor in Nickerson case that in fact he was "an important witness" for the prosecution. Furthermore, Nickerson claimed that Petitioner confessed to the crime, providing "probably the most probative and damaging evidence that can be admitted against" a defendant. Arizona v Fulminante, 499 U.S. 322 (1991). The jury might very well have hesitated had it been informed that Nickerson (1) lied to them (2) received a 5 yr deduction in his sentence as a reward for testifying against Mr. Foster and thus had a motive to fabricated, and (3) that the State prosecutor had "aided and a betted" Nickerson's false and misleading testimony, (as with Smith and Burnette) it most likely would have disbelieved Nickerson's testimony entirely. Thus, Contrary to the Appeals Court object Supreme Court holdings, there is indeed a very "Reasonable likelihood" that the false testimony affected the jury's verdict. See Aqurs, supra at 103. The Constitutional error complained of had a "substantial and injurious effect or influence" on the verdict. See Brecht v Abrahamson, 507 U.S. 619 (1993)

## The Michigan Court of Appeals denial of Relief Regarding Petitioner's Constitutional and Statutory Right to Presence Was Contrary To And An Unreasonable Application of U.S. Supreme Court Precedent.

As discussed and argued in issue II of Petitioners response Brief, the trial court held extensive hearings, questioned and excused prospective jurors, and discussed and held a fact – finding and evidentiary inquiry into whether Petitioner (and co-defendants) was seen in handcuffs and restraints. TT IV 16-24, 134-156. In addition to closing the above described proceedings to the public as discussed in Issue II, is the fact that Petitioner was not allowed to offend them as well. Id. Mr. Foster contends that this exclusion, without his express consent and waiver, violated his constitutional right to be present at these critical stages of trial.

Because there was no objection to holding these proceedings in Mr. Foster's absence, the Appeals court view should be for plain error affecting substantial rights. United States v Olano, 507 U.S. 725, (1993), United States v Marcus 560 U.S. 258 (2010), United States v Jones 108F3d 668 (6th Cir 1997) Alternatively as argued in Issue II, infra, defense counsel was ineffective in allowing these proceedings to occur without Petitioner. Strickland, 466 US at 688-98.

A defendant has a right under the Fifth and Sixth Amendments to the United States Constitution to be present at every critical stage of trial. Illinois v Allen, 397US337,338. (1980) Campbell v Wood, 18F3d 662 (9th Cir 1994). That right extends from "the empanelling of the jury to the reception of the verdict." See Diaz v United States, 223US442, 455 (1912), including, "voir dire, selection of and subsequent challenges to the jury, presentation of evidence, summation of counsel, instructions to the jury, rendition of the verdict, and any other stage of the trial where the defendants substantial rights might be adversely affected." United States v Riddle 249F3d529, 534 (6th Cir 2001)

Petitioner's constitutional right to presence was violated during key points at trial, when, during jury selection, the court held extensive hearings regarding jurors eligibility and fitness to serve on Mr. Foster's jury, in addition to lengthy hearings and discussion addressing the defendants in restraints and the possibility of Petitioner's jury panel (panel A) being tainted. TT IV pg. 16-74, 134-163, 222-25. These were highly critical stages of the proceedings at which Petitioners substantial rights were at stake. U.S. v Riddle 249F3d at 534. Holding these proceedings without Mr. Foster violated his Fifth and Sixth Amendment right to attend his own murder trial.

There was no objection to Petitioners absence from these critical proceedings. At one point, Mr. Foster's trial Attorney purported to waive his presence during a key aspect of the proceeding. TT IV pg 134-135. The trial court: "Let the record reflect that we are in chambers." "none of the defendants are here." "But counsel, this is a matter that needs to be addressed." "I believe your waive the presence of your clients to be here on this, and this is concerning a juror." Id at 134 But the failure to object and counsels attempt to waive is not dispositive. The right to presence is personal, a right that cannot be waived by counsel but only by the defendant himself. Taylor v Illinois, 484US400, 418 -24 (1988); Cross v United States, 325F2d629 (1963). A concession or stipulation by counsel cannot substitute for an informed waiver by the defendant of his right to

be present. See Evans v U.S. 284F2d 393 at 395. Mr. Foster could be deemed to have waived this fundamental Constitutional right only if the record unambiguously shows that: (1) he had specific knowledge of the Constitutional right, and (2) he made an intentional and voluntary decision to relinquish that right. See Johnson v Zerbst, 304U.S. 458, 464 (1938). The record is silent as to whether Petitioner knew of the right or intended to waive it. Such silence can never form the basis for a valid waiver. Zerbst, 304 US at 464-65.

The deprivation in this case has been characterized in 3 ways (1) a denial of the Petitioner's right to be present at every critical stage of a criminal trial including voir dire, (2) a denial of effective assistance of counsel at trial, and (3) a denial of the right to be tried by an impartial jury. As shown in Ground II of this Petition, counsel failed to object to the public's exclusion from key components of jury selection and other proceedings (including voir dire of prospective jurors) at the beginning of trial. Trial counsels failure to object to the closure of these proceedings not only "denied Petitioner a substantial fir trial right but counsel should have approached the issue with more caution, but more importantly, counsel allowed these critical proceedings to be held without Mr. Foster's attendance, by denying petitioner's presence, being absent from portions of voir dire, denied Foster the ability to assist in his own defense, including the selection of his jury, and most importantly, to help ensure he had a jury panel that was unprejudiced, unbiased, and impartial after discussion were had between potential jurors of a juror actually viewing Petitioner (and co-defendants) in visible restraints, handcuffs, or shackles. Please See Grounds II & III of supporting facts. Petitioner's absence resulted in selection of a jury that prejudiced his case…out the "3 deprivations" described in Rushen v Spain, 4646US114 (1983) Petitioner has established at least two and has sustained his burden of showing essential unfairness in the Michigan Appeals courts unreasonable applications of Supreme Court precedent.

Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored…to ensure that prospective jurors will be free of bias or prejudice and will perform their duties impartially. Unfortunately, in this case, those rights were not afforded Mr. Foster. Petitioner's absence, along with the closure of voir dire proceedings to the public as well as the remaining prospective jurors left Mr. Foster potentially with an "tainted" jury.

Petitioner concludes that he was prejudiced by his absence and his trial counsel was ineffective where his performance fell well below and objective standard by not only his failure to object to his clients absence during a critical stage at his trial, but more importantly, waived his clients presence where it would have benefited Petitioner to be present. Defense counsel's deficient performance prejudiced Petitioners defense by allowing his jury to possibly being "tainted" a belief established by defense counsel himself, but did nothing to resolve those beliefs or "concerns" including consulting with Petitioner. Mr. Ronning: "there is something about seeing somebody in handcuffs that screams guilty…." It causes me grave concern for Mr. Foster that somebody sees him in handcuffs." TT IV pg. 32, 33.

Notably, Petitioner was denied to assist his attorney in concluding the fact-finding inquiry in which defense counsel, alone, failed to procure the "male" potential juror from panel "A" that discussed with other potential jurors, that he had witnessed Petitioner and co-defendants (both

male), in handcuffs and shackled. See TT IV pg 141. More ever, the fact-finding inquiry consisted of questioning only two potential jurors from Petitioners "A" panel of their ability to recall who the male juror was. To this Petitioner, even in hindsight, that it is the "common sense" question that Petitioner would ask: "why not question the male jurors from panel A?" To ensure that no one (male), at the very least, sat upon Mr. Foster's jury, with bias, prejudice, or impartiality. Petitioner contends that had it not been for counsel deficient performance by (1) not calling into question, any or all male jurors from Panel "A" to ensure, in the absence of his client, that there would be protection to the fundamental right a fair trial afforded Petitioner. See Estes v United States 335F2d 609 (1964) ("if there is any reasonable possibility of prejudice from defendants absence at any stage of proceedings conviction cannot stand."). (2) Once trial counsel delved into the fact-finding inquiry of the voir dire proceedings he should have demonstrated his knowledge of the law (and common sense) and objected to his clients absence and not have waived Petitioner's statutory and constitutional rights, not only to being present during such a critical stage of the proceedings, but also to a public trial.

In United States v Reyes 764F3d1184 held that the district court violated "Rule 43" when it questioned a juror ("Juror H") outside of Reyes "earshot" at the bench. The Court also concluded that the district court conducted "voir dire" of "Juror H" at side bar when it asked about her ability to be fair and impartial in light of her personal experiences with bank robbery, because the conversation concerned whether she was "qualified and suitable to serve on a jury." Here, in Petitioners case, jurors were questioned, arguments were made and determinations were entered on the issue of shackling and more importantly, whether the jury pool was tainted after having either viewed or discussed defendants in restraints. However, Reyes held that "Meetings between counsel and the court at which the participants discuss whether jurors should be excused for cause, exercise peremptory challenges, or decide whether to proceed in the absence of prospective jurors are all examples of conference or hearing on a question of law from the defendant may be excluded at the district courts discretion.: US v Reyes 764F3d1184. The term "question of law" typically refers to an issue to be decided by the judge, concerning the application or interpretation of the law. Where a "fact-finding" inquiry of a prospective juror involves a fact intensive inquiry, of the "question" – Answer" variety, into his or her ability to be fair and impartial or qualified and suitable. Voir dire is established and the scope of the proceedings has initiated the defendants constitutional and Statutory right to be present at every stage of his trial should be upheld. Reyes US at 1180 (See also FRCP43(6)(3))

Contrary to the Michigan Court of Appeals objectively unreasonable decision that "there was no evidence in the record" to support a finding that there was any "Reasonable possibility" that Petitioner prejudice by his absence. The Appeals Court unreasonable determination that no harm was suffered by Petitioners personal Constitutional right to presence during voir dire is contrary to United States Supreme Court precedent and a unreasonable application of clearly established federal law.

Petitioner contends that because he was not allowed to assist his attorney, or advise him of the necessity of further inquiry into who the unidentified male juror was that discussed viewing Petitioner (and Co-defendants) in restraints, denied Petitioner a fair trial. See TT IV pg 16-74,

134-163. Trial counsels failure to object to Petitioners absence was outside the bounds of what would be considered reasonable trial strategy considering the circumstances. Counsel, under the belief that having his client viewed in shackles "screams guilty" and that he harbored "grave concern" that someone witnessed his client in restraints, counsel went so far as to express his concern that Petitioner's entire jury "being tainted" (See TT IV pg 72) stating that the issue at hand "came from the jury" concerning the unidentified male juror discussion with "other" potential jurors about viewing defendants in restraints. Counsels course of action, or the lack there of, not to exercise means to protect Mr. Foster's right to be present, to not use sound judgment to express his "concerns" and "fears" and more importantly, to not allow his client to assist in the fact-finding inquiry into who's the unidentified male juror was, cannot be considered sound trial strategy. Any counsel, acting within the wide range of professional, competent assistance, harboring such beliefs, fears, and concerns Petitioners trial Counsel expressed, would have objected to Petitioners exclusion from these proceedings.

Failure to invoke the right to be present to a partial closure of the voir dire of prospective jurors, in which the defendant is not informed is taking place between the judge, defense counsel, the prosecution, and a juror, violates Petitioner's right to be present. See U.S. v Simmons 2015 FED. App. 0188P (6th Cir)

There is an reasonable possibility that the jury selection process was hindered by the absence of Petitioner (and the public), more importantly, Petitioner may have suffered a "tainted" jury all together because of his absence and his counsels failure to object, therefore, Petitioner was prejudiced by counsels failure, and there are reasonable probability that the outcome of Petitioner's trail would have been different but for counsel ineffectiveness. See Strickland 466US at 694.

