UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

U

ED D. FOSTER,

Petitioner,

vs.

O.T. Winn, Warden,

Respondent.

Case No. 2:15-CV-12265-LJM

Hon. Laurie J. Michaelson
U.S. District Judge

Hon. Michael J. Hluchaniuk
U.S. Magistrate Judge

FILED
MAR 27 2017
CLERK'S OFFICE
U.S. DISTRICT COURT

/

MOTION TO AMEND/SUPPLEMENT GROUND ONE OF PETITION

Under the Federal Rules of Civil Procedure Rule 15(2)(d), this Petitioner hereby moves without any intentional cause of "undue prejudice," "delay," or "inconvenience" to the non-moving party, nor is it Petitioner's intent to file in "bad faith" or "improper motive" the following amended/supplemented portion of the Petition entitled, "Ground One" of supporting facts, i.e. failure to correct the known use of false and/or perjured testimony. The Supplementation of the Affidavit presented is only to show a "common theme" displayed and articulated throughout the course of Petitioner's Trial.

See Attachment.

Petitioner prays upon this most Honorable Court to allow this amended/supplemented portion of his Petition to stand under the above rule.

Respectfully Submitted,

Ed D. Foster #226862
Saginaw Correctional Facility
9625 Pierce Road
Freeland, Michigan 48623

Date: March 24, 2017

cc: file

STATE OF MICHIGAN )
)ss
COUNTY OF BRANCH)

AFFIDAVIT OF TOMMIE JEFFRIES

I, Tommie Jeffries, MDOC ID No. 279527, being of sound mind, and after first being duly sworn, deposes and says as follows:

1. I am willing to testify to the facts as set forth in this sworn affidavit as I believe them to be true, accurate, and based on personal knowledge of the information in the body of the affidavit. That I have not been forced, coerced, or promised any tangible financial payment to make the statements, and I will testify as follows:

While at the Lakeland Correctional Facility, I approached Scottie Shavers whom I testified falsely against him during his jury trial and helped him get convicted of a crime he did not commit. I was forced to say some things on the witness stand I knew were not truthful.

I was forced by the leading detective Diane. I was never in the club on the night of the incident when Scottie supposedly killed someone. Detective Diane briefed me on what happened in Scottie's case, and what supposed to have happened in the club that night. That there was suppose to have been a fight between the Shavers and some woman. She [Detective Diane] told me about the fight between them. The truth is I've never seen a fight between them, or anyone else that night.

I never seen any of the defendants at al that night. I was outside the club the whole time. I was never in the car with Tisha Holland. Diane told me that she had evidence of me in that car and the car I was in hit the victim, and if I didn't tell her what she wanted, she was going to charge me with the murder, so I agreed to testify at Scottie's trial falsely because I didn't want to be charged in a murder. She [Detective Diane] made it clear that I was a suspect.

2. That I would like to apologize to the Courts for my false testimony, but I was forced to lie. I told Diane that I don't know any thing about this during the interview I had with her.

3. That I want to clear things up about what I did at trial because it was wrong. I was in fear of my freedom being taken away for the rest of my life for something I didn't do and Diane knew I didn't see any of this because in the beginning of the interview, I told her I didn't witness nothing that night and I advised her I was not with Tisha Holland. Diane told me that the fight happened inside the club because the victim called Ivory a 'nigga.' I never seen or heard none of that.

4. The entire circumstances surrounding my false testimony, took place over interviews at the Project Rehab and once right before I testified in court.

5. If I am called as a witness in this case, I will testify truthfully to the statements listed in this affidavit as they are true to the best of my belief, knowledge and understanding. FURTHER, I say not.

/s/ Tommie Jeffries
Tommie Jeffries

Subscribed and sworn to before me,
this 8 day of March, 2016
[signature]
NOTARY PUBLIC
MY COMMISSION EXPIRES: 1/28/22
Acting in Branch, County Michigan

# GROUND ONE

Additional Page

Supporting Facts

IV. Due Process right to a Fair Trial where Petitioner was seen by the jury in handcuffs and appeared before the jury obviously wearing leg restraints.

