21

15-12265

Appx H:

Michigan Court of Appeal's Order Denying Leave to Appeal

FILED
JAN 27 2020
CLERK'S OFFICE
DETROIT

Lexis Advance®

Document: People v. Foster, 2019 Mich. App. LEXIS 1916

# People v. Foster, 2019 Mich. App. LEXIS 1916

Copy Citation

Court of Appeals of Michigan

May 10, 2019, Decided

Docket No. 346717

**Reporter**

**2019 Mich. App. LEXIS 1916 ***

**People** of MI **v** Edward Deon **Foster**

**Prior History: [*1]** LC No. 10-017033-FC.

**People v. Foster**, 2013 Mich. App. LEXIS 1359 (Mich. Ct. App., Aug. 8, 2013)

## Core Terms

orders, delayed, waive

**Counsel:** For **PEOPLE** OF MI, Plaintiff-Appellee: VAN BUREN COUNTY PROSECUTOR.

EDWARD DEON **FOSTER**, Defendant-Appellant, Pro se.

**Judges:** James Robert Redford, Presiding Judge. Douglas B. Shapiro, Mark T. Boonstra, Judges.

Opinion

**ORDER**

The Court orders that the motion to waive fees is GRANTED for this case only.

The Court orders that the motion to remand is DENIED.

The Court further orders that the delayed application for leave to appeal is DENIED because defendant has failed to establish that the trial court erred in denying the motion for relief from judgment.

**Content Type:** Cases

**Terms:** people v.. foster 2019 mich. app. lexis 1916

**Narrow By:** Sources: Sources

**Date and Time:** Jun 06, 2019 02:01:18 p.m. CDT

LexisNexis About LexisNexis® Privacy Policy Terms & Conditions Sign Out Copyright © 2019 LexisNexis. All rights reserved. RELX Group™

Appx I:

Michigan Supreme Court's Order Denying Leave to Appeal

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 26, 2019

159893 & (17)

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

SC: 159893
COA: 346717
Van Buren CC: 10-017033-FC

EDWARD DEON FOSTER,
Defendant-Appellant.

_________________________________________/

On order of the Court, the application for leave to appeal the May 10, 2019 order of the Court of Appeals is considered, and it is DENIED, because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D). The motion to remand is DENIED.

SEAL OF THE MICHIGAN SUPREME COURT · LANSING ·

I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 26, 2019

Clerk

p1118

**Appx J**

**Shevy Gill's Police Statements**

Michigan Department of State Police
SUPPLEMENTAL INCIDENT REPORT 0059

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| Mon, Mar 29, 1999 | 055-0001422-99 (DB) |
| SUPPLEMENTARY DATE | FILE CLASS |
| Mon, Dec 22, 2008 | 09001 |

INCIDENT STATUS
Open

# HOMICIDE

## JOURNAL:

| | | |
|---|---|---|
| 12-3-08 | MCNALLY | Rev'd supps # 55,56,57, pends additional interviews and investigation. |
| 12-15-08 | DCO | Interviewed GILL Lives on Maple St. |
| 12/17/08 | DCO | Interviewed SHAMIKA ECHOLS at Kalamzoo PD |
| 12/18/08 | DCO | Interview Shaver at Parnell |
| 12/22/08 | DCO | Polygraph Shaver. |

## SUSPECT:

NAM: SHEVOLIER JOVAN GILL

NBR: 425 DIR: W
STR: MAPLE
SFX: STREET
CTY: SOUTH HAVEN ST: MI
TXH: ZIP: 49090
TXW:

RAC: B
SEX: F
DOB: 01/13/1977
HGT: 5'07"
WGT: 130
HAI: BLK
EYE: BRO

ETH:
OPS: MI/G400765444037
SSN: 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
SID:
FBI:
MNU:
PRN:

## INTERVIEW SHEVOLIER GILL:

On 12/15/08 I had received information that SHEVY GILL was staying with her grandmother on Maple Street in South Haven. I met with GILL at that residence at approximately 1:15 p.m. I identified myself and explained to her why I wanted to talk with her. GILL stated that she was aware of this investigation and she has been waiting for us to contact her. At this time GILL consented to come to the post for an interview. The interview took place at approximately 1:30 p.m. in my office at the MSP Satellite office in South Haven.