## Petitioner's Due Process Right To A Fair Trial Was Violated Where There Was Evidence That He Was Viewed By The Jury In Handcuffs And Restraints And Appeared Before The Jury Obviously Wearing Leg Restraints The Michigan Court Of Appeals Was Objectively Unreasonable And Its Decision To Decide Otherwise.

The decision to shackle a defendant rest in the first instance in the discretion of the trial judge and is obviously clear, or review, that the trial judge has abused its discretion and retaining petitioner in the absence of any evidence of necessity. See Appdx A pg 8. See also Deck v Missouri, 544 US 622; 125 S. Ct. 2007; 161. L. Ed 2d 953 (2005). The court nonetheless refused to reverse, asserting that petitioners has not shown that any members of jury saw the shackles or that he suffered prejudice as a result of wearing shackles. Id at 8,9.

During pretrial services on the logistics of dressing and transporting defendants to and from the courtroom. A Sheriff Deputy explains the defendant would be restrained with a leg immobilizer that goes underneath the clothing. TT 8-13-10 pg 115. Later, the defense objected during jury selection to the fact that petitioners was viewed wearing handcuffs or restraints while being transported to and from the courtroom. TT IV pg 24-32, 72, 155. More importantly, the issue of the defendants being equipped with knee- locking devices, which were apparent to jurors when petitioner entered and exited the courtroom, was the only alternative presented to see Mr. Foster and handcuffs. Id at 29-31, 55-57, 155. As the court trial explained, the device was a brace born on petitioners legs that prevented him from extending his legs all the way and required petitioner to "shuffle along" when he walked. Id at 31-32. Petitioner along with co-defendants, were brought together into the courtroom obviously wearing leg restraints, underneath their pant legs. After potential jurors were already seated, such that it was clear and obvious that jurors would see the manner in which the devices hindered the way they walked. Id at 31-32, 43-44.

Factors to be considered by trial courts in making Shackling the decisions (1) the defendant's record, his temperament and the desperation of his situation. (2) the state of the courtroom and the court house (3) the defendant's physical condition. (4) whether there is a less prejudicial but adequate means of providing security. See Kennedy v Cardwell 487 f2d at 110-11 (6th Cir 1973). The trial court was aware of difficulty and hindrance caused by the restraint... trial court; and the device we are talking about is one that, as it has been explained to me, it is on their legs and they can't take a full stride, because if they take a full stride it locks up. So they have to kind of shuffle along. See TT IV at pg 31.

Concededly, the prohibition against shackling does not extend to safety precautions taken by officers while transporting a defendant to and from the courtroom. The trial court judge explains that, in this particular instance, trying to prevent an observation ( of defendants handcuffed or shackled) is virtually impossible. TT IV pg 30.

( Note: Petitioner was required to walk and testify before his jury wearing the restraints described by the judge in this case. TT IV pg 32,33. See also TT XV pg 16).

The record contains no formal or informal findings specific to petitioner. The trial court did not engage in a case-by-case determination of the necessity for the restraints. See Deck, 125 S. Ct. At 2012-15. In this instance, the trial court allowed a sheriff's deputy to determine cause for the restraint, simply as a means of convenience. Although a trial court may find a correctional officers opinion highly relevant to answering the ultimate inquiry as to whether shackling is necessary in a particular case. And individual's determination under due process requires more than "rubber stamping" that request. More importantly, a correctional officer's preference does not excuse the trial court from conducting the appropriate inquiry. Nor does the convenience of shackling a defendant justify its use. Esteemed v Williams 425 U.S. 501.505 (1976)

Despite the trial court's abuse of discretion and the appeals court acknowledgement nonetheless refused to reverse, citing that petitioner has not shown that any member of the juror saw the shackles or that he has suffered prejudice as a result of wearing the shackles. Appdx A. pg 8-9. After trial commenced, the defense objected during jury selection to the fact that petitioner was seen wearing shackles while being transported to and from the courtroom. TT IV pg. 24-32. 72, 155. In addition to the defense objections, the court questioned potential jurors Avon Morgan-King and Kristen Schoenborn about their involvement in conversations about the defendant's being handcuffs and shackles voir dire. TT IV pg 139-152. Notably the appeals court cites only part of this conversation overheard by juror King, where a female juror asking a man "where do jurors come from"? But the appeals court omits the male juror's response to the question, which refutes courts unreasonable determination of the facts in its decision where it states "there is no record evidence upon which to conclude that any juror was aware that (the) defendant, was in fact, in shackles during, before, or after trial". Appdx 9. It is clear, the male juror's response is contrary to the appeals court finding: Juror King, in relevant part. The word I heard was the lady said are these - "where do the defendants come from..." but the man that responded... But he said he saw one come in shackles. See TT 1V pg 141. Juror King also notified the court that many other jurors were likely to have heard this conversation as well. Id at 142-45.

Juror Schoenborn, the juror who Ms. King believes was involved in the discussion about shackling, testified, that she had heard potential jurors talk about the defendant's custody status on multiple occasions. TT IV pg. 148-49. She claimed that she did not see defendants in restraints and denied being involved in the discussion with male about viewing defendants in restraints. Id at 149-50,51.

Contrary to the Michigan appeals court decisions, the record in the form of trial counsel offer of proof during pretrial discussions reveals that the restraints were obviously detectable by the apparent effect that has on the petitioners can't and hindered manner of walk. TT IV pg. 29-31, 54-56.