V. In effective Assistance of counsel by Petitioner's Trial counsel where he failed to protect Mr. Foster's constitutional right to a public trial and to his presence at critical stages of the Trial proceedings.

Ground One (Additional Page) Supporting Facts continued...

And complete the record under MCR 7.216(A)(4) with the transcripts and a motion for downward departure from the sentencing in Keith Nickerson's Federal robbery case. See United States v Nickerson, NO 1:09-CR-311 (U.S. District Court, W.D. MI 2009), see Appendix C-D.
Materials from Nickerson's federal Sentencing clearly reveal that, contrary to testimony, he in fact did receive a sentence reduction for testifying in Petitioner's case. At his Sentencing, the Federal Judge explicitly ruled, in response to the government's motion for a downward departure, that Nickerson's testimony against Mr. Foster was grounds for departing below the Federal Guidelines Sentence range. See Appendix C, pp. 20-25. The State prosecutor was well aware of Nickerson's compensation for testifying but did absolutely nothing to correct or cure the false and misleading testimony given by Nickerson. See Appendix D, pg. 2 (Emphasis added)

Perjury-- **The statement in question was false.**

In his testimony for the prosecution, Keith Nickerson repeatedly denied receiving any benefit or leniency on his Federal Sentence for testifying against Petitioner, or that

the prosecutor had done anything for him in his Federal bank robbery case that would have led to a Sentence reduction. TT. Vol. XII, pp. 225-226, 241-242, 243-247. Specifically, Nickerson testified on direct examination as follows:

> Q. And I asked you at that time and I will ask you again, in March did I indicate to you that I would do <u>nothing</u> for you in regard to any cases that you had pending?
>
> A. Nothing.
>
> Q. Okay. have I done <u>anything</u> on your behalf?
>
> A. Nothing.
>
> Q. Is there <u>any benefit</u> that you know of that you could receive for testifying today?
>
> A. No. (TT. Vol. XII, pp. 225-226, 241 (Emphasis added).

On cross-examination, Nickerson was questioned and answered as follows, in relevant part:

> Q. And as a result of the 5k Motion filed by the Federal Government, you received a reduction down to 128 (from 188 months), is that right?
>
> A. That is not why I got the reduction.
>
> Q. You didn't get a reduction because of the 5k Motion?
>
> A. No. (TT. Vol XII, pp 244-246 and TT. Vol. XII, p. 247)

The federal Judge explicitly ruled that Nickerson's testimony against Mr. Foster was grounds for departing below the Federal guidelines, explaining, in relevant part:

"First, I recognize the government has filed a 5k motion as it relates to the defendant's cooperation in the prosecution of a still pending unsolved homicide, which is pending in State court. The defendant has testified at a preliminary examination and according to the 5k motion filed by the government, was an <u>important witness</u> in support of the prosecution. A far as the 5k motion is concerned, the court intends to grant it." See Appendix A, at p. 13.

**THE PROSECUTION-Known Use Of Perjured And Or False Testimony.**

The state Prosecutor was required to correct the false testimony given and must not allow a government witness, in this case, Keith Nickerson, to testify falsely or mislead the jury about the actual or expected Sentencing benefits given or offered as a result of his testifying at trial. See TT. Vol. XII, p. 247.; Appendix C, pp. 20, 25. Here, it is quite apparent that Nickerson testified falsely when he repeatedly denied receiving no Federal Sentencing benefit from his testimony and unequivocally testified falsely that the Prosecutor had done absolutely "NOTHING" on his behalf in that Federal case. See TT. Vol. XII, p. 247. The state Prosecutor in Petitioner's case presented tainted and false evidence that misled the jury into believing that Nickerson not only stood "nothing to gain" from his testimony, but also gave the impression that he (the state Prosecutor) "would do nothing" in regard to Nickerson as well, when in fact he had. See Appendix D, p.2. The government motion for downward departure for substantial assistance in Nickerson's case states in relevant part:

"Mr. Nickerson's testimony proved to be instrumental in murder charges being brought against five individuals by the Michigan Attorney General in People v Ivory Shaver, et al, No. 10-17030-FC (36th Cir. 2010).
Undersigned counsel has spoken to Assistant Attorney General Dennis Pheney about (Nickerson's assistance and was advised that the defendant testified at a preliminary examination and was an important witness n this case. The trial is scheduled to commence in June, where Defendant is expected to testify again." (Emphasis added)

Aside from the Prosecutor's direct knowledge or involvement. the Prosecution specifically asked Nickerson questions for the specific intent to negate any inference of a benefit for his testimony. See TT. Vol. XII, pp. 225-226. It is readily apparent that during his direct and cross examination that Nickerson testified falsely, in which the state Prosecutor was well aware of (See Appendix D: TT. Vol. XII, p. 247), yet stood by idly and allowed the jury to be mislead as to the false evidence, which was highly relevant to the witness's bias. See Appendix C, p. 20: Appendix D, p.2

What is abundantly clear, as the Federal record reveals, is that the state Prosecutor in fact did do "something" for Nickerson when, upon being contacted or contacting the federal Prosecutor, he informed Federal authorities that Nickerson "testified" at a preliminary examination and was an important witness in the case" against Mr. Foster. See Appendix D, p. 4: Appendix C, p. 4-5. The primary motivating force behind the granting of the government's downward departure request was the qualitative information provided by the Prosecutor in this case. See Appendix D. that there were no explicit "promises" did not change Nickerson's lies or the Prosecution's failure to correct false or perjured testimony or the fact that the Trial Prosecutor did "something" for him and the fact he indeed received a Sentencing break as a direct result of his testimony. (Emphasis Added)

**MATERIALITY**- The Michigan Court of Appeals asserts that the "pertinent information" about the Sentencing benefit Nickerson received was somehow presented to the jury on cross-examination by Petitioner's Trial attorney. See Appendix A, p. 13. While Defense Counsel's questions may have suggested that Nickerson was not being truthful, the actual answers Nickerson gave denied any prosecutorial assistance or a Sentencing benefit. See TT. Vol. XII, pp. 244-247. The fact Defense Counsel's questions "suggested" something other than what Nickerson claimed is irrelevant. The Trial Court in Petitioner's case specifically instructed the jury that it could "**consider only the evidence that was properly admitted in this case,**" which consisted solely on the sworn testimony of witnesses, and the exhibits admitted into evidence. See TT. Vol. XII, p. 18. More importantly, the judge also specifically instructed the jury that "the lawyer's questions to witnesses are also NOT evidence." id. at 19. Jury's are presumed to follow instructions. See CJI 2d. 2.5, 2.7, and 3.5 (2)(5). (Emphasis Added). Thus, contrary to the Court of

Appeals claim, defense attorney's cross-examination did absolutely nothing to present the "pertinent facts" regarding Nickerson's false testimony or, to "cure" his false testimony. the Court of Appeals used an attorney's "question" rather than the answers to them, as evidence that the jury could use to cure the impropriety. See Appendix A, p. 13. The Court of Appeals brushed off the magnitude of the harm and seriousness of the due process violation finding the error harmless with a reference to what it felt was "significant other evidence concerning defendant's participation." in the assault of Boothby. See Appendix A. p. 13. this conclusion fails to take into account the entire record and misapplies the harmless error standard set forth by clearly established Federal law (Emphasis Added).

## UNREASONABLE DETERMINATION OF THE FACTS

The Appeals Court's usage of "significant other evidence" that Petitioner "could be held culpable" for Booth's death simply due to his participation in stomping and kicking her in the head" is an unreasonable determination of the facts, clearly established by the Trial record. See Appx. A, p. 9. As the Trial record reflects, Boothby suffered a small bruise on the brain, that according to both medical examiners, may or may not have resulted from an assault; the cortical contusion on the brain was determined to be non-life-threatening and non-fatal. Therefore, Petitioner could not have been held culpable for Boothby's death "simply" for his alleged participation in Boothby's assault as the State Court erroneously determined. See TT. Vol. XI p. 202,206,208,211-213. (Emphasis Added).