At this time I went over the investigation with GILL. GILL advised that she has heard from a number of friends that we had talked with them. She advised she has been waiting for us to come and talk with her about this. GILL further stated that she was glad this was finally being looked into.

I asked GILL some personal questions. I asked GILL who she was raised by. She advised she was raised by her grandparents, as her parents were killed when she was 3. She advised she has a brother and one sister, and 4 children, 3 girls and 1 boy. She advised that the ages are 16, 14, 12, and 8. She stated the father of the 16 year old is TERRANCE BURTON, the father of the 14 year old is JEREMY WORLD, the father of the 12 year old is WILLIE C. PRIMER, and the father of the 8 year old is IVORY SHAVER.

I asked GILL if she has been working. She said she has been working a few hours with Cornerstone, but wasn't getting very many hours.

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 1 of 7 | D/SGT DIANE C OPPENHEIM #106 | | |

Michigan Department of State Police

SUPPLEMENTAL INCIDENT REPORT 0059

| ORIGINAL DATE | INCIDENT NO. |
|---|---|
| Mon, Mar 29, 1999 | 055-0001422-99 (DB) |
| SUPPLEMENTARY DATE | FILE CLASS |
| Mon, Dec 22, 2008 | 09001 |

asked GILL if she could tell me what she remembered of that night. GILL advised she was with IVORY SHAVER and they went to the Blue Star Lounge, and she drove her Subaru Impreza. She said that she remembered IVORY and the lady arguing at the lounge. I asked her if she knew who the lady was. GILL said she did not. She said she was a white lady at the Blue Star Lounge, and she was later told by IVORY that they used to go together. I asked GILL if they met up with anybody that night. She said that she recalled VERLANDA SHAVER, MIOSHE WHITFIELD, SHAMIKA ECHOLS (LADY), ANDREA GOODWIN, MICHELLE JACKSON, and CYNTHIA HATTER. I asked if she recalled anyone else. GILL said there were a lot of people out there that night.

I asked if she recalled seeing the victim come in. She said she did not, and didn't know if she was already there, but she came up to the bar and starting arguing with IVORY. GILL said the lady was very very drunk. She said that at one point the lady threw a drink on IVORY, and a crowd of people gathered around her. She said there was a lot of pushing and shoving going on, but she couldn't see who exactly was doing what. She said the lights came on and the bouncer was telling everybody to stop or they were going to close the club. She said everyone continued to push and shove, so everyone was directed to leave. She said that everybody was headed out the door and the last time she saw the lady, she had stumbled in the parking lot and was picked up by SAM BAM. She said that she and IVORY had already gotten back to the car and were warming it up. She said that when they saw the lady stumble and fall they kind of laughed about it, but then they just left.

At this time I explained to GILL that we had been given a lot more information from a number of people that she in fact had a fight with BOOTHBY at the club. GILL said she did not. She said that she never laid a hand on the lady. She said the lady was really drunk and was acting crazy and yelling at people. She said a lot of people were gathered around her and were pushing and shoving her. She said at one point she had words with the lady and was getting ready to jump her, but people were holding her back. She said she didn't realize she had so many people who liked her and was that popular, but she is glad now because she knew that the lady was crazy and that she could see that death was upon the lady that night, and she is glad that she never did lay a hand on her. I explained to GILL that a number of people we had talked with said that she in fact threw punches at BOOTHBY and did have a fight with her both inside and outside of the bar. GILL said this was not true. She said she had words with her, but she couldn't remember what those words were. She said people were rowdy and pushing and shoving at the lady, and she knows that someone had poured a pitcher of beer on her, but there was such a big crowd that she could not see exactly who that person was. GILL said she really felt sorry for the lady because she was so drunk.

At this time GILL said, "I wouldn't have any reason to hit somebody who was as drunk as she was. I don't know what the reason would be for me to do that. " I explained to her that a number of people told us it was because she came in and had been confronting IVORY, and that she was not going to allow another girl to talk to her man that way. At this time GILL just hung her head and said, "No, I did not touch that lady."