The trial court may allow shackles and other restraints where necessary to prevent the defendant's escape, to prevent a descended from injuring others in the courtroom, or to maintain an orderly trial. See Deck, supra; Holbrook; Estelle, supra. Illinois v Allen 397 US 337 (1970). But such concerns cannot be generalized- they must exit in the particular case. Apply specifically

to the defendant on trial in the case. And the concern must be articulated on the record. Deck, 544 US at 628-629.

Mr. Foster contends that he was denied his state and federal constitutional right to process where there was evidence he would see in Shepherd and in an obvious state of restraint by the knee-locking device he was required to wear in the courtroom before the jury. The Fifth and Fourteenth amendments guarantee the right to a fair trial. US Const. Ams V, XIV; Michigan Const 1963, art 1, S17; Holbrook v Flynn. 475 US 560 (1986). Central to this right is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial. And not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. Holbrook, 475 US at 567, quoting Taylor v Kentucky, 436 US 478.485 (1978).

Both Michigan and federal law clearly states that a criminal defendant has a right to appear before the jury without any indica of incarceration, including physical restraints jail clothing. See Deck v Missouri, 544 US 622 (2005); Estelle v Williams, 425 US 501 (1976). Allowing Mr. Foster to be seen in restraints or other indica of incarceration undermines the presumption of innocence, the right to counsel by interfering with his ability to communicate with his attorney. As well as the related fairness of the fact that finding process.

The inherent prejudice apply to petitioner where he was cast in the eyes of the jury as a dangerous untrustworthy pernicious individual from the very start of the trial impinge upon his credibility by indicating to the jury unwarranted prejudice, guilt, fear, and that petitioner was some type of dangerous. See Estelle, 425 US at 512-13. Having been viewed by at least one (male) potential juror in shackles. A juror that very well may have sat on petitioner's jury potentially biased and impartial and having his custody status discussed along with conversation among "many" other potential jurors of petitioner being viewed in shackles or restraints was devastating to the constitutional provisions of the presumption of innocence. Having petitioner walk before the jury in such a prejudicial to destroy saints only further deteriorated his chances of being tried, innocent until proven guilty beyond a reasonable doubt by competent evidence. The trial court so you to remove petitioner's restraints before he entered the courtroom (during voir dire) and prior to testifying denied petitioner his constitutional right to a fair trial. See Gomez v U.S. 490 US 858 (1989). See also TT XV pg 16.

These indicia incarceration left the impression that Mr. Foster was guilty and or dangerous. And despite the appeals courts presumption that this case was not "close" petitioner has shown contrary to the Court's view in which it decided its decision based on only half of the facts established in petitioner's trial transcripts. (Please see "Ground One of Supporting Facts of this Petition). Because shackling before the jury is inherently prejudicial, the burden in shackling cases shift to the government to prove beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained. Deck 544 US at 635 (quoting Chapman v California, 386 US 18.24.87 S Ct. 824 (1967). However, the government may reboot the presumption of presidents by proving that the error was harmless, by showing overwhelming evidence of defendant's guilt. Larkin v Stine 431 F3d 959 (6th Cir 2005). Here the court alludes to significant other evidence that it asserts comes from several witnesses where had the court

viewed the entire trial record and not fail to take into account the actual testimony of these witnesses, it is obvious that their testimony was anything but "overwhelming" as they gave inconsistent and conflicting testimony of what was supposedly to have taken place in the bar's parking lot that night. See TT V II pg. 79-85, 143.147.149.-50.157-58.167.201. TT V III pg. 103.109-12, pg 125-137. TT IV pg 24-27.30.32.214-217; TT XV pg 26-30. 34-36. The testimony of several other witnesses the appeals court failed to take into consideration and its decision to affirm petitioner's conviction, including, but not limited to; Letisha Holland, Tracys Hughes, Michelle Ruiz, Shameka Echols, Verlanda Shaver and Sharon Martinez. I testify to either not viewing Foster involved with the assault (or kidnapping) of Boothby, or leaving the parking lot prior to Boothby's death. See TT VII pg 232-241; TT VIII pg 198, 210-12, 264-69. TT IV pg 124-40; 143-44, 151, 176; TT XV pg 124-30, 31. 135-137. See also TT XV pg. 161-63.

The court also in ironically erroneously relied upon testimony from witnesses that gave false account that it was their opinion that Boothby was "dead" or appeared "unconscious" were obviously wrong and not a part of the medical field two make such a determination. The court again fail to consider the consistent testimony of Danyele Jones or Marie Black-Harris who bought at 5 that Boothby was "alive" "walking" and "uninjured" prior to stumbling and being struck by a unknown vehicle later discovered to be driven by the prosecution's "star" witness Adrienne Burnett. Please see TT VIII pg 58-59, 75, 68-69. 79-80; TT XIV pg 48-51, 52, 72-73, 54, 58-59.

Petitioner contends that a view of the entire record shows a showing of prejudice and that if not for being viewed in such a inherently prejudicial state on multiple occasions the results of the proceedings would have been different. In a case that depended mostly on inconsistent and conflicting eye witness's testimony. Essentially turning his case into a credibility contest that at one point during deliberations left the jury unable to return a unanimous verdict confirming that petitioner's jury struggled with the evidence and testimony at hand. See TT XVIII pg 16. The Michigan Court of Appeals did not prove the absence of prejudice beyond a reasonable doubt and this error had a substantial injurious effect and influence in determining the jury's verdict. And all the fair-minded jurist would agree that the Michigan Court of Appeals decision conflicts with United States Supreme Court precedent. A new trial is in order. And a grant of the Writ. Respectfully.

(4) (Note: Burnett testified during cross examination that she was "Ed" Foster's name by authorities and used it as a "way out" of the situation. See TT XV pg 240).

Petitioner's Constitutional Right to A Public Trial Was Violated By Holding Key Portions of Pretrial Proceedings Avel Voir Dire In Chambers with no Access By The Public.