28 USCS 2254(d)(2) applies to questions of fact and asks whether State Court's decision was based on unreasonable

determination of facts in light of the evidence presented. Its plain language does not require that the State Court decision involve both unreasonable determination of fact and unreasonable application of law before the court may grant relief. Therefore, when State Court adjudication is based on an unreasonable determination of fact, set forth in 28 USCS 2254 (d) is satisfied, and the court may proceed to consider Petitioner's claim de novo. See Maxwell v Roe, 628 F.3d 486 (6h Cir) and Dietrich v Ryan, 619 F.3d 1038, 1059-60 (9th Cir, 2010).

To determine that the State Appellate Court's decision was based on unreasonable determination of the facts under 28 USCS 2254(d)(2), Petitioner must both establish the unreasonable determination and show that the resulting State Court decision was based on that unreasonable determination. A federal Court may take into account only the record that was before the State Court that adjudicated the claim on the merits when evaluating an ADEPA claim under 2254(d). See Rice v White, 660 F. 3d 242, 250 (6th Cir. 2011).

Petitioner also has the burden of rebutting the presumption of correctness by clear and convincing evidence. The presumption of correctness also applies to factual findings made by a State Appellate court based on the Trial Court record. See Williams v Bagley, 380 F.3d 932, 941 (6th Cir. 2004). Here Petitioner contends that the Michigan Court of Appeals was objectively unreasonable when it determined on more than one occasion, the Petitioner was not entitled to relief based on its erroneous assumption that Petitioner could have been "held culpable" for Boothby's death "simply" due to Boothby's assault, with reference to Petitioner's "stomping and kicking her in the head." See Appx. A, p 9-13. However, taking into account all credible evidence provided by both medical examiners from the record, (See TT. Vol. XI, pp. 202,206,208,212,213), and from briefs presented to the

Appellate Court, it is not disputed that both medical examiners testified in open court that the small bruise discovered during the autopsy of Boothby's brain was determined that that injury alone, is not and was not fatal or life-threatening.

If the Court would draw its conclusion from the actual testimony with the actual autopsy report from the medical examiner who testified for the State, it revealed, in relevant part:

> Q. The contusion you mentioned, you said the cortex?
> A. Yes.
> Q. Is that bruising to the brain?
> A. Yes.
> Q. A bruise to the brain, that injury itself, could it be fatal?
> A. This small bruise could not have been fatal by itself.
> Q. Now doctor, before you get to the specific injuries, the injuries that you have noted to the head from the neck up, would those be consistent with her being hit or run over by a car with actual tires going across the head?
> A. Yes (Emphasis Added).

The State prosecutor followed-up with this question concerning the blow to the head:

> Q. Is that a serious injury?
> A. In and of itself, NO, but it represents a severe blow to the head."

(See TT. Vol. XI, p. 214. [emphasis Added] )

The trial record proves by clear and convincing evidence that the Court's factual determination was objectively unreasonable. The "other evidence" supporting the court's determination is based on inconsistent and contradictory eyewitness accounts where the court completely ignored testimony from eyewitnesses who testified that Petitioner was not involved in the assault or death of Boothby. See TT. Vol. VII, pp. 79-85, 143,147,149-150,157-58,167,201; TT. Vol. VIII, pp. 103-109, 112; TT Vol. IX, pp. 24,27,30-32,214-217; TT Vol. XI, pp. 26-30,34-36; TT. Vol. VII, pp. 232-241; TT Vol. VII, pp. 198-210-212,215,264-269: TT. Vol. IX, pp. 124-140, 143-144,151,176: TT. Vol. XI, pp. 124-131,135-139; TT. Vol. X, pp. 161-163.