I asked GILL when she had learned that something had happened with this particular person. She said that the next morning SHPD were at the door questioning IVORY about had happened, and they had told her that the lady was dead. She said she was in such shock and felt very sorry for her. I asked GILL who drove home that night and she said it was the driver. She advised that never let IVORY drive her car because he was not that responsible. I asked her if there was anybody else with her and she said no, they just went right home. I

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 2 of 7 | D/SGT DIANE C OPPENHEIM #106 | [signature] | |

explained to GILL that she had talked about going to an after party, and she said they had not. I asked GILL if there was anybody else with them when she left with Ivory or gave anyone a ride home. She said no, it was just them.

At this time I asked GILL why so many people would say that they witnessed her hitting this girl. She said she didn't know why they would be saying that. She maintained that she felt sorry for the girl and there would be no reason for her to do that.

At this time I asked GILL if she would be willing to take a polygraph. She said she would. At this time I read a statement that one of the witnesses had given, which talked about GILL's role in BOOTHBY's death. GILL did not reply to that written statement. GILL went on and asked why, after all this time, is this being investigated. I explained to her that the circumstances just didn't allow for law enforcement to be able to investigate it during that time. I explained to her that it was unfair to her that in fact it wasn't, and she agreed. GILL said that all this time went on and thought this should have been taken care of way back when it happened. I explained that I didn't disagree with her.

At this time I explained to GILL that I would contact a polygraph officer and set up a polygraph date for her. I asked GILL if she would be willing to write out a statement. GILL wrote out a statement and it will be attached to this complaint. At this time I took GILL home.

On 12/18/08 I went to GILL's residence at approximately 9:30 a.m. At this time I advised GILL that a polygraph date had been scheduled for Monday 12/22/08 at 8:00 a.m. GILL advised that she would not be taking the polygraph test, but would be willing to continue to talk with me. GILL advised that it was too early in the day for her, and asked that I make arrangements to talk with her at a later date.

**WITNESS:**

NAM: SHAMIKA ECHOLS

| | | | |
|---|---|---|---|
| NBR: 5860 DIR: | | RAC: B | ETH: |
| STR: BRIARCLIFF LANE | | SEX: F | OPS: |
| SFX: LANE | | DOB: 02/11/1980 | SSN: |
| CTY: KALAMAZOO | ST: MI | HGT: | SID: |
| TXH: | ZIP: 49006 | WGT: | FBI: |
| TXW: | | HAI: | MNU: |
| MB: (269)744-6403 | | EYE: | PRN: |

**INTERVIEW SHAMIKA ECHOLS:**

I made contact with SHAMIKA ECHOLS on 12/11/08 and scheduled an interview for 12/17/08 at 3:30 p.m. at the Kalamazoo PD. On 12/17/08 I interviewed SHAMIKA ECHOLS at the Kalamazoo PD interview room. I introduced myself and explained where we were at with this investigation. SHAMIKA stated that she had talked with her cousin CALLIE and VERLANDA and she was aware that we would be contacting her. I asked her if she was related to SONY ECHOLS and she said that he was her uncle. I asked her if she knew the victim and she said no. I asked if she knew the victim's daughter, NATASHA, and she said she did. I asked

264-767-7053

12-15-08

On the night of the club - I drove my car, which ~~is~~ was a suburu Impreza - burgundy/tinted windows/small sized car. Ivory + I went to the club (BLUE STAR LOUNGE) @ 12:30-/ish. Everybody was drinking + partyin' + dancing. At one point, I saw Ivory + that lady (Debbie) kinda arguing. Soon after, she came over to me (very drunk) we had a few words I dont remember exactly what we said, but, the conversation was @ Ivory. She then accidently splashed some beer/drink onto my clothes - at one point she did throw her drink onto Ivory. Everybody gathered around her (it was like one big circle). The DJ informed everybody to stop or the club would be over - ~~it~~ it continued to be rowdy so people were directly to go towards door + leave. I followed behind the crowd. As soon as we all got outside, someone poured a whole pitcher of beer onto Debbie heads. It was such a big circle of people so I dont know exactly who did it. As we were walking away - the stumbled down + fell a few different times - this happened because of her being drunk. I, myself, felt really [illegible]

into my car + then went home. Early in the morning, So. Haven police were at my door + questioned Ivory + I about what happened and then told us that she was dead. I was so shocked + felt sorry. I later on gathered that death was upon that ~~la~~ lady that night because really drunk + bothering people + kept falling. Very sad situation. Justice needs to be served for the concern + closure to her family.