The Sixth Amendment directs that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial…" US Const; Am VI (emphasis added). This right applies to state prosecutions under the Fourteenth Amendment. In Re Oliver, 333US257,273 (1948) The United States Supreme Court has emphasized the vital concerns underlying the right to a public trial. "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his tries keenly alive to a sense of their responsibility and to the importance of their functions…" Waller v George 467 U.S.39, 46 (1984) (quoting InRe Oliver, 333US at 270, n25.)

In Presley v Georgia 588US. 209,130 S.Ct. 721, 725 (2010). The U.S. Supreme Court made it explicitly clear that the right to an open courtroom applies to the jury selection phase of the trial and, in particular, the voir dire of prospective jurors. The beneficiary of the right to a public trial is both the accused and the public-at-large. The right is grounded in both the Sixth Amendment, Gannet Co v De Pasquale, 443 U.U. 368,380 (1979) as well as the first Amendment, See Press – Enterprise Co v Superior Court, 478 U.S.1 (1980); Globe Newspaper Co v Superior court, 454 US 1051 (1981)

Presley emphatically re-affirms that the process of juror selection is itself a matter of importance, "not simply to the adversaries, but to the criminal justice system." Presley 130S.Ct. at 24-25 (quoting Press – Enterprise Co, 478 US at 5050.) Presley stresses that "trial courts are obligated to take every measure to accommodate public attendance at criminal trials, "including during the jury selection phase of trial. Id At724. What is obvious from the measures there in mentioned by the Court is that first and foremost among those "obligations" is a mandate that the judge take any necessary precautions to ensure the courtroom is open. Only in rare circumstances where a party seeks to close the proceedings and advances "an overriding interest that it's likely to be prejudiced" can the right to a public trial be overcome. Presley, 130 S.Ct.at724. " Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." Id at 725. Given the purposed of the public trial right articulated in Waller, it follows that the "integrity and public

reputation of the judicial proceedings" is damaged when jury selection is closed to the public.

Here, in such circumstances, the "partial closure" of a courtroom need only be supported by a substantial interest rather than a compelling one. Douglas v Wainwright, 739F2d531 (11th Cir 1984; Judd v Haley, 250I3d1388 (11th Cir 2001) Nevertheless, the trial court in this case did not make sufficient findings to show the reviewing court to determine whether the closure was proper (1) The judge did not insert into the record and findings to support the closure. It concluded: "Let the record reflect that we are in chambers…this is a matter that needs to be addressed…and this is concerning a juror" TT IV p134 (2). Nor did he include his reasoning in weighing the interest of a fair trial with the right of the public to attend the trial, nor was there an opinion written at a later date. (3) The trial covet did not inquire or attempt to find an alternate solution which would have met the need to ensure fairness; there was not recognition on the record of any right for the public or defendant to attend that part of the trial held in chambers. The trial court judge allowed the onus of the closure to fall upon the prospective juror, the prosecutor, defense counsel, and the bailiff. TT IV p135, 139-40. There was no justification indicated or record that would provide the "overriding concern" necessary to all proceedings to be held in private rather than in public. The courts bailiff was allowed to assess the situation himself, including the juror's state of mind. TT IV pg 135, 36.

The four part test established by the U.S. Supreme Court in Waller applies to courtroom closures whether the closure was partial or full. Drummond v Hook 728 I3d520 (2013). The trial court violated Petitioner's right to a public trial and the Michigan Court of Appeals unreasonably applied clearly established U.S. Supreme Court when it hold otherwise, the trial Court demonstrated neither an overriding interest nor an substantial reason to close the courtroom, the closure was broader than necessary, no alternatives were considered and the (Michigan Court of Appeals) trial courts findings were not adequate to support the closure. The trial court: *"Let the record reflect that we are in chambers." None of the defendants are here." "But counsel, this is a matter that needs to be addressed." "I believe you waive the presence of your clients to be here on this, and this is concerning a juror."* TT IV pg.134.

A potential juror requesting a conference in chambers does not give way to a defendant's constitutional right to public trial. Juror Oviedo advised the court that she recognized "a couple of defendants" and was

subsequently questioned by the court in chambers, this is the only time recorded that Juror Oviedo was brought into the judge's chambers. See TT IV pgs.16 -26. The Appeals court cited that because the proceedings was considered only an "partial" closure and "the fact that she was shaking, crying, and seriously distraught over having to consider the case may have adversely affected the other jurors" that these circumstances were considered "A substantial reason for closing the proceeding." See Appdx A pg 5. However, the Appeals court decision was based on a unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Juror Oviedo, the alleged "upset" juror, never entered into the judge's chambers a second time. After the bailiff stated that the juror wants to "go home" and couldn't deal with it. The court asked at least two more times "Anyone want her brought in?" After he asked "you want to bring her in here? See TT IV pg. 136. All attorney's including the state prosecutor replied "NO" Id at 136-37. There was no inquiry into the juror's reasons for wanting to go home, or if she could continue on, someone from the public or law enforcement of the jury could have been the cause. There was no indication that the case would be compromised in anyway by allowing public access (or Petitioner) to those proceedings. Richmond Newspapers Inc. v Virginia 488 US 555 (1980).

During the second set of proceedings the trial court held a hearing on the issue of prospective jurors viewing defendants in shackles or restraints, in which two jurors; Avon Morgan-King and Kristen Schoenborn testified about several conversations they had overheard or were involved in concerning jurors witnessing defendants in restraints. See TT IV pg 141-155. The Michigan Court of Appeals erroneously and unreasonably held in its decision that had the discussion with both jurors taken place in open court about viewing defendants in handcuffs and shackles would have "Implied that defendant was in custody" and was an substantial reason for the closure. See Appdx A. pg 5

Notably, the court does not take into account the entire trial record, where it's was clear on the record, that at least one juror witnessed a "male" defendant in restraints See TT IV pg 141.