The State has not presented any direct evidence that proves that Petitioner could have been charged with Boothby's death simply for his alleged participation in her assault or where the injury to her brain was determined to be fatal or even life-threatening.

It was objectively unreasonable for the Appellate Court to determine that Petitioner's due process right to a fair trial was not violated by Nickerson's false testimony and by relying on "other evidence" it considered "significant" concerning Petitioner's alleged participation in Boothby's assault. Moreover, unreasonably having considered the testimony of the State's medical examiner but deciding not to credit the testimony as it was determined on the record by the medical examiner himself. There is no legal or scientific reasoning given during Trial that suggests that Petitioner or anyone associated with allegedly having participated in the assault of Boothby, being held "culpable" for Boothby's death by simply assaulting her.

The Court made reference to its decision and determination held in Petitioner's shackling issue, See Appx A p 9; where it stated; "However, as <u>previously discussed</u>, there was significant other evidence concerning defendants participation in at the beating of Boothby." The " previous " discussion involved an unreasonable determination of facts, not only could Petitioner not have been held culpable for Boothby's death from the assault alone, according to trial testimony from Dr. Palutke, the Court also erroneous held that " moment of her death " was " unclear " Id. However, the medical examiner for the State that she died from a " constellation of injuries " the contusion on the brain did not contribute to Boothby's death. He also testified that it was " unclear "exactly what injury caused her death, He alluded to the fact that the contusion in and of itself was non fatal and nonlife threatening. See TT. Vol. XI, p214.

The Appeals Court plainly misapprehended and misstated the record in making their findings and the misapprehension goes to a material factual issue that is central to Petitioner's claim. That misstatement of the record " fatally undermined " the fact- finding process, rendering the resulting factual finding unreasonable. See e.g. Wiggins 123 S. Ct. at 2538-39.

The Court can grant relief under Section 2254 (d) (2) if the state court " misconstrued or misstated the record or overlooked or misconstrued evidence " or if the state court applied an erroneous legal standard in making the factual determination. See Wiggins v Smith 539 U. S. 510, 528 (2003), See also Taylor v Maddox 366 F3d at 1001. A State court may make a factual determination and employ an adequate procedure in making that determination, the resulting determination is substantively unreasonable because it is not fairly supported by the evidence presented in the state court record. See Rice v White 660 F3d 242, 257 (6th Cir. 2011.)

Here, the Appellate Court's partial reliance on an erroneous factual finding produced an unreasonable State court decision. No fair and reasonable reading of the record would permit the Michigan Court of Appeals to find that Petitioner could have been held culpable for Boothby's death from the injuries suffered from the contusion found on her brain that may or may not have come as the result of being "kicked" or " stomped" in the head. As a matter of fact, absolutely nothing in the record suggest as much. Denying Petitioner's due process right to a fair trial by the introduction or failure to correct false and or perjured testimony because of "other evidence" concerning his alleged involvement in the assault of Boothby, is based on the erroneous premise that he could of been held responsible for her death from the assault alone.

The State Court finding is unsupported by substantial evidence in the State record, the Appellate Panel, applying the normal standards of appellate review, could not

reasonably conclude that the finding is supported by the record. See Lockyer v Andrade, 538 U. S. at 75.

## STANDARD OF MATERIALITY

A different standard of materiality applies where the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony. Where either of those events has happened, the falsehood is deemed "material", if here is <u>any</u> reasonable likelihood that the false testimony <u>could have</u> affected the jury. In conjunction, the Supreme Court has held that this standard of materiality is equivalent to <u>Chapman v California</u>, 386 U.S. 19, 24; 87 S.Ct. 824, 828; 17 LEd.2d 705 (1967). Harmless beyond a reasonable doubt standard. See <u>Bagley</u>, 473 U.S. 679 n. 9.