[signature] [signature] 12/6/08

2-2
59-3471-55

into my car + then went home. Early in the morning, So. Haven police were at my door + questioned Ivory + I about what happened and then told us that she was dead. I was so shocked + felt sorry. I later on gathered that death was upon that ~~la~~ lady that night because really drunk + bothering people + kept falling. Very sad situation. Justice needs to be served for the concern + closure to her family.

[illegible]

[illegible] 12/15/08

[illegible]

the sum of evidence introduced at trial that Defendant took part in the beating and kidnapping of Boothby, it is not reasonably likely for this court to conclude that Defendant's outcome at trial would have been different had an accident reconstruction expert been employed. *Armstrong*, 490 Mich at 289-290; 806 NW2d 676. As well, the court does not find any irregularity so offensive that the conviction should not be allowed to stand.

**b. Interviewing Co-Defendant Shevolier Gill**

Defendant additionally contends that trial counsel was ineffective for failing to interview co-defendant Shevolier "Shevy" Gill. Defendant's motion notes that a 2009 letter written by Gill to a third-party, Jennifer Loyd, included Gill questioning why and how Defendant became involved in the investigation into the case. Defendant points to this letter as a sign of his innocence, and now argues that counsel should have pursued this further, albeit admitting this subject was brought up at trial.

Again, this court notes that "[d]ecisions regarding what evidence to present and whether to call or question witness are presumed to be matters of trial strategy." *Davis (On Rehearing)*, 250 Mich App at 368; 649 NW2d 94. Trial counsel extensively pursued during trial examination the themes that Defendant and the co-defendants were enemies, that they did not interact the night of Boothby's death, and that they never interacted after that night. (TT, XV, 24-69). Thus, while trial counsel may not have addressed an issue in the precise manner desired by Defendant, this court finds neither deficient representation nor any irregularity on this ground.

**c. The Bereza Affidavit**

Defendant presents a letter and affidavits from accident reconstruction specialist Thomas Bereza, which were drafted in 2014 and 2015 in relation to co-defendant Scottie Shaver's trial.

Bereza interviewed Shaver and Shaver's trial counsel and reviewed his defense file and other investigative materials. Defendant has now attached Bereza's letter and affidavits to his own motion. There is no contention that Bereza reviewed Defendant's trial materials or transcripts, or even that Bereza reviewed the transcripts from co-defendant Shaver's trial before forming an opinion. From Bereza's review of the materials he was provided, he opined that Boothby's death was not a murder but rather a hit-and-run accident. Notably, Bereza ignores the substantial quantum of evidence that contradicts a theory of a hit-and-run accident, for instance witness testimony regarding the beating and kidnapping of Boothby.

As his good cause for raising this issue now, Defendant asserts that this is newly discovered evidence. Newly discovered evidence must meet the *Cress* test: "[i]f the jury would have heard this testimony, from someone trained to determine this type of event, it is possible one juror would have accepted this evidence . . . [m]aking a different result possible." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). "For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) "the evidence itself, not merely its materiality, was newly discovered"; (2) "the newly discovered evidence was not cumulative"; (3) "the party could not, using reasonable diligence, have discovered and produced the evidence at trial"; and (4) "the new evidence makes a different result probable on retrial." *Id.*

Defendant initially fails to explain how the evidence itself was newly discovered. Bereza used, in part, the police report and medical examiner's report — documents common to co-defendant Shaver's trial and Defendant's trial. Bereza did not conduct his own independent investigation nor did he interview witnesses. Rather, he reviewed materials in existence at the time of Defendant's trial. It cannot be said, therefore, that they are "newly discovered."