The Court: "Okay tell us the words you heard please?

Juror King: (In relevant part), "The words I heard was the lady said are these " ---" where do the defendants come from, are they from jail?" "And I saw her, but the man that responded…" "I don't see him, but he said he saw one coming in shackles…" "And he thought he was in jail now for something else." Id at 141 (emphasis added)

Juror King gave a detailed description of who the woman was involved in discussion with the male juror. Id at 142. And once confronted with who the male juror was in the discussion, Juror Schoenborn completely avoids assuring the trial courts question as to the extent of the conversation. Id at 143. Juror King was very adamant and specific as to what she had heard and the female juror involved. Juror Oviedo response was "I heard [other] people talk about it and I haven't seen anybody and I don't know." Id at 148. The trial court, in holding these proceedings outside the presence of the public (as well as Petitioner) subverts the values and protections afforded a defendant by the constitution al right to public trial. Morever, "Essentially, the public trial guaranteed embodies a view of human nature, true as a general rule, that judges , lawyers I witness, and jurors will perform their respective functions more responsibly in an open court rather than in secret proceedings. A fair trial is the objective, and a public trial is an institutional safeguard for attaining it. "Estes v Texas 381US532 (1951) (quoting In Re Oliver 333 US at 266) See also St. of Washington v Wise 288p 3d 1113 (2012).

Petitioner contends that had the trial court held the voir dire proceedings of those potential jurors in open court, the "male" juror who had actually viewed defendant or defendants in handcuffs and shackles would have been discovered, either by coming forward on his own or pointed out by another juror. At the very least, the court could have called forward all "male" jurors from panel A. The guarantee of open public proceedings in criminal trials applies to jury selection and voir dire examination of prospective jurors. See Press Enterprise Co. v Superior Court of California, 404 US 501 (1984) "Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system. "See Gannett Co. v De Pasquale 443 US 368 (1979).

Having the voir dire proceedings in chambers failed to ensure Petitioner a fair trail, encourage witnesses to come forward, or discourage witnesses from committing perjury, and remind the government and judge of their responsibility to the accused and the importance of their functions. See Waller v Georgia 467 US at 46

(1) failure to ensure a fair trial: The fact that no one including the trial court decided to voir dire panel "A" at the very least, All male jurors associated with that particular. In all likelihood, there may have been at least one juror who sat on Petitioner jury, with possible bias from either viewing him in restraints or an inability to render a decision

impartially. From the trail court records, it is a fact that someone from the A panel discussed and or witnessed Petitioner (or co-defendants) in handcuffs and shackles, denying Petition his constitutional right to the presumption of innocence. See TT IV p27. 141

(2) Failure to encourage witnesses to come forward: Having the jurors answer questions and make statements that were contrary to one another in a "private" setting failed to produce the "male" juror or have him come forward with what did or did not see and who he actually spoke with and more importantly could he remain "unbiased and impartial in rendering a verdict where Petitioner's life and liberty were at stake. Someone else from the A panel may have overheard or witnessed Petitioner in such a prejudicial state, one Petitioner's defense counsel so harmful de didn't think there was a instruction the court could give to cure such an impropriety see TT IV pg. 32.

(3) Discourage witnesses from committing perjury: It appears from the trial transcripts that Juror King gave a very detailed description of who and where Juror Schoeborn was and what Juror Schoenborn had said, Juror Schoenborn was "stand offish" and evasive in her answers to the court. The entire voir dire process is to find the "truth" while one juror gave one answer the other pretty much denied ANY knowledge of the issue at hand . Who's to say one was being truthful and the other not so much? Having the voir dire at both jurors in open court would most likely have produced the "truth" of the matter and certainly gave way to who the "male" juror was.

(4) Reminding the government and judge of their functions to the accused: The trial court as well as trial counsel were reluctant to or simply failed to center their inquiry around the "source" of the problem: that an unidentified led male juror serving on panel A possibly viewed Petitioner in handcuffs and shackles and more than likely spoke and discussed what he had seen with other potential bias or prejudice; failing to protect Petitioner from accumulating a tainted jury.

The U.S. Supreme Court in Presley reaffirmed that the substantive and procedural components of Waller must be applied "before excluding the public from any stage" of a criminal trial and reiterated Press – Enterprise I's admonition that trial courts are "obligated to take every reasonable measure to accommodate public attendance at criminal trials" and that absent "consideration of alternatives public attendance at criminal trials" and that absent "consideration of alternatives to closure, the trial court could not Constitutionally close the voir dire," even when alternatives are not offered by the parties. Presley, 558 US at 213; (quoting Press-Enterprise I, 464 US at 505)

Concededly, the Presley Court observed there are "no doubt circumstances where a judge could conclude that threats of improper communications with jurors (here there weren't any) or safety concerns are concrete enough to warrant closing voir dire, "but even in such cases, "the

particular interest, and threat to that interest, must be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Presley 558 US at 215 (quoting Press-Enterprise I. 464 US 1t 505)

Conceal, the Presley Court observed there are "no doubt circumstances where a judge could conclude that threats of improper communication with jurors (here there weren't any) or safety concerns are concrete enough to warrant closing voir dire," but even in such cases, " the particular interest, and threat to that interest, must be articulated along with findings specific enough that a reviewing court can determined whether the closure order was properly entered." Presley 558 US at 215 (quoting Press- Enterprise I. 464 US at 510)