Here, in Petitioner's case, the Michigan Court of Appeals unreasonably applied the standard of materiality that requires the reasonable possibility of a different result" would not have been likely due to "significant other evidence" of Petitioner's alleged participation in Boothby's assault. The State Courts application of this particular materiality standard is associated with <u>nondisclosure</u> rather than the materiality standard applicable to a prosecutor's <u>knowing use</u> of false testimony. Reasonable possibility is substantially more difficult to meet than the could have affected standard. The courts erroneous application, was contrary to clearly established federal law. (emphasis added)

The standard for known use of perjured testimony is clear, and none of the <u>Napue/Giglio</u> type cases have ever suggested that "sufficiency of evidence" (or insufficiency) is the touchstone. The appeals court appears to assume that Petitioner must lose because there was "other evidence" concerning his alleged involvement in Boothby's assault. The courts viewpoint about the weight of the "other evidence"

misses the mark, because that is not where the line of contention was drawn during trial; this was not an "assault and battery" case. The Napue/Giglio materiality is the proper standard for this case and for the use of perjured testimony.

The Sixth Circuit has also justified this standard on the grounds that the known use of false testimony involves "prosecutorial involvement" and more importantly involves "a corruption of the truth-seeking function of the legal process." See Freeman v Trombley, 74 F. Supp. 2d 297 (E.D. Mich 2010) See also Burks v Egler, 512 F.2d 221, 229 (6th Cir. 1975).

Nickerson's denial of why he received a Sentence reduction for his testimony against Petitioner was a crucial link in the Prosecution's case. Nickerson did not testify only that Foster assaulted Boothby, his testimony alleged that Foster verbally confessed of his participation to Nickerson. The state offered during direct examination that its witness had not received any compensation for his testimony, and thus had nothing to gain. Furthermore, he testified that he had no expectations of payment for his testimony. This cannot reasonably be implied to not have had an impact on the minds of the jury of him being accounted as truthful.

Nickerson's testimony and credibility became paramount in helping prove the State's case. Nickerson was an important witness for the prosecution and his direct and cross-examinations did not elicit truthful, adequate information that would allow the jury to fairly assess his credibility, motives or possible bias. See Beckett v Haviland, 76 Fed Appx. 726, 2003 U.S. App LEXIS 20025 (6th Cir. 2003).

When determining whether the evidence established the defendant's guilt beyond a reasonable doubt, the jury naturally weighs the probability that the evidence is true. Holland v United States, 348 US 121 (1954).

The cross-examination by Defense Counsel does not obscured the prosecutor's obligation to correct the false and misleading testimony given by the witness, which was highly prejudicial. See Giles v Maryland, 386 US 66, 74 (1966); Napue, 360 US at 260-70.

Concededly, Nickerson was not the state's "chief" witness, or the only "jail-house snitch" to testify against Petitioner. However, as the record states, Nickerson was the only witness that claimed Petitioner allegedly "confessed" of his guilt, that was not sufficiently impeached by the defense, attacking the core of their credibility as witnesses. There was not overwhelming evidence associated with Petitioner's participation in the murder of Boothby. There was no motive established for Foster to participate in a murder with co-defendants Scottie or Ivory Shavers, both of whom were Foster's enemies at the time of the crime. There was no DNA associated with Foster. There was no physical evidence. Eyewitness accounts were no more than inconsistent or contradictory. Michael Smith, also a "jail-house snitch" was successfully and sufficiently impeached during cross-examination by trial counsel of is intentions to curry favor for his testimony against Petitioner in the State of Indiana, where letters had been written to lead Detective Oppenheim of his request for compensation and he openly admitted to having access to Petitioner's "legal work" which contained supplemental police reports of witness interviews with Police which gave various details of the crime and the names and events he referred to during the course of the trial. See Trial Transcripts Vol. XII, pp. 188-191, 202-203,, 205, 226, 241-242, 244-246.

The state primarily hinged its case on testimony from its "Star" witness who had been convicted of perjury/murder, Adrienne Burnette, whose testimony alleged that Petitioner was inside a vehicle driven by co-defendants Shevy Gill and

Ivory Shavers. See TT. Vol. X, pp. 57-58, 60-63, 260. Burnett, who testified during cross-examination, admitted to continuing to testify falsely about certain facts of the case, also testified that Petitioner's name was repeatedly fed to her by authorities, and she subsequently used Foster's name as a way out of her situation. See TT. Vol. X, p. 240.