Defendant also fails to explain how he could not, using reasonable diligence, have discovered and produced the evidence at trial. Defendant could have engaged an accident reconstruction expert to review his case prior to trial. In fact, Defendant argues elsewhere in his pleading that defense counsel was inadequate for failing to produce such an expert based on their discussions and these materials. Defendant cannot logically argue that the evidence could not have been discovered using reasonable diligence and also argue that counsel was ineffective for failing to discover it. As well, based on the other evidence produced at trial, and considering the anticipated value of Bereza's testimony once tested by cross-examination, Defendant cannot show that an expert's opinion would make a different result probable on retrial. For these reasons, Defendant fails to meet his burden of establishing both good cause and actual prejudice on this issue. As well, the court finds without merit these assertions.

**II. Ineffective Assistance of Appellate Counsel**

Defendant argues that appellate counsel, Michael Mittlestat, was ineffective for failing to submit Defendant's Standard 4 Brief timely to the Court of Appeals, failing to raise the above issues on appeal, and failing to raise the issue of ineffective assistance of trial counsel on appeal. Defendant presents these alleged inadequacies as his "good cause for failure to raise" these grounds previously. MCR 6.508(D)(3)(a).

The court first notes that appellate counsel presented the following arguments to the Court of Appeals as evidenced by the opinion: (1) denial of right to a public trial due to conversations during pretrial proceedings and voir dire held in chambers, and ineffective assistance of counsel for failing to object to this; (2) right to a new trial for his absence from critical stages of trial, namely the pretrial proceedings held in chambers; (3) denial of right to a fair trial due to the jury

seeing Defendant in handcuffs and leg restraints; (4) false and perjured testimony from a witness; and (5) abuse of discretion by the trial court because it would not allow jurors to view the scene of the crime. *People v Foster*, 2013 WL 4033639 (Ct App Mich, Aug 8, 2013).

As with trial counsel, "reasonably effective assistance" is the standard for appellate counsel. *Strickland*, 466 US at 690. Appellate counsel need not raise every possible appellate claim. Appellate counsel may be selective as a matter of discretion and strategy when choosing which meritorious issues to raise on appeal. *Reed*, 449 Mich at 397.

**a. Failure to File Standard 4 Brief**

The court will address first Defendant's argument that appellate counsel is at fault for the untimely filing of Defendant's Standard 4 Brief. The purpose of a Standard 4 Brief is to give Defendant an opportunity to raise an issue on appeal that is against the advice of appellate counsel, as a safeguard if appellate counsel is mistaken as to potential meritorious issues. To raise these issues, Defendant files a Standard 4 Brief *in propria persona* within 84 days of the appellate attorney's brief. While Defendant is responsible for drafting the Standard 4 Brief, appellate counsel must be available to provide "procedural advice and clerical assistance" to ensure the Brief is acceptable for filing with the Court of Appeals. If Defendant falls past the 84-day mark, the Defendant may file a motion in the Court of Appeals to extend the deadline for good cause. *See Minimum Standards for Indigent Criminal Appellate Defense Services as approved by the Michigan Supreme Court*, January 1, 2005.

Pursuant to MCR 6.504(B)(1), this court is required to "promptly examine the motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack" and the court "may request that the prosecutor provide copies of transcripts, briefs, or other

records." As Defendant did not attach all necessary documents, this court contacted the Appellate Attorney General's Office to obtain all necessary documents with regard to Defendant's Standard 4 Brief. Defendant filed a document entitled "Pro Per Motion to Amend and/or Supplement Application for Leave" in the Court of Appeals. The Court of Appeals returned that document on October 11, 2012, stating that since Defendant was represented by Attorney Mittlestat, his counsel was responsible for all filings. Defendant sent a letter to Attorney Mittlestat requesting assistance with filing the supplemental brief on October 16, 2012. In a Motion to Expand Grounds for Review and to Accept Pro Per Supplemental Application for Leave to Appeal dated November 23, 2013 and filed with the Michigan Supreme Court, Attorney Mittlestat states that Defendant sent his supplemental brief to his office timely; however, due to an oversight within the office, it was never filed. Attorney Mittlestat notes that it was not until after the Court of Appeals denied reconsideration on October 3, 2013 that the oversight was realized. Consequently, Attorney Mittlestat attached Defendant's supplemental brief to his motion and requested that the Supreme Court accept the supplemental brief and expand the grounds for review on whether it should grant leave to appeal to cover the issues in Defendant's supplemental brief. The Supreme Court entered an Order granting Attorney Mittlestat's motion on December 3, 2013. The Attorney General's Office responded with an objection to Defendant's supplemental brief on December 23, 2013. The Supreme Court denied the application for leave to appeal on June 18, 2014, reasoning that it was "not persuaded that the questions presented should reviewed."