The Michigan Court of Appeals argues that the proceedings were only "partially" closed rather than totally. Nevertheless, courts have generally modified only the first prong of the Waller test and required the trial court to show a lesser standard of "substantial" reason for particular closures. As opposed to the more stringent standard of "overriding" interest. Drummond v Houk 728D3d520 (6th cir) (2013). United States v Peters 663 I3d 375 (8th Cir 2011). A particular closures is justified where the trial judge had a substantial reason for the closure and where the closure was narrowly tailored to exclude spectators only to the extent necessary to satisfy the purpose for which it is ordered." U.S. v Sherlock 962 F2d 1349 (9th Cir 1989). Here, the trial court failed to articulate A "substantial interest" that might, consistent with the modified Waller (test) Sixth Amendment standards permit such a broad, categorical exclusion of the general public, as well other potential jurors and Petitioner, practically as a matter of convince. The partial closure of these proceedings occupied at least 3 hours of a 7 hour court proceeding. Even if this court agreed that the partial closure was supported by a substantial interest, the remaining components of the Waller standards are not modified in partial closure cases, and have not been satisfied in this case as well. See Drummond v Houk 728 F 3d 520 (6th Cir 2013), Walton v Bailey, 361 F3d 431 (7th Cir 2004), Constant v PA Doc, 912 F. Supp 2nd 279.

Both partial and total closures burden the defendant's constitutional rights and before either is undertaken, A court must hold a hearing and articulate specific findings. However, the Court must hold a hearing and articulate specific findings. However, the Court pointed out that, the possibility that other rights or interests may sometimes override a defendant's interest in a public trial. The Court also pointed out that "such circumstance will be rare… and the balance of interest must be struck with special care." Waller 467 US at 45 The four part test in Waller has been and remains intact for complete closure of a court room, only the first prong of Waller has been reduced to a substantial interest as opposed to an overriding or compelling interest; However, the trial court still must consider reasonable alternatives to closing the proceedings and must make findings adequate to support the closure. As articulated in the Sixth Circuit Drummond v Hauk, Waller still applies whether the closure was partially or totally done so. See Also United States v Simmons 797 F3d 409 (6th Cir 2015). "The United States court of Appeals for the Sixth Circuit agrees with its sister circuits and adopts the modified Waller test to assess whether a criminal defendant's 6th amendment right to a public trial is violated when a district court bars some, but not all, spectators from the courtroom during the proceedings.

All federal courts of appeals have distinguished between partial closures and total closures of courtrooms modify the Waller test so that the "overriding interest requirement is replaced by requiring a showing of a "substantial reason" for a partial closure, but the other three factors remain the same. See, e.q. Bucci v United States 662 F3d 18,23 (1st Cir 2011); See also United States v Osborne, 68 F3d 94, 98 -99 & n.12 (5th Cir 1995) (adopting the "substantial reason" test for partial closures and noting that the 2nd, 8th, 9th, 10th, and 11th have done the same). Thus under the modified Waller test applied by those courts: (1) a party seeking a partial closure of the courtroom during proceedings must show a "substantial reason" for doing so that is likely to be prejudiced if no closure occurs; (2) the closure must be no broader than necessary or must be "narrowly tailored"; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) the trial court must make findings adequate to support the closure. US v Simmons 2015 US app. LEXIS 14285.

The Sixth Circuit noted that "other circuits" have posed that the first question viewed by the modified Waller test is whether there is a substantial reason for partially closing the courtroom – one that is likely to be prejudiced if no closure occurs. The Court in Simmons noted that other" courts have held the need to protect A witness from intimidation justifies closure of the courtroom." The court cites Eisner, 553 F2d at 1993-94 concluding that a witness' fear of testifying is a proper basis for excluding all spectators except the press. Notably in U.S. v Eisner the judge in that case actually went on record and stated his reasons for the closure as he recorded that "There is reason to believe that this next witness has a fear of the courtroom and the persons that might be init… "he went on to state that he was unable to say if the "fear is unreal or imaginative" or how he came to that conclusion Id at 993. Here, there is no scope within the judge's orders to partially close the courtroom other than convenience. There is no proper reason given on record who the judge had reason to believe should have been excluded or why. Juror Oviedo never claimed to have been in fear of any of the defendants and didn't claim to have even known this Petitioner. There was never any inquiry as why the juror was upset or in fact if she acted in part because of "having to consider the case" where the Michigan Appeals Court erroneously cited that her being upset was an "substantial reason" for closing the proceeding when in fact Juror Oviedo never came back into the judge's chambers. Here, the record is insufficient to support the trial judges grounds to exclude the Petitioner and the public; because he didn't indicate any substantial reasons for the partial closure and never concluded that the interest being protected was "likely to be prejudice" in either of three proceedings. See Waller, 467 at 48. The trial court therefore did not reach the conclusion necessary to satisfy the 1st prong of the modified Waller test.

The trial court clearly failed the fourth prong of the Modified Waller, which requires a district court to make findings that are "adequate to support the closure" and "Specific enough that a reviewing court can determine whether the closure order was properly entered. Waller, 467 U.S.at 45, 48 (quoting Press- Enterprise 404 U.S.at 510). The district court in Petitioner's case made no findings whatsoever. Here, the trial court made no attempt to ask Juror Oviedo any questions from his chambers, ex parte. Though he did ask if any of the Attorneys wished to speak with her, they all answered "No" Asking question either on his own or by one of the Attorneys might have led to information that could of justified a partial closure but instead the

district court didn't even invite the juror into chambers to ask any questions at all, and furthermore the Appeals court was incorrect by suggesting that the trial court had Juror Oviedo in its Chambers a second time when in fact it did not.