The credibility of each of these three witnesses became key in resolving the issues of guilt or innocence. The conflicting and contradictory testimony concerning the "several witnesses" the Appeals Court referred to in its decision speaks for itself. The jury also heard evidence from Danyella Jones, Marie Black, and Sharon Martinez, all of whom gave accounts of Foster not being involved with the murder/kidnapping, or place Foster at a different place or location at the exact time the murder took place. The falsity of Nickerson's testimony went to the heart of his credibility as a witness. Especially where he was asking the jury to believe that Foster had "confessed" to his alleged role in Boothby's untimely demise. At the very least. the conflicting testimony in resolving the issue of credibility, alone, despite the jury's apparent struggle with the evidence and testimony, affected the decision of the jury. Petitioner is entitled, as a matter of due process, to present his case to a trier of fact that is not "laboring under a government-sanctioned false impression of material evidence." See United States v Barham, 595 F. 2d 231. See also TT. Vol. VIII, pp. 52-59, 75 and TT. Vol. XIV, pp. 48-55, 59, 73.

Where a jury is "deadlocked" in reaching a unanimous verdict at some point in its deliberation, an error of such magnitude would have permitted the jury to reasonably infer his testimony without cause to consider it unreliable or untruthful, and the Prosecutor's failure to correct such a false impression, casts doubt on the integrity of the verdict. Ascribing a motive as for Nickerson's denial of why

he did not receive a sentence reduction for his testimony against Petitioner, or showing that this portion of his testimony was false before the jury, would have made a measurable difference in the Defense's ability to challenge Nickerson's credibility and for the jury to fairly assess his credibility as well. A Knowing Presentation error harms the accused when the error had a substantial and injurious effect or influence determining the jury's verdict. Here, the State Appellate Court failed to bear its responsibility for consideration or showing that the error had no effect on the verdict. Where in fact, there is a reasonable probability that it did. See TT. Vol. XVIII, p. 16.

The Michigan Court of Appeals summarized its decision with the following paragraph:

> "Had Nickerson's testimony been the only testimony against defendant, the situation may be different. However, as previously discussed", there is significant other evidence concerning defendant's participation in at least the beating of Boothby. Thus, defendant's right to a fair trial was not violated by the introduction of false and perjured testimony from Nickerson." See Appendix A, p. 13 (Emphasis Added)

If the Court cannot say (and the Michigan Court of Appeals did not) with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment of the jury was not swayed by the error, it is impossible to conclude that the substantial rights of the Petitioner were not affected. The Court's inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had a substantial influence. (Emphasis added).

## CONCLUSION

In conclusion, Petitioner would like to take this opportunity to clarify to this Honorable Court that not only

did the State of Michigan try and convict an innocent man, the Michigan Court of Appeals failed to adhere or consider the evidence before it as a whole.

To begin with. the Court failed to take into consideration the relationship or the lack thereof with co-defendants Ivory and Scottie Shaver that had been long standing, bitter, and often violent. This was not a group of "friends" that decided to get together one night to commit a murder. There was a genuine, extreme dislike between the parties. See TT.Vol.VI,p122;TT.Vol.VII,p34,102;TT.Vol.VIII,p43-45,161-65,302-03;TT.Vol.XIV,p19.

Petitioner did not know Ms. Boothby, had never had any "run-ins" or any verbal or physical confrontations with Ms. Boothby, which begs the question; WHY WOULD HE ALLEGEDLY HELP PLOT TO ASSAULT, KIDNAP, AND MURDER SOMEONE HE DID NOT KNOW WITH INDIVIDUALS HE DID NOT ASSOCIATE WITH OR GET ALONG WITH?