The court finds that, even if appellate counsel's failure to file Defendant's supplemental brief to the Court of Appeals erred on the side of deficient conduct, this failure did not prejudice Defendant. Simply put, the court finds without merit the issues raised by Defendant in his Standard 4 Brief. This conclusion is bolstered by the fact that Defendant's Brief was accepted by the

Michigan Supreme Court, with the Court opining that the questions presented did not warrant review. Defendant cites various arguments in the Brief, such as "police coercion," "camouflaged conjecture," "prosecutorial threats," and an "influenced amendment to certification of death." However, while Defendant states facts and cites law, he fails to connect the two in a cohesive and sound argument. The court declines to formulate arguments for Defendant, but nevertheless finds unavailing Defendant's underlying premises. Defendant may not merely announce his position and leave it to the court to discover and rationalize the basis for his claims, nor may he only give cursory treatment with little or no citation of supporting authority. *People v Kelly*, 231 Mich App 627; 588 NW2d 480 (1998); *People v Milstead*, 250 Mich App 391; 648 NW2d 648 (2002).

**b. Failure to Raise Issues on Appeal**

As stated previously, Defendant notes failure to investigate, failure to interview co-defendant Gill, and the Bereza Affidavit as viable issues that should have been raised by trial counsel. Defendant also asserts that appellate counsel should have raised these issues on appeal. Appellate counsel may be selective as a matter of discretion and strategy when choosing which meritorious issues to raise on appeal. *Reed*, 449 Mich at 397. For the reasons stated above, this court finds without merit the issues Defendant claims appellate counsel should have raised. Appellate counsel cannot be faulted for failing to raise non-meritorious issues.

**c. Failure to Raise Ineffective Assistance of Trial Counsel**

As noted, Defendant asserts that appellate counsel failed to specifically raise on appeal various instances of ineffective assistance of trial counsel. As the court is not persuaded that trial counsel was ineffective, appellate counsel was under no duty to raise this issue.

**III. Actual Innocence**

Lastly, Defendant argues that his actual innocence warrants relief from judgment. As noted, the court does not waive the good cause requirement of MCR(D)(3) because it does not conclude that there is a significant possibility that the Defendant is innocent of the crime. As well, after examining the file, records, and transcripts in this case, the court finds this claim meritless.

## CONCLUSION

For all of these reasons, Defendant's Motion for Relief from Judgment is DENIED.

IT IS SO ORDERED.

Dated: May 17, 2018

Hon. Kathleen M. Brickley
Circuit Court Judge

## PROOF OF MAILING

I certify that on this date I sent a copy of this **OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT** to the parties in interest at their above state addresses via ordinary mail.

Dated: May 8, 2018

Melissa Williams

motion. The court encloses with this return a form approved by the State Court Administrative Office (CC 257). The clerk of the court shall retain a copy of the motion.

IT IS SO ORDERED.

Dated: 12/15/17

KATHLEEN M. BRICKLEY, CIRCUIT JUDGE

**CERTIFICATE OF MAILING**

I certify that on today's date a copy of the above was provided to the attorneys and/or defendant at the addresses above by first class ordinary mail.

Dated: 12/15/17

Melissa Williams

Mr. Ed. D. Foster #226862 (A-9T)
E.C. Brook Cor Facility
2500 S. Sheridan Dr.
Muskegon, Mi 49444

U.S. POSTAGE PITNEY BOWES
ZIP 49444 $ 007.85⁰
02 4W
0000358298 JAN 15 2020

1/15/2020

RECEIVED
JAN 27 2020
CLERK'S OFFICE
U.S. DISTRICT COURT

~~226862~~
~~FOSTER~~
~~A9T~~

Office of the Clerk
United States District Court
Eastern Dist. - Southern Div.
231 West Lafayette Blvd. 5th fl
Detroit, Mi 48226