Aside from giving only a substantial reason (as opposed to a compelling one) where proceedings are partially, rather than totally closed. The other three prongs of Waller Presley are no less valuable or burdened and remain to be upheld even as certain spectators are able to subject the proceedings to some degree of public scrutiny. A partial closure of the courtroom, even for a temporary period, eliminates for a time the valuable role their presence of spectators can have on the performance of witnesses, especially where a fact-finding, truth seeking inquiry is made of prospective jurors in their ability to serve on defendants jury bias free and remain impartial to viewing Petitioner handcuffed and shackled. Where other potential jurors had discussions concerning viewing Foster in such a prejudicial state, as the in-chambers proceedings outside the public and other prospective jurors, failed the remaining 3 prongs of the Waller/Presley test. Moreover, holding voir dire of three prospective jurors outside the presence of the public (and Petitioner) failed to ensure Petitioner's right not only to a public trial but a fair trial as well.

"A requirement that prejudice be shown would in most cases, deprive the defendant of the public trial guaranteed, for it would be difficult to envisage A case in which would have evidence available of specific injury." Waller 467 U.S. at 50.

The Michigan Court of Appeals unreasonably held that the failure to object to excluding the public from some or all of jury selection constitutes a wave of this right waiver is the intentional relinquishment or abandonment of a known right. Whereas forfeiture is the failure to make the timely assertion of a right U.S. v Olano 507 U.S. 725 (1993). Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; whether defendant's choice must be particularly informed or voluntary, all depend on the right at stake. Mere forfeiture, as opposed to waiver does not extinguish an "error" under FRCP52 (b). (if a legal rule was violated during the district court proceedings and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52 (b) despite the absence of a timely objection.) United States v Olano 507 U.S. 725, 733 – 34; 113 S. Ct. 1770; 123 Led2d 508 (1993).

Petitioner, on direct Appeal, argued and the Michigan Supreme Court has since agreed, that failure to object did not constitute a waiver of the right to a public trial that precluded review on appeal, but instead constituted a forfeiture of a constitutional right subject to plain error analysis. See Vaughn, 491 Mich 642 however, the State in its "Federal law if no objection was made" continues to cite objectively unreasonable federal case law, relies on Levine v United States, 362U610 619 (1960), in which the U.S. Supreme Court addressed closure of the courtroom during criminal contempt proceedings following the defendants refusal to answer a grand jury's questions, not at the defendants trial. The Levine Court held "procedural safeguards for criminal contempt's do not derive from the Sixth Amendment. Criminal contempt proceedings are not within 'All criminal prosecutions' to which that Amendment applies." Id at 616 Because Levin

did not address a Sixth Amendment Public trial issue, it is not applicable to Petitioner's case or any criminal trial case.

The Michigan Court of Appeals denial of relief regarding this issue is contrary to and an unreasonable application of U.S. Supreme Court precedent, where the failure to grant relief where there was no objection is actually inconsistent with U.S. Supreme Court precedent Levine did not address a Sixth Amendment public trial issue, furthermore, Petitioner cited Salem v Jenkins not Salem v Yukins (414 F Supp 2d 687, 696 CE.D Mich 2006). Though this case isn't clearly established federal law, United States v Presley is, and that court held; it is not incumbent upon the defendant to contest a closed courtroom; rather, the on vision the trail court to ensure the public is granted access to a trial, thus persecuting not only the defendant's right, but also the rights of the public-at-large. Presley, 130 U.S. at 721.A accurate application of Presley and Waller compels a conclusion that the failure to object does not foreclose review of a trial court's decision to bar the public from voir dire in direct violation of the First and Sixth Amendments.

It is readily apparent that Petitioners constitutional right to a public trial was violated. It is equally clear that this violation of this right is "structural" error. Waller 467 U.S. at 50n.9, since it "affects the framework within which the trial proceeds." United States v Marcus, 130 S.Ct. 2159 (2010) (quoting omitted) Automatic reversal is required for this structural error. Washington v Recvenco. 548 U.S. 212, 218-19 (2006) See also Arizona v Fulminante 499US279(1991)

Even under plain error review reversal is Mandated. "In criminal cases, where the life or liberty, of the defendant is at stake, the courts of the United States, in the exercise of a sound discretion, may notice [forfeited error]" Sykes v US204 F2d909 (8th Cir 1973). Constitutional error may not be found harmless if error deprives the defendant of the "basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." (quoting Rose v Clark 478US570 (1986). (Even under plain error review CARINES, 460US at 763). Since a violation of the public trial right is among the limited class of cases that are structural error, prejudice is presumed, See Johnson v Sherry. 586 F 3d 439, 444 (6th Cir 2009) Deck v U.S. 108 F 3d 450 (2nd Cir 1997). A violation of substantial rights has occurred, and a new trial is required. Neder v United States, 527 US 1.8-9 (1999)

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL

U.S. POSTAGE $5.75
49009
Date of sale 04/09/15
06 2500
08341096
SSK

FOLD HERE

FOREVER/USA

# PRIORITY® ★ MAIL ★

- DATE OF DELIVERY SPECIFIED*
- USPS TRACKING™ INCLUDED*
- $ INSURANCE INCLUDED*
- PICKUP AVAILABLE

* Domestic only

WHEN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.

**PRIORITY® ★ MAIL ★**

UNITED STATES POSTAL SERVICE®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Ed D. Foster #226862 Lock 8-30
Saginaw Co. Facility
9625 Pierce Rd
Freeland, MI. 48623

TO: United States District Court
For the Eastern District of
Michigan Southern Division
231 W. Lafayette Blvd.
Room 564
Detroit, MI. 48226

Case No. 2:15-CV-12265
Hon. Laurie J. Michelson
Mag. Michael J. HLUCHANIUK

Label 228, July 2013 FOR DOMESTIC AND INTERNATIONAL USE

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES POSTAL SERVICE®

This envelope is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® sh[…] violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rig[…]

IORITY®
MAIL ★

TRACKED*
★ ★ ★
INSURED*
★

FLAT RATE ENVELOPE
ONE RATE ★ ANY WEIGHT*

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

UNITED STATES
POSTAL SERVICE®

* Domestic only. * For International shipments, the maximum weight is 4 lbs.