Primarily the Court failed to consider key eyewitness accounts given from Danyella Jones and Marie Black 15-20 minutes after the incident. Both Jones and Black witnessed the account prior to, during, and after Boothby was struck by a vehicle(s). See TT. Vol. XIV, p. 48-51 Danyella Jones testified that she witnessed Ms. Boothby "alive," "staggering," "apparently drunk, "and "walking" down the side of the road, Id. at 51, before being struck by "white car." Id. at 54. 54.

The Court also failed to adhere to other key eyewitness accounts from friends and relatives of the Shaver's including, but not limited to, Michelle Ruiz, Tracy Hughes, Latisha Holland, Shameka Echols (cousin), Verlanda Shaver (cousin), and Sharon Martinez, who testified that one or more of the co-defendants were amongst the group of individuals assaulting Ms. Boothby, but did not witness Petitioner involved in the group. See TT.Vol.VII,p232-241;TT.VolVIII,p198,210-12,215,264-269; TT.Vol.IX,p134-

through February 4th 2009, and either did not mention his name or unequivocally denied he was involved in Mr. Boothby's death. See TT.Vol.X,p74-77,237-239. More importantly, during examination, she answered the following questions" not only did you not bring up his name, not only did you not agree with them you didn't say anything about Mr. Foster?" Her answer; "CORRECT" "It (Foster's name) was given to you as a WAY OUT AND YOU DID TAKE IT CORRECT?" Her answer: "CORRECT." See TT Vol.X,p260 (emphasis added.)

This Petitioner pleads that he is absolutely innocent of this crime, and a new trial in the "interest of justice" is appropriate here. The conduct of the State and the Appeals Court ~~saw~~ fell far below what society, Mr. Foster, and Ms. Boothby's family are entitled to expect from our public servants, entrusted with an very important aspect of national interest and the basic liberty of having a fair trial, free of corruption, distorted facts, half-truths, intimidation, and perjury.

The government is charged not only with the duty to prosecute the accused, but also with the paramount duty to ensure that justice is done. Here, the conviction of an innocent man should NEVER be accounted or foreseen as justice. The State as well as the Appeals Court, failed to bring forth the true facts surrounding the commission of this crime...so that justice could have its place. Surely conduct such as that indulged here by the Prosecutor ,cannot in any imaginable way, promote the just administration of the laws in our country, in fact, it affirmatively obstructs the pursuit of the truth.

This Court is endowed with certain inherent "supervisory powers" over the administration of justice in the court's of the United States, and it is my hope and prayer that this Court utilizes that power to correct this wrong, where the pursuit of the truth and justice has become tainted...

Adrienne Burnette "tainted" this case and Keith Nickerson "tainted" this trial and the State allowed it to happen at the expense of my freedom. The purpose of the Writ of Habeas Corpus cannot envision few other situations that would recommend more strongly for this Court to allow the truth to employ justice in a case and trial that has been denied both by the granting of the Writ.

## RELIEF SOUGHT

For the reasons stated in this Petition and cited above, this Petitioner prays this Honorable Court grant the Writ. This Court should also grant any requested discovery, evidentiary hearings, Bond, oral arguments, and any other Relief Petitioner seeks in this action, including a Certificate of Appealability.

Respectfully Submitted,

[signature]

Date: March 24, 2017

Ed D. Foster #226862
Saginaw Cor. Facility
9625 Pierce Rd.
Freeland, MI 48623

cc: file

ED. D. Foster #226862 (7-5)
Saginaw Cor. Facility
9625 Pierce Rd
Freeland, Mi 48263

FILED
MAR 27 2017
CLERK'S OFFICE
U.S. DISTRICT COURT

RECEIVED
MAR 27 2017
CLERK'OFFICE
DETROIT

US POSTAGE PITNEY BOWES
ZIP 48623 $ 001.61⁰
02 1W
0001403190 MAR 24 2017
3/24/17 DP

U.S. Eastern Dist. Court of Michigan
231 W. Lafayette Blvd.
Detroit, Michigan, 48226