66

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD FOSTER,
Petitioner,

-vs-

THOMAS WINN, Warden,
Respondent.

Case No. 15-CV-12265
Hon. Laurie L. Michelson
Magistrate Judge Michael J. Hluchaniuk

______________________________/

Edward Foster
Petitioner in Pro Per
LRF 226862
E. C. Brooks Correctional Facility
2500 South Sheridan Drive
Muskegon Heights, MI 49444

______________________________

Michigan Attorney General
Attorney for Defendant
Habeas Corpus Division
P.O. Box 30212
Lansing, MI 48909

______________________________/

# REVISED/AMENDED MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

# TABLE OF CONTENTS


Description — Page

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

Statement of Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

Trial Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

ISSUES PRESENTED

1. PETITIONER'S FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE INTRODUCTION OF FALSE AND PERJURED TESTIMONY FROM KEITH NICKERSON, A KEY PROSECUTION WITNESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II. PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHERE TRIAL COUNSEL FAILD TO INVESTIGATE AND CALL A KNOWN WITNESS, WHO WOULD HAVE PROVIDED KEY EVIDENCE IN SUPPORT OF THE DEFENSE'S CHOSEN THEORY. . . . . . . . . . . . . . . . . . 34

III. PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, WHERE APPELLATE COUNSEL FAILED TO INVESTIGATE GILL AND LITIGATE TRIAL COUNSEL'S INEFFECTIVENESS ON DIRECT REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

ACTUAL INNOCENCE CLAIM

THIS HONORABLE COURT CAN AND SHOULD ADDRESS THE MERITS OF THE UNDERLYING ISSUES BECAUSE: (A) TRIAL COUNSEL IS INEFFECTIVE, (B) APPELLATE COUNSEL IS INEFFECTIVE, (C) PETITIONER IS ACTUALLY INNOCENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

## INDEX OF AUTHORITIES

Citation Page(s)

Arizona v. Fulminante, 499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31, 33

Avery v. Prelesnik, 548 F.3d 434 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

Blackburn v. Foltz, 828 F.2d 1137 (6th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38, 39

Brown v. Smith, 581 F.3d 424 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bryant v. Scott, 28 F.3d 1411 (5th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34, 39

Burton v. United States, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Carver v. Straub, 344 F.3d 340 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

Chapman v. California, 386 U.S. 19 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Clinkscale v. Carter, 375 F.3d 430 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Combs v. Coyle, 201 F.3d 269 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Couch v. Booker, 632 F.3d 241 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39, 55

Davis v. Ayala, 135 S.Ct. 2187 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Dickerson v. Bagley, 453 F.3d 690 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

English v. Romanowski, 602 F.3d 714 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Evitts v. Lucey, 468 U.S. 257 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45.

Giglio v. United States, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . passim

Gulimette v. Howes, 624 F.3d 286 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Hardwick v. Crosby, 320 F.3d 1127 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Harrington v. Richter, 502 U.S. 86 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43, 49

Harris v. Heabelin, 526 F.3d 903 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 22

Henderson v. Palmer, 730 F.3d 554 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Herrera v. Collins, 506 U.S. 390 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Hickey v. Hoffner, 701 Fed.Appx. 422 (6th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Hodgson v. Warren, 622 F.3d 591 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Holland v. United States, 348 U.S. 121 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Howe v. Bell, 547 U.S. 518, 165 L.Ed2d 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

Jackson v. Virginia, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 52

Johnson v. Horton, 2018 U.S. Dist. LEXIS 20711 *6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Johnson v. Williams, 137 S.Ct. 1083 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Jones v. Barnes, 463 U.S. 743 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Kernan v. Hinajoso, 136 S.Ct. 1603 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

Lafler v. Cooper, 132 S.Ct. 1376 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Landrum v. Mitchell, 625 F.3d 905 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Lundgren v. Mitchell, 440 F.3d 754 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

Matthews v. Abramajtys, 92 F.Supp2d 615 (E.D. Mich. 2000) . . . . . . . . . . . . . . . . . . . . . . .43, 46

McCleskey v. Zant, 499 U.S. 467 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

McFarland v. Yukins, 356 F.3d 688 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 47, 49

McQueen v. Scroggy, 99 F.3d 1302 (6th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34, 42

Mooney v. Holahan, 294 U.S. 1036 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

Moore v. Berghuis, 700 F.3d 882 (6th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Mosely v. Atchison, 689 F.838 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

Napue v. Illinois, 79 S.Ct. 1173 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

O'Neal v. McInich, 513 U.S. 432 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32, 33

People v. Ackley, 497 Mich 481 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

People v. Johnson, 451 Mich 115 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

People v. Lo Presto, 9 Mich App 318; 156 NW2d 586 (1961). . . . . . . . . . . . . . . . . . . . . . . . . .51

People v. Pippen, 501 Mich 902 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

Perry v. Johnson, 532 U.S 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Ramanez v. Berghuis, 490 F.3d 482 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Rayner v. Mills, 685 F.3d 636 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Richard v. Marsh, 481 U.S. 200 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Robinson v. Howes, 653 F.3d 519 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

Rompilla v. Beard, 125 S.Ct. 2456, 162 L.Ed2d 360 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . 54

Rosencrantz v. Lafler, 568 F.3d 577 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27, 31

Ruelas v. Wolfenbarger, 580 F.3d 403 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed2d 808 (1995). . . . . . . . . . . . . . . . passim

Schneider v. Estelle, 552 F.2d 593 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Thomas v. Westbrooks, 849 F.3d 659 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Towns v. Smith, 395 F.3d 251 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Wade v. Timmeron-Cooper, 783 F.3d 1059 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . .43, 49

Wiggins v. Smith, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

Williams v. Taylor, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 35

Workman v. Tate, 957 F.2d 1339 (6th Cir. 1992) . . . . . 53

Yarborough v. Rapelje, 2013 WL 116343 at *6-7 (E.D. Mich.) . . . . . 40

**OTHER AUTHORITY**

U.S. Const, Ams. V, VI and XIV . . . . . 34, 49

28 USC § 2254, et seq. . . . . . passim

MCL 750.316(1)(b) . . . . . 1

MCR 6.508(D) . . . . . 40, 51

MCR 6.508(D)(3)(b)(iii) . . . . . 40

CJI 2d 2.7 . . . . . 30

CJI 2d 2.5 . . . . . 30

CJI 2d 3-5 (2) and (5) . . . . . 30

**STATEMENT OF JURISDICTION**

This Honorable Court has jurisdiction to adjudicate this matter on the merits pursuant to the All Writs Act of ***28 USC § 1651***, and ***28 USC § 2254, et seq.***

## STATEMENT OF QUESTIONS PRESENTED

## ISSUES PRESENTED

1. WAS PETITIONER'S FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL VIOLATED BY THE INTRODUCTION OF FALSE AND PERJURED TESTIMONY FROM KEITH NICKERSON, A KEY PROSECUTION WITNESS?

Petitioner answers "YES"
The State Courts did not resolve this issue

II. WAS PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL VIOLATED WHERE TRIAL COUNSEL FAILD TO INVESTIGATE AND CALL A KNOWN WITNESS, WHO WOULD HAVE PROVIDED KEY EVIDENCE IN SUPPORT OF THE DEFENSE'S CHOSEN THEORY?

Petitioner answers "YES"
The State Courts did not resolve this issue

III. WAS PETITIONER DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, WHERE APPELLATE COUNSEL FAILED TO INVESTIGATE GILL AND LITIGATE TRIAL COUNSEL'S INEFFECTIVENESS ON DIRECT REVIEW?

Petitioner answers "YES"
The State Courts did not resolve this issue

## ACTUAL INNOCENCE CLAIM

CAN THIS HONORABLE COURT AND SHOULD THIS HONORABLE COURT ADDRESS THE MERITS OF THE UNDERLYING ISSUES BECAUSE: (A) TRIAL COUNSEL IS INEFFECTIVE, (B) APPELLATE COUNSEL IS INEFFECTIVE, (C) PETITIONER IS ACTUALLY INNOCENT?

Petitioner answers "YES"

**TRIAL FACTS**

Petitioner was convicted in State court for first degree murder (during commission of a kidnapping) under ***MCL 750.316(1)(b).*** The trial commenced in Van Buren County Circuit Court from September 21 through October 18, 2010, before visiting Judge Richard Lamb. T1-T22. Each of the 22 volumes of transcripts from the trial will be cited according to its date as "T1" through "T22" respectively. Other pretrial transcripts will be cited by its date followed by the corresponding page number, while the sentencing transcript will be cited as "T." Petitioner was tried jointly with a separate jury from his co-defendants: Shevolier Gill, Scottie Shaver and Ivory Shaver. In this cold case prosecution, the State alleged that during the early morning hours of April 25, 1998, Petitioner, along with his co-defendants, brutally assaulted Deborah Boothby in the parking lot of a Covert nightclub and at another location, then placed her in the road near the nightclub and ran her over with two cars to make death look like a hit-and-run car accident. The defense argued that Petitioner, who had been in a long-running feud with the main co-defendant, had nothing to do with Boothby's death.

The case arises out of an incident occurring at the Blue Star Lounge, a nightclub located on the Blue Star Highway about half-way between the Towns of Covert and South Haven, Michigan. It is well known that there was a long-standing, bitter, and often-violent rivalry between residences of Covert and South Haven. T6, p. 122; T7, p. 34, 102; T8, p. 43-45, 161-163, 302-303; T14, p. 19. Despite that rivalry, people from both towns – primarily "African Americans," patronized the Blue Star Lounge. T6, p. 122, 242; T7, p. 45, 102, 103, 242. Petitioner went to school and grew up primarily in Covert. The co-defendants were from South Haven. T8, p. 43-45, 301-303; T15, p. 17-20.

The night of April 25, 1998, Deborah Boothby, who was white, went with a friend to the Blue Star Lounge, and by all accounts, she became extremely drunk, disruptive and belligerent. T6, p. 229, 247-256; T7, p. 10, 39; T8, 96-98, 200-201, 295-297; T9, 167-169; T11, p. 19-21, 82-84; T15, p. 33-34. At some point, Boothby encountered Ivory Shaver, who was there with some of his South Haven friends and relatives, including his nephew Scottie Shaver and then girlfriend, Shevolier ("Shevy") Gill. T9, p. 206-208. Boothby, who had previously dated Ivory Shaver, got into a fight with the Shavers and Gill that escalated until Managers closed the bar and ordered everyone to leave. T6, p. 235-256; T7, p. 18-230; T8, p. 96-322; T9, p. 18-324, T10, p. 28-91. As the large crowd was leaving the bar, witness described a second fight or assault in the parking lot involving Boothby and several other people. T7, p. 83-240; T8, p. 102-268; T9, p. 21-218; T10, p. 33-40, T11, p. 25-130, T15, p. 32-40.

Covert Police Officers were dispatched to the Blue Star sometime after 2:30 a.m. in the morning of April 26 1998, in response to a 911-call. T5, p. 153-155. They found Boothby lying, severely injured and bleeding. In the northbound lane of the highway a short distance from the Blue Star Lounge entrance. T5, p. 154-158. She was barefoot, and a bystander handed officers a pair of shoes that apparently had been found nearby. T5, p. 159, 170; T6, p. 69. Boothby was alive and conscious, and while she asked about her injuries, she did not report being assaulted. Id., at 33.

As Police and crews were tending to Boothby and investigating the scene, several cars left the Blue Star Lounge parking lot without being contacted by Police. T6, p. 48, 66, 102-103. Other cars were inspected at the scene and no damage to them was found. T5, p. 164-165; T6, p. 25-26. A large blood spot was seen on the road where Boothby was found, and a second, smaller blood spot was observed on the road a few feet away. T5, p. 165-166, 179-180; T6, p. 111; PX

2. Two eyewitnesses whom Officers were able to interview at the scene stated that Boothby was seen staggering drunk down the road near the bar's entrance after closing time, uninjured. T6, p. 63-65; T12, p. 39-42. The witnesses indicated she fell down and was struck by an unidentified car. Id.

Based on information received from bystanders and anonymous tips, Officers focused early on two individuals: Adrienne Burnett and Scottie Shaver. On May 20, 1998, Officers went to the Burnett's house to investigate the apparent hit-and-run accident and a white car that had been connected to Burnett. T6, p. 43-113. There, they observed minor damage to Burnett's Mother's white Chevrolet Celebrity; including a broken right-front turn signal lens. T6, p. 84. The car was seized on June 10, 1998, and further damage was observed, including a broken spoiler-type device on the front underside of the car, an "impression" on the right under side of the front bumper, and scratches to the car's pan that appeared to be covered up. T5, p. 177-178; T6, p. 76-135, PX 35-41. No biological material was found on the car. Id., at 150.

Traces of white and blue metallic paint chips were found from within items recovered from Boothby's body, including her coat and other clothing. T6, p. 162-164. Forensic analysis revealed similarities between some of those chips and samples taken from the white Celebrity connected to Adrienne Burnett, but a match could not be made. Id., at 170-172, 174 185. A pattern on the fabric of Boothby's sweater appeared similar to a pattern impression seen on the undercarriage of the white Celebrity, but no match could be made. Id., at 170. No other cars, including Shevy Gill's Subaru, were inspected or forensically analyzed. T6, p. 154, 187; T13, p. 138.

## EYEWITNESS ACCOUNTS

At trial, several eyewitnesses described the fight inside the bar between Boothby and the two Shavers, Gill, and possibly others. T6, p. 235, 255-256; T7, p. 18-230; T8, p. 96-322; T9, p. 18-236; T10, p. 28-32. No one claimed that Petitioner was involved in this fight. Id. But the witnesses gave inconsistent and conflicting accounts of what occurred in the parking lot after everyone was ordered to leave. Mildred Christie, Carolyn Thomas, Latonya Truman, Sherrell Madry-Lewis, Tommie Jeffries, and Patricia Jones, testified that they recalled seeing Petitioner in the parking lot either assaulting Boothby with one or more of the co-defendants, or assisting one or more of the co-defendants taking Boothby to a car after the assault. T7, p. 143, 201; T8, p. 198-720.

Specific eyewitness accounts are as follows:

### ROBERT ROSS

Robert Ross accompanied Boothby to the Blue Star Lounge the night of April 25, 1998, and remembered arriving there around 10:30 p.m. He testified that a drunk Boothby got into a fight that had begun when she argued with and then tried to pour a drink onto Ivory Shaver, her ex-boyfriend. T6, p. 254-256; T7, p. 18-22. Ross left the bar sometime before 2:00 a.m. T7, p. 22-23. As he walked to his car, he saw Boothby in the parking lot speaking with a man he remembered to be the son of "Oscar Woods." T7, p. 25, 38. He asked Boothby if she wanted to leave with him, but she declined, saying she had a ride with someone else. Id. at 23-24. Boothby seemed "alright" at the time and Ross saw no disturbance in the parking lot. Id. at 25-26.

### GLOVER DANDRIDGE

Glover Dandridge, the Blue Star Lounge's owner, knew all the co-defendants from the bar, but he did not recall seeing Petitioner the night Boothby was killed. T7, p. 73-75. A fight

broke out, which got so bad that he had to close the bar early. Id., at 79-85. As the bar was clearing out, Dandridge saw a "commotion" in the middle of the bar's north-side parking lot, which appeared to be a fight between several people. T7, p. 84-88. The disturbance cleared after about four or five minutes. Around 2:30 a.m., someone knocked on the bar door and asked him to call 911 because a woman had been hit by a car in the road nearby. Id.at 89-91, 122. No one reported an assault in the parking lot that night. Id., at 100.

**KEITH OWENS**

Keith Owens, known by most as "Sam Bam," was a bouncer the night and morning of April 25-26, 1998. T11, p. 79-82. He recalled seeing a "skirmish" inside the bar in which a very drunk Deborah Boothby either fell or was knocked to the floor, possibly by Shevy Gill. Id. Eventually Owens ordered everyone to leave the bar, after which he saw several altercations in the parking lot, but did not recall seeing Deborah Boothby there. T11, p. 93-94, 101. The parking lot was cleared and awhile later, Owens went outside and saw Scottie Shaver and Adrienne Burnett sitting in a small white car. Id., at 94-95. Owens bought some drugs from Scottie Shaver, after which Shaver and Burnett left in the white car. Id., at 95-96, 106.

A short while later, Jeanine Black and Danyela Jones knocked on the door and reported seeing a woman lying in the road. T11, p. 97-98, 104-105. Owens called 911 and ran out to see Deborah Boothby lying injured in the road. Id., at 98-99. Police and an ambulance crew arrived a few minutes later, Id. Owens did not see Petitioner at any point that night. Id., at 101.

**TRACY HUGHES**

Tracy Hughes testified that she went to the Blue Star Lounge with two friends the night of April 25, 1998 and saw an argument, and then a fight, break out when Deborah Boothby tried to throw a drink onto Ivory Shaver. T9, p. 130-132. As Hughes was walking to her car, she saw

about a dozen people crowded around Boothby, violently assaulting her. Id., at 134-136, 138-140. While Hughes identified Ivory and Scottie Shaver, along with Gill and "some other guys" as being involve in this group, she did not identify Petitioner. Id., at 136-138.

Hughes testified that at some point, an unidentified man went to a van nearby, and then returned to the fight carrying a bat. T9, p. 140-142. Hughes did not see what happened, but she heard a loud thump that was consistent with a bat striking someone. Id., at 140-142. Hughes testified the bat was a miniature sized of the type that is given away at professional baseball games. Id., at 14. She was the only witness to claim a bat was involved in the fight.

After that, everyone started getting into cars and leaving. T9, p. 142-143. As this occurred, Ivory Shaver picked Boothby up by the hair and took her to a nearby car with the help of an unidentified male. Id. at 144-145. Gill then got into the car with Ivory Shaver, while Scottie Shaver and a girl got into a separate car and the two cars headed toward the parking lot exit. T9, p. 145-148. Hughes then got into a line of cars that was trying to leave, right behind a car driven by a man she referred to as "Ed." Id., at 146-151, 157.\

**PATRICIA JONES**

Patricia Jones, who claimed to have seen Petitioner involved in the assault, testified that Boothby was eventually knocked unconscious, after which Petitioner and Ivory Shaver carried her to a four-door care and placed her into it. T11, p. 34-37. Ivory Shaver then got into the car's driver seat while a second black male got into the front seat and a black female got into the back seat. T11, p. 35-37. The car the drove to the end of the parking lot where it appeared to stop. Id., at 37.

After seeing this, Patricia Jones and her friends, Sharon Williams (Martinez in 2010) and Shalimar Thomas, drove to Thomas's house and smoked marijuana. T11, p. 38-40. She and

Williams returned to the bar to retrieve her eyeglasses about a half-hour later. Id. at 68-69. As they neared the parking lot entrance, parked by the side of the road with Boothby outside of it.

Although she could see little because she had poor vision without her glasses, she claimed she then saw the car's lights go from red to white, and back to red, after which Sharon, who was driving, exclaimed that the woman might have been hit. Id., at 46-48. They then drove into the bar's parking lot and asked Sam Bam to call 911. Id., at 48-49. At some point, Jones recalled seeing a white car driven by a woman with Scottie Shaver in the passenger seat leave the parking lot and turn in the direction of where they had seen Boothby. Id., at 49-151.

**SHARON MARTINEZ (WILLIAMS)**

Sharon Martinez (Sharon Williams in 1998) testified, contrary to Patricia Jones, that she saw only Scottie and Ivory Shaver, and not Petitioner, amongst the group of people hitting and kicking Boothby in the parking lot. At some point, Scottie and Ivory Shaver then dragged Boothby to a four-door car that was parked across the parking lot. T11, p. 124-130. Boothby was placed into the back seat of the car while Scottie Shaver got in beside her and a black female got into the car's driver seat. Id., at 130-131. As Martinez and her friends were leaving the parking lot, whey saw hands "flailing" inside the four-door car. Id.

When Martinez saw the same four-door car facing north in the road in front of the entrance with its lights on and Boothby lying in front of it. T11, p. 133-135. Ivory Shaver was in the driver's seat of the car. With the aid of her rear view mirror, she saw the four-door car move forward and backward near where Boothby was lying. Id., at 136-137, 151. Martinez then pulled into the Blue Star parking lot, where she and Jones told the bouncer what they had seen. T11, p. 138. While there, Martinez saw Scottie Shaver in the parking lot talking to Petitioner. Id., at 139-140, 160. Scottie Shaver then got into a car driven by a woman, which left the parking lot,

after which Petitioner got into a truck and left by himself. Id., at 140-141, 161. That was the first and only time Martinez saw Petitioner that night, and she never saw him contact Boothby in any way. Id., at 162-163.

**MARIE HARRIS-BLACK**

Marie Harris-Black testified that she, her sister Jeanine Black, and her friend Danyela Jones, went to the Blue Star Lounge in a brown minivan the night of April 25, 1998, where they hung out in the parking lot. T8, p. 52-53. Sometime after 1:00 a.m., the next morning, they drove to a nearby gas station to by something to smoke. Id., 55. When they returned about 15-20 minutes later, the bar appeared closed so they saw a white woman wearing a long leather jacket walking north along the road near the bar's entrance. The woman did not appear to be injured, but was "staggering" as if drunk. Id. at 58-59, 75. As they passed the woman, she fell down, as if she had passed out. Id., at 58-59. Seeing this, they turned around and went back to the bar to report what they had seen to Sam Bam. Id., at 58, 63. While waiting for police to arrive, Harris-Black recalled seeing about five cars in the parking lot, including a white car and a blue-green colored car that may have been driven by a woman she thought was Latisha Hollings. Id., at 62-63. The white and blue/green cars left the parking lot and turned in the direction of where the woman had fallen in the road. Moments after the cars left, Harris-Black went out to the road and saw the woman lying in a different place with blood on her face, and it appeared she had been struck by a car. Id., at 68-69, 79-80.

**DANYELA JONES**

Danyela Jones, along with Marie Harris-Black, had been interviewed by police 15-20 minutes after Boothby was discovered in the road. T14, p. 48-51. Despite this, the prosecution did not bother calling Danyela Jones at trial; instead, the defense called her. T14, p. 47-75.

Danyela Jones testified that after hanging out with her friends Janine and Marie Black in the Blue Star Lounge parking lot, they left for several minutes and then returned. Id., at 61. Upon returning to the bar, they saw a white woman "staggering" drunk on the side of the road near the parking lot's entrance. Id., at 51. Seeing this, she and her friends "came up with the bright idea that [they could] clip" the woman with their van, so they turned around to go back to her. Id., at 50-51. But as they did so, the woman fell to the ground. Feeling guilty about what they had planned, they stopped to help the woman. Id., at 51-52. The three got out of their van and approached the woman was still lying by the road side. Id., at 51-52, 72-73. The woman appeared to be semi-conscious and drunk, but was not injured. Id., at 52, 54-55, 73.

They went to the bar and asked Sam Bam to call for help for the woman, then went near the parking lot entrance to wait for the ambulance. T14, p. 52-53. While there, Danyela Jones saw a white car followed by a second car leave the parking lot, after which she heard thumping sounds consistent with a car hitting or running over someone. Id., at 54.

Danyela Jones was interviewed about this again in 2009, by a Michigan State Police detective, and she gave the same account she had provided to police in 1998 and at a trial a year later. This interview did not "go well," however, because the detective repeatedly pressured her to say [she'd] seen stuff that [she] hadn't seen," including that the woman's face was "all bloodied up" when she first saw her. T14, p. 58-59. Also, the detective kept pushing a "story" that was not true and pressuring Jones to go along with it. Id., at 59.

**JAMES LANGFORD**

James Langford went to the Blue Star Lounge around 1:30 the morning of Boothby's death. T13, p. 226-227. When he got there, he saw a white woman wearing dark clothing walking in the road near the bar's entrance, but thought little of it. Id., at 230-231, 240-241, 247.

In the parking lot, he noticed that there were few cars remaining, but spotted Scottie Shaver there, talking to some people from the bar. Id., at 231-236. He offered Scottie a ride from the bar, but he declined. As they were chatting, a van pulled into the parking lot, two women got out of it and pounded on the bar's door. Id., at 229-230, 241-242. Scottie Shaver then got into a white car driving by an unidentified person, which left the parking lot. Id., at 229-239.

**ADRIENNE BURNETT**

The prosecutor's case hinged on the testimony of Adrienne Burnett, who testified after pleading guilty to second degree murder for her role in Boothby's death, as well as perjury for repeatedly lying under oath about material facts surrounding this case. T10, p. 17-22. Rather than facing a sentence of life in prison without the possibility of parole for the murder, Burnett was promised she could get out of prison in as little as eight years if she testified against Petitioner and his co-defendants. Id. The agreement called for Burnett to testify consistently with the last two in a string of 11 contradictory, inconsistent, and retracted police statements she had given over a 12-year period. Id., at 18-20, 74-75.

Burnett testified that she and a friend, "Aveda," went in her mother's white Chevrolet Celebrity to the Blue Star Lounge the night of Boothby's death, where they planned to meet Michelle Jackson. T10, p. 23-26. Like others, she saw Deborah Boothby confront, argue, and fist-fight with Ivory Shaver and Shevy Gill. Id., at 27-29. Eventually, everyone was ordered to leave, after which Burnett went to the parking lot with "Aveda" and Jackson, where Aveda retrieved an overnight bag from the white Celebrity. Id., at 30-32, 34-45.

While she was in the parking lot, she saw Boothby arguing and fighting with Ivory Shaver and Shevy Gill, and other members of the Shaver family. T10, p. 32-36. Boothby eventually was knocked to the ground where she was punched and kicked some more. Id., at 32-

33, 36-37. Burnett claimed that a one point, Petitioner "blasted" Boothby with a punch that "put her out." Id., at 36-37. As Boothby law motionless on the ground, Sam Bam, the bouncer, came out and threatened to call the police, so people started leaving. Id., at 39-40. Burnett, also testified that she too tried to leave in her car got "stuck" in traffic. T10, p. 40. As she was sitting in the lot, she claimed she saw Petitioner and Scottie and Ivory Shaver take Boothby to Shevy Gill's car and place her into the back seat, the get into the car themselves. Id., at 40-42. Then Scottie Shaver, her boyfriend at the time, suddenly got into her car and ordered her to follow the Gill's car. Id., at 45-47.

Burnett testified that she then followed Gill's car a short-ways south on the Blue Star Highway to some woods near a campground. T10, p. 46-49. There, Boothby was removed from Gill's car and was punched and kicked some more by the four co-defendants. T10, p. 48-56. Eventually, Boothby stopped moving, and the group got scared that she was dead. Id., at 56. At Ivory Shaver's suggestion, they decided to place Boothby in the road to make it look like a car had struck and killed her. Id.

Boothby was then placed back into Gill's car and the group returned in the two cars to the Blue Star Lounge. The cars pulled over near the parking lot entrance, where Ivory Shaver and Petitioner "dumped [Boothby's] body onto the road." Id.,

The two men then got back into Gill's car, after which the car drove backward and forward over Boothby, left the scene without returning to the parking lot. Id., at 60-63, 260.

At Scottie Shaver's direction, Burnett then drove into the Blue Star Lounge parking lot, where she waited for him to complete a drug deal with Sam Bam. T10, p. 566-67. Scottie Shaver then returned to the car and instructed her to leave and "run over the bitch" again. It., at 67-68. Burnett then drove out of the lot, followed by Tisha Hollings, who was driving a green car.

According to Burnett, both Hollings' cars ran over Boothby as they left. Id., at 69-70. Burnett insisted that Boothby was lying down on the road when all three cars struck her, and that she never stood or walked again after she was knocked to the ground the physical assault in the nearby wooded area. Id., at 218-223.

Burnett and Scottie Shaver then went home together, where Scottie ordered her to keep quiet, threatening to kill her if she told anyone about what they had done. T10, p. 72. Burnett claimed she complied with that request because she feared Scottie Shaver and the other defendants. Id. She was threatened again in the days following the incident. Burnett claimed that years later, Petitioner called to warn her to stay quiet. Id., at 73-74.

As the years went by and the investigation opened back up, Burnett made at least 11 statements to the police, some of which were under oath pursuant to investigative subpoenas. T10, p. 74-75. Burnett conceded that each of those statements were inconsistent in may key respects, and that she had repeatedly lied about her and others involvements in Boothby's death. Numerous times, Burnett had accused may other people of being involved in the crime, whose names she did not even mention at trial. T10, p. 75-231; T13, p. 142-146. In many of those statements, Burnett insisted she was telling the police the absolute truth, only to later revise, recant, and fundamentally alter her story in subsequent statements. Id., at 150, 239-241; T13, p. 146-147.

In all of the numerous police statements Burnett gave from 1998 through February 4, 2009, she either did not mention Petitioner's name or unequivocally denied that he was involved in any way in Boothby's death. T10, p. 74-77, 237-239. Interrogators began suggesting or insisting that Petitioner was involved in 2007. Id., at 132, 237-240. It was not until April 22, 2009, that Burnett finally implicated Petitioner. Id., at 78, 240. This was Burnett's 11th statement

to police, and was made in response to at least five statements by her interrogator that Petitioner was involved. Id., at 78, 240. Even that statement, Burnett conceded, was riddled with inaccuracies and inconsistencies. Id. at 78-79. Burnett admitted she had even lied at the preliminary examination too, which put her in breach of her plea agreement. Id., at 157, 170-171, 245-146.

**VERLANDA SHAVER**

Verlanda Shaver, Scottie Shaver's own niece, recalled seeing Scottie and Ivory Shaver, along with Shevy Gill, hitting, stomping, and kicking Deborah Boothby in the parking lot after the Blue Star Lounge was closed the morning of April 26, 1998. T8, p. 263-269. Shaver did not see Petitioner involved in the assault in any way. Id., at 269. She knew Adrienne Burnett and was well aware of her reputation in the community as a liar. Id., at 281.

**JOAN GIBSON**

Joan Gibson, an old friend of Deborah Boothby, often went with Boothby to go to bars in the Covert/South Haven area. T14, p. 17-19. Boothby would often get drunk and these bars and routinely walk or hitchhike home, often while barefoot. Id., at 19-20, 24.

**ANGELA GOODWIN**

Angela Goodwin, who was friends with Adrienne Burnett in 1998, testified that she saw Adrienne Burnett together with Scottie Shaver numerous times in the weeks and years after Boothby died. T13, p. 250-253. This included at restaurants, bars, and other establishments. Many times, Goodwin saw Burnett and Scottie Shaver acting very affectionately towards each other when they would go out dancing. Id., at 252-254. To Goodwin, it appeared that Burnett and Shaver had a good relationship, and Burnett never indicated or appeared to fear Scottie Shaver. Id. One time, Burnett bragged about murdering someone. Id., at 254-255.

## PETITIONER'S ARREST

Following several investigations by various agencies, Petitioner was arrested 11-years after Boothby's death at his home in Indianapolis, Indiana. T12, p. 100-146. Members of the Federal Fugitive Task Force took Petitioner in custody, and testified the upon being removed from his house, Petitioner grew visibly upset and vomited in the yard. T12, p. 102-103, 146. While being transported to the jail, Petitioner reportedly asked whether a person could be charged with murder if he was merely present when someone else actually committed the crime. Id., at 104-105, 117-118, 150-151. Upon receiving an affirmative answer, Petitioner allegedly asked if that would still be the case if a vehicle was involved. Id., at 105-106. Petitioner did not make any admission, and he was entirely compliant and cooperative with the agents. Id.

## JAILHOUSE INFORMANTS

The prosecution bolstered its case through the testimony of two jailhouse snitches, both of whom came forward initially hoping to cut deal in their own sentences in exchange for implicating Petitioner in the crime. Michael Smith, who had numerous convictions for crimes of dishonesty including forgery and theft, was housed at the Indiana Jail where Petitioner was detained prior to being transferred to Michigan. T12, p. 178. Smith was a self-proclaimed "paralegal" who helped other inmates with their court cases, including Petitioner. Id., at 178-179.

According to Smith, while they were working on Petitioner's case, Foster "bragged" about how he and the co-defendants had beaten and kicked Boothby in the Blue Star Lounge parking lot, then took her to a place "behind the bar" where they ran over her with two cars. T12, p. 182-183. Petitioner also said that they then dumped Boothby's body into the road in front of the Blue Star Lounge, after which he left in his SUV. Id. at 183. Smith claimed Petitioner

explained he joined in the assault after getting angry at Boothby for hurling racial slurs during the fight. Id., at 187.

Smith displayed a remarkable recall of all the relevant individuals' names from the case at trial. T12, p. 181-183. Although he claimed he knew this and the facts of the case solely through speaking with Petitioner, Smith admitted that he had access to and had thoroughly read numerous police reports and witness statements for the case, including Adrienne Burnett's statements. Id., at 188-190, 207. Although Smith claimed he was testifying against Petitioner for "ethical" reasons, he conceded that he had initially contacted authorities and tried to cut a deal in exchange for incriminating Petitioner. On multiple occasions, he had threatened not to provide information when authorities would not offer him what he wanted in the form of a lower sentence in his own case. Id., at 191, 202-203, 205.

Keith Nickerson, claimed to have known Petitioner while they were incarcerated together at the Van Buren County Jail pending Foster's trial. T12, p. 226-228. Before Foster's trial, Nickerson had pled guilty in Federal Court to bank robbery, and was sentenced to 10-years, 8-months in prison. Id., at 224. Nickerson also had prior convictions for several crimes of dishonesty. Id.

Nickerson, Petitioner's bunkmate, claimed Petitioner confessed to participating in the murder of Boothby, indicating that he had kicked her in the head during the assault in the Blue Star Lounge parking lot, then drove with the co-defendants while they took her to a second location and ran over her with two cars. T12, p. 238-240. According to Nickerson, Petitioner stated they then took Boothby to the Blue Star Lounge, where Scottie Shaver directed Adrienne Burnett to run her over again. Id., at 239.

## MEDICAL EXAMINERS

Dr. Waldemar Palutke, the medical examiner who performed the autopsy on Boothby, originally had classified the cause of her death as multiple blunt force trauma to her head and body, and the manner of death as "undetermined." T11, p. 219-220. Based on this, Boothby's death certificate indicated that she was the victim of an "accident pedestrian struck by car." Id. at 238. However, Dr. Palutke testified at trial that after being "given new information" that was selected by the police and/or prosecutor, he decided in 2009 to change his opinion and reclassify the manner of death as a homicide. Id., at 220-222.

Dr. Palutke testified that Boothby had a blood alcohol level nearly 3-1/2 times the legal limit for driving when she died. T11, p. 203-204, 256. The bottoms of her feet were extremely dirty with abrasions and cuts on them. Id., at 235-236, 273-274. Dr. Palutke observed numerous lacerations and "brush burns" over Boothby's head and body that were consistent with her being scraped or dragged across a rough surface, such as gravel or asphalt. Id. at 232. She had several bruises to her brain, several bruises to her brain, several fractured ribs, a broken hip, collar bone, and nose, and suffered internal bruising and bleeding throughout her body. Id., at 207-220, 228-229. Although he did not originally report this, Dr. Palutke testified at trial that the extent of these injuries were "consistent" with her being hit or run over by a car, but based on the new information he was given, he felt they were also consistent with "more than" that, including being physically assaulted. Id., at 219-223. The doctor testified that the extent of such lacerations on the head would have resulted in significant blood loss by Boothby if they occurred before she died, and that if she was transported in a car while in such a state, large amounts of blood could be expected to be found inside the car. Id., at 209; T12, p. 26-27. The Doctor could not say whether Boothby had been standing, lying, or kneeling when hit or run over by a car, nor

could he say whether there were multiple cars involved. Id., at 223-224, 227-228. The case of death was the accumulation of the numerous injuries described above, as no particular injury would be definitely identified as the fatal one. Id., at 219, 237.

On cross-examination, the Doctor conceded that much of his revised opinion regarding the manner of death was based primarily on what the police and/or the prosecutor told him. T12, p. 268. Because that information was from the police, a source he knew and trusted, the Doctor believed he should change his medical opinion regarding the manner of death. Id., at 254-255, 270. He could not say whether he was given eyewitness accounts that contradicted the information provided by the prosecution. Id., at 254.

The Doctor further agreed that Boothby's injuries, as well as the cause and manner of death, also were consistent with the summary he wrote in his original autopsy report, which read:

> "34-year-all woman with a history of alcoholism was reportedly escorted out of a bar because of her behavior and a short time afterward was observed to be lying in street near the bar apparently uninjured. Emergency medical services were summoned and on their arrival the decedent was found to be severely injured. T11, p. 251-253."

Although the Doctor believed, based on the information provided by the police, that the blunt force injuries to Boothby's head were consistent with a physical assault, he conceded they were just as consistent with her falling down after passing out and striking her head on a road or the ground, and then being struck or run over by a car. Id., at 253-268. The Doctor could identify no single injury that he could definitely say was a result of her being struck by a person rather than by a car. Id., at 263.

Doctor Brian Hunter, the Genesee County Medical Examiner for whom Dr. Paultke had expressed a great deal of professional respect, testified for the defense. T11, p. 255; T13, p. 191-

223. Dr. Hunter testified that Boothby's injuries were entirely consistent with her being hit or run over by a car or cars, and he saw nothing to be definitely shown she had been physically assaulted. T13, p. 197-202. Of particular note were injuries to the backs of Boothby's knees, which Dr. Paultke had not bothered to cut open to examine internally. Id., at 202-203. Such an examination and a comparison to the type and height of the bumpers of the suspect car or cars would have helped determine whether Boothby was lying or standing when struck and/or run over. Id., at 202-203. Because of that deficiency in Dr. Paultke's autopsy, it could not be definitely determined whether Boothby was standing or lying when struck by a car or cars. Id. Dr. Colby further testified that it was highly unlikely that Boothby could have gotten up and walked after being run over twice by a car, as Burnett had claimed.

**PETITIONER'S TESTIMONY**

Petitioner testified, and while acknowledging his presence at the Blue Star Lounge the night of the incident, he denied any involvement in Boothby's death. He described for the jury the intense and often-violent feud between those from Covert, where he was from, and those from South Haven, where the Shavers were from. T15, p. 19-21. Petitioner was involved in that feud starting in high school, and it continued after graduation when they both started dealing drugs, which transformed the feud into a turf war. Id., at 21-22. The two had been in several fights, some while armed. One flight had occurred at the Blue Star Lounge a week or two before Boothby's death. Id., at 22-27, 116-117. He did not know Ivory Shaver very well, but he knew Scottie Shaver and hated him because he as a "punk." Id.

Although his memory was foggy due to the passage of time, Petitioner recalled going alone in his Jeep Cherokee to the Blue Star Lounge the night of April 25, 1998. T15, p. 23-25.

He remembered drinking and smoking a lot of marijuana that night and getting intoxicated. Id., at 26, 106-108. He did not recall seeing the Shavers or Gilll inside the bar. Id., at 29-30.

Petitioner did not see a fight inside the bar, but he remembered seeing Deborah Boothby because she was the only white woman there that night. T15, p. 30, 33. Around closing time, he went to the parking lot where he saw a fight between seven or eight people, including Boothby and at least one other woman. Id., at 33-36. When he approached the fight to see if anyone from Covert was involved, he got hit by a pitcher of beer, after which he tussled briefly with a man named Clifton Haddock [sic] (Hatter), whom he though had through it. After confirming that Haddock had not been responsible for hitting him with the pitcher, the tussle ended and Petitioner left the scene of the fight after a few moments. It., at 35-37.

Due to his hatred of South Haven people and in particular Scottie Shaver, Petitioner never would have helped him in a fight, even if he heard someone on the other side using offensive racial epithets. T15, p. 39-40. Regardless, he did not recall seeing the Shavers involved in a fight, and he did not get involved himself. Id., at 39-40. While walking toward his car, Petitioner spotted Scottie Shaver and Adrienne Burnett sitting in a white car, talking to each other with both front doors opened. T15, p. 40-41. Petitioner believed he then left the bar alone and drove to a party. Id., at 42-44. He learned Boothby had been killed a day or two later. Id., at 45-47.

As Petitioner and Scottie Shaver matured over the years, the feud between them cooled, and though they never became friends, they learned to tolerate each other. T15, p. 48-50. Petitioner moved to Atlanta, Georgia in 2004 with his wife and family, where he eventually got out of the drug trade and gained a legitimate employment. Id., at 50-53. Thereafter, he occasionally visited Covert, where he would run into people from his past, including Scottie

Shaver, and was told rumors about Boothby's death and the on-and-off investigation. Id., at 122-123.

After his wife died in early 2009, Petitioner moved to Indianapolis where he eventually moved in with the mother of his teenage son. T15, p. 57-58. During that period, he had been contacted by police about Boothby's death, and had tried to contact the Covert police to cooperate with the investigation. Id. at 61-62, 69. About three weeks before his arrest, Petitioner heard additional rumors about Scottie and Ivory Shaver's involvement in Boothby's death, and was told that they and Gill had been arrested. Id., at 72-73, 125-126.

When agents came to arrest him, Petitioner was shocked and got sick because he was so upset about being detained for what he thought was merely questioning. T15, p. 66-67. He admitted that he asked whether a person could be charged with murder if he was merely present at the time when someone else actually killed a person, even if it occurred in a vehicle. He was asking about Scottie Shaver's situation, as he heard Shaver was in Burnett's car when she ran over Boothby. Id., at 70-71, 129-130. In three subsequent police interviews, Petitioner consistently and adamantly denied any involvement in the crimes. Id., at 74-76.

Petitioner described his incarceration in the Indiana Jail with Michael Smith, known as "Flame" because he was a homosexual. T15, p. 86. Smith, a jailhouse paralegal who helped Petitioner with some legal research, had access to many of the police reports about the incident, including Adrienne Burnett's testimony and police statements. Id., at 88-90, 138-140. Additionally, Petitioner had discussed the various witness statements with Smith, but there was a final "fallout out" over Smith's divisive and manipulative behavior; particularly during their jail Bible study group. The final straw was when Smith had bragged about his plan to blackmail the victim of his most recent identity theft crime, who was a Senator, by threatening to claim that he

and the Senator had been homosexual lovers. Id., at 91-93, 150-151. Petitioner denied ever confessing to anyone. Id.

Petitioner recalled meeting Nickerson in the Van Buren County Jail. He may have discussed his charges with Nickerson at some point during that time, but he never admitted having anything to do with Boothby's death. T15, p. 94. While there, Petitioner had all of his file material with him, including police reports and written police reports and written police statements, and there were many times when those materials had been left unattended in his cell so that other inmates would have access to them. Id., at 94-96, 125-126, 139.

## STANDARD OF REVIEW

Under the Antiterrorism and the Effective Death Penalty Act (AEDPA), a State Court conviction may be overturned for an issue adjudicated on the merits in State Court if the decision was:

> "(1) contrary to, or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, or, (2) resulted in a decision that was based on an unreasonable determination of facts, in light of the evidence presented in the State Court proceedings."

***28 USC § 2254; Harris v. Heabelin,*** 526 F.3d 903, 904 (6th Cir. 2008).

A State Court adjudication is "contrary to" Supreme Court precedent under ***§ 2254(d)(1),*** "if the State Court arrives to a conclusion opposite to that reached by the Supreme Court on a question of law" or "if the State Court confronts facts that are materially indistinguishable from relevant Supreme Court precedent and arrives at an opposite result." ***Williams v. Taylor***, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" clause of ***§ 2254,*** habeas relief is available if the State Court identifies the correct governing principle from the Supreme Court decision but,

"unreasonably applies the principle to the facts of a petitioner's case." ***Harris,*** 526 F.3d at 909. Put differently, "a Federal Court may grant relief when a State Court has misapplied a principle to a set of facts different from those of the case in which the principle was announced." ***Wiggins v. Smith***, 539 U.S. 510, 520 (2003). The "central inquiry" is whether the State Court decision was objectively unreasonable and not simply incorrect. ***Harris, supra***, 526 F.3d 910. The Williams Court went on to explain, "the unreasonable application prong means exactly that." Id.

Additionally, when a claim has never been "adjudicated on the merits" in State Court, the claims do not fall under ***28 USC § 2254(d), Kernan v. Hinajoso,*** 136 S.Ct. 1603, 1604 (2016). In such cases, "a federal court reviews the claim pursuant to the pre-AEDPA Standard of Review, *de novo* for questions of law (including mixed questions of law and fact), and for clear error for questions of fact." ***Robinson v. Howes***, 653 F.3d 519, 523 (6th Cir. 2011) (citing ***Brown v. Smith***, 581 F.3d 424, 426 (6th Cir. 2005)).

## ISSUES PRESENTED

### 1. PETITIONER'S FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE INTRODUCTION OF FALSE AND PERJURED TESTIMONY FROM KEITH NICKERSON, A KEY PROSECUTION WITNESS

### A. Clearly Established Law

It is well settled that, "the deliberate deception of courts and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice." ***Giglio v. United States***, 405 U.S. 150, 153 (1972). Further, the Supreme Court has made unequivocally clear that, "the Fourteenth Amendment Due Process clause requires a new trial where a conviction is obtained through the use of materially false evidence, or perjured testimony, which the prosecutor knew, or should have known as false." ***Moody v. Holohan***, 294 U.S. 1036 (1935).

Also, "the principle that the State may not use false evidence including false testimony to obtain a conviction does not cease to apply merely because the false testimony goes to the credibility of a witness." ***Napue v. Illinois***, 79 S.Ct. 1173, 1177 (1959). And, "the prosecutor has a duty to correct false or perjured testimony not only going to the elements of the offense, but anything that affects the credibility of the witness.' ***Giglio,*** 405 U.S. at 153-155.

**B. Pertinent Facts**

In his testimony, Keith Nickerson repeatedly denied receiving any benefit or leniency during Federal sentencing for testifying against Petitioner, or that the prosecutor had done anything for his Federal case that would have led to a sentence reduction. T12, p. 225-226, 241-242, 243-247. A fair review of the record illustrates that Nickerson testified as follows:

> "Q. And I asked you at that time and I will ask you again, in March did I indicate to you that I would do nothing for you in regard to any cases that you had pending?
> A. Nothing
> Q. Okay. Have I done anything on your behalf?
> A. Nothing.
> Q. Is there any benefit that you know of that you could receive from testifying today?
> A. No."

See, T12, p. 225-226, 241.

Then on cross examination, Nickerson was questioned and answered as follows:

> "Q. Do you remember what your originally scored [Federal] guidelines were at the minimum?
> A. 188 months.
> Q. And that's the bottom end, correct?
> A. Yeah.
> Q. And as a result of this 5K Motion filed by the Federal Government, you received a reduction down to 128 months; is that right?
> A. That is not why I got a reduction.
> Q. You didn't get a reduction because of the 5K Motion by any chance?
> A. No, I didn't actually.

Q. You never saw that?
A. No.
Q. Were you sitting in the courtroom when the federal Judge sentenced you to your 128 month?
A. Yes, I was.
Q. Did you hear the federal Judge mention a number of times that based upon your substantial assistance in a state murder case, along with some dispute about a definition of career criminal, that he was going to give you a three --- level departure below your original guidelines were?
A. The departure was because of the close proximity of my previous offenses.
Q. There was a dispute about the definition of career criminal, correct?
A. Correct.
Q. The Judge did say at your sentencing that as a result also of your cooperation he was going to give you this benefit. In fact, he went so as to say it was only as a result of the benefit that you gave up to that date and had nothing to do with any future benefit. Do you remember that?
A. No. I don't remember specifically what you are saying. I got credit for this, but I didn't get credit for this. That is not what has happened."

See, T12, p. 244-246.

* * *

"Q. The Federal Government filed a specific motion saying that as a result of the information that they received from Mr. Pheney indicating that you had testified, that they would agree to the reduction; is that right?
A. I didn't receive a reduction from my assistance [sic] in this case.
Q. All right; that is your understanding the, correct?
A. Correct."

See, T12, p. 247

Documents from Nickerson's Federal Court proceedings and sentencing reveal that, contrary to his trial testimony, he did receive a sentence reduction for testifying in this case. At that hearing, the Federal Judge explicitly ruled, in response to the Government's motion for a downward departure, that Nickerson's testimony against Foster was grounds for departing below the Federal Guidelines sentence range, explaining:

> "First, I recognized the government has filed a 5K motion as it relates to the defendant's cooperation in the prosecution of a still pending unresolved homicide, which is pending in state circuit court. The defendant has testified at a preliminary examination, and according to the 5K motion filed by the government, was an important witness in support of the prosecution. As far as the 5K motion is concerned, the Court intends to grant it. I have considered only defendant's cooperation to date, as I am required to do. I have not factored in any future cooperation the defendant may lend to the prosecution of others.
>
> * * *
>
> The Government has suggested that the Court move down three levels for his substantial assistance to the state attorney general's office. Given the fact that Mr. Nickerson decided to cooperate, in light of the potential harm to himself and to his family, I think the three level 5K motion is appropriate based on his live testimony at the state preliminary examination. As I said before, I have only considered Mr. Nickerson's cooperation to date. It does not contemplate any further potential of a Rule 35 as I adjudicate this case today. Accordingly, I believe that with a three level reduction, I ordinarily, without the 5K consideration, would have sentenced Mr. Nickerson, in light of his prior record, at least in the middle of the attendant guideline range, which was --- which would have been approximately 212 months, but the --- and a three level departure from the low end of the 188 guideline range would have been 140 months. I believe a sentence of a level that gives credit to Mr. Nickerson's cooperation, as well as the fact that at the margin his career offender guideline does over score him. Accordingly, I intend to depart downward in a manner consistent with his 5K cooperation, as well as giving him a modest decrease for the fact that the career guideline overstates the seriousness of his particular situation."

See, Nickerson's Sentencing Hearing Transcripts, Appx D. p. 20 and 25.

Moreover, the Government filed a motion for such downward departure in Nickerson's case, arguing in relevant part:

> "4. [Mr. Nickerson's] testimony proved to be instrumental in murder charges subsequently brought against five individuals by the Michigan Attorney General in People v. Ivory Shaver, et al, No. 10-17030-FC (36th Cir. 2010). Undersigned counsel has spoken to Assistant Attorney General Dennis Pheney about [Mr. Nickerson's] assistance and was advised that the defendant

> testified at a preliminary examination and was important witness in the case. The trial is scheduled to commence in June where the defendant is expected to testify again."

See, Federal Government 5K Motion, Appx C, p. 2.

**C. The State Court's Determination**

The last reasoned State Court opinion to address Petitioner's perjured testimony claim comes from the Michigan Court of Appeals. In affirming Petitioner's convictions, that Court, concluded Nickerson testified falsely regarding the benefits he received from the Federal Judge for his assistance in defendant's case and that such testimony misled the jury. See Michigan Court of Appeals Opinion, Id., at p. 14, Appx. A.

Nevertheless, the Michigan Court of Appeals found that Nickerson's perjured testimony did not violate Petitioner's due process rights, because there was no evidence that the state prosecutor actually "promised Nickerson anything, that defense counsel had sufficiently presented " the pertinent information "regarding the benefits Nickerson received through cross-examination, and because there was significant other evidence concerning Petitioner's participation in at least the beating of the victim." Id.

**D. Discussion**

On habeas review and analysis of any cognizable Federal claim demands an inquiry as to whether the issue has been adjudicated on the merits in State court, if it has AEDPA's deferential standard kicks in, ***Davis v. Ayala***, 135 S.Ct. 2187, 2195 (2015). If not this Court must review Petitioner's claim de novo. ***Kernan, supra,*** 136 S.Ct. 1604 (2016); ***Robinson, supra***, 663 F.3d at 823. Thus --- the Michigan Court of Appeals Opinion reflects that the relevant claim was adjudicated on the merits in the State court. See, Michigan Court of Appeals Opinion. Id. Therefore, AEDPA applied in this context. ***Davis***, 135 S.Ct. at 2195.

Moreover, to acquire habeas relief on the instant claim Petitioner must demonstrate: (1) the prosecutor presented false testimony, (2) the prosecutor knew the testimony was false, and (3) there is a reasonable likelihood the perjured testimony affected the jury's verdict. ***Giglio,*** 405 U.S. at 153-154; ***Napue,*** 360 U.S. at 264-272; ***Rosencrantz v. Lafler,*** 568 F.3d 577, 583-584 (6th Cir. 2007). As explained below, this standard has been met in this case. And because the Michigan Court of Appeals failed to apply the law accordingly when adjudicating the claim --- it's determination is "contrary to" and also "involved an unreasonable application of Supreme Court precedent." See, ***28 USC § 2254(d)(1).***

**a. Nickerson's Testimony That He Did Not Receive Any Benefit in His Federal Case for His Cooperation In Petitioner's Case Was False**

It is abundantly clear from Nickerson's Federal sentencing transcript, Appx. D, and the facts in this case, T12, p. 244-246, 247, that Nickerson testified contrary to what the Federal Judge placed on the record during his Federal sentencing. Id. As the Michigan Court of Appeals noted "He did indeed receive a benefit from the 5K Motion (which was based on his cooperation in the instant matter), in the form of a reduced sentence and yet he unequivocally testified that he did not receive a reduction in his sentence because of his assistance in the instant matter." "Nickerson's testimony was thus contrary to the actual facts." See, Michigan Court of Appeals Opinion. Id., at p. 13, Appx. A.

**b. The Michigan Attorney General Who Tried the Case Knew or Should Have Known That Nickerson Testified Falsely When He Denied That He Did Not Receive Any Benefit from The Federal Authorities for His Cooperation and The Testimony He Gave Against Petitioner**

A fair assessment of the State Court's opinion reflects that when undertaking the relevant inquiry the Michigan Court of Appeals noted, "there is no indication that the state prosecutor

promised Nickerson any benefit for his cooperation." See, Michigan Court of Appeals Opinion. Id. at p. 14

In taking such a position the Michigan Court of Appeals ignored that Dennis Pheney did not have to promise Nickerson anything, --- for him to possess knowledge that Nickerson received benefits from the Federal Government for the testimony he gave against Petitioner. In addition, the Michigan Court of Appeals also ignored that the actions of Dennis Pheney were the primary motivating force behind the Government's 5K Motion. See, Appx. C, p. 2 and Appx. D, p. 20 and 25. And the fact that Nickerson was actually sentenced in Federal Court in April of 2010, i.e., almost four-months prior to him testifying against Petitioner, --- suffices to establish that Dennis Pheney knew his Federal colleagues rewarded Nickerson for his cooperation and testimony against Petitioner.

If this Court were to somehow conclude that the Michigan Attorney General lacked knowledge of Nickerson's perjured testimony; such a finding does not defeat Petitioner's claim, but instead, it would alternatively validate the position being taken by Petitioner. As clearly established Supreme Court precedent dictates that knowledge of perjured testimony must be imputed to the prosecutor. In ***Giglio***, for example, a key prosecution witness lied on cross-examination by denying he received any leniency. The prosecutor who tried the case did nothing to correct the lie, because the prosecutor did not know of the promise. The Supreme Court reversed and remanded for a new trial premised on the perjury brought out by the defendant's cross-examination. ***Giglio, supra,*** 405 U.S. at 151-152.

Guided by the approach taken by the Supreme Court in ***Giglio*** and ***Napue,*** Federal Courts, including those in the Sixth Circuit have taken the position that, "the constitutional prohibition against the knowing use of perjured testimony applies when any of the state's

representatives would know the testimony was false." See, e.g., ***Jackson v. Brown,*** 513 F.3d 1057, 1075 (9th Cir. 2008); ***Schneider v. Estelle,*** 552 F.2d 593, 594-596 (5th Cir. 1977) ("If the state through its law enforcement agents suborns perjury for use at trial a constitutional due process claim will not be defeated because the prosecuting attorney was not previously aware of the prosecutorial activity."); see also, ***Thomas v. Westbrooks,*** 849 F.3d 659, 667-668 (6th Cir. 2017) ("Assuming --- without deciding --- that the law requires that knowledge of perjured testimony be imputed to the prosecutor.").

Regardless of the circumstances the law demands that the Assistant Attorney General Dennis Pheney must be charged with actual knowledge of Nickerson's false testimony, which he had an obligation to correct. ***Napue,*** 360 U.S. at 271.

**c. There Is a Reasonable Likelihood That Nickerson's Perjured Testimony Affected the Jury's Verdict.**

Contrary to the standard employed by the Supreme Court in ***Napue*** and ***Giglio*** --- the Michigan Court of Appeals when addressing this claim also failed to inquire whether there was any "reasonable likelihood" that the false testimony could have affected the judgment of the jury." ***Napue,*** 360 U.S. at 271; ***Giglio***, 465 U.S. at 154. Instead, in place of applying the appropriate legal standard, the Michigan Court of Appeals focused on the actions and questions posed to Nickerson by defense counsel at trial. See, Michigan Court of Appeals Opinion, Id., p. 14, Appx. A. In doing so, that Court held, "Defense counsel's cross-examination called Nickerson's credibility even more into question. It cannot be therefore, concluded that defendant's conviction was obtained through perjured testimony.

Not only does such an approach by the Michigan Court of Appeals contravene the clear directives of the Supreme Court, it also overlooks that the trial court specifically instructed the jury that it could "consider only the evidence that was properly admitted in this case, "which

consists solely on the sworn testimony of witnesses and the exhibits admitted into evidence," T12, p. 19; see also ***CJI 2d 25; CJI 2d 2.7; CJI 2d 3-5 (2)*** and ***(5).***

Given that clearly established Supreme Court precedent illustrates that, "Jurors are presumed to follow their instructions," ***Perry v. Johnson,*** 532 U.S 782, 799 (2001) (citing ***Richard v. Marsh***, 481 U.S. 200, 211 (1987), it was Nickerson's testimony, i.e., his responses to the questions posed by defense counsel and not defense counsel's actual questions, that the jurors gave due consideration to. Id. And, Nickerson unequivocally testified that he did not receive any benefits in his federal case for the testimony he gave against Petitioner. See, T12, p. 225-226, 241; T12, p. 244-246. Consequently, the Michigan Court of Appeals findings that defense counsel's cross-examination of Nickerson somehow presented the "pertinent facts" of his false testimony to the jury, or cured the impropriety is, belied by cases such as Richard and Perry and has been rebutted by clear and convincing evidence. See ***28 USC § 2254(e)(1).***

Moreover, the relevant legal determination by the Michigan Court of Appeals is at odds with, and clearly involved, an unreasonable application of Supreme Court precedent. As neither ***Giglio*** or ***Napue*** created an exception that gives State appellate courts the discretion to deviate from the legal standard to be applied in this context when it finds defense counsel has attempted to get a witness to testify truthfully regarding a specific matter through cross-examination. Id. Nor is there any language contained in those cases suggesting that under certain circumstances a prosecutor is absolved of its obligation to correct testimony that comes from a witness that he knows is false. ***Napue***, 360 U.S. at 271; ***Giglio,*** 405 U.S. at 153-154. Thus, the relevant determination by the Michigan Court of Appeals cannot survive. ***28 USC § 2254(d)(1).***

Petitioner now contends the application of the correct legal standard here compels a different result than the one the State Court reached. To begin with, the question of whether

Nickerson was a critical witness was confirmed by the Michigan Attorney General Dennis Pheney. As he admitted to Federal authorities that Nickerson "was an important witness" in the case. See Government's Motion for Downward Departure, Appx. C. Indeed, the actions of Dennis Pheney speaks to the weakness of the State's case without Nickerson's testimony. Id.

Additionally, it cannot be denied that Nickerson's detailed testimony, which conveyed that Petitioner allegedly told him that he participated in Boothby's murder, certainly as viewed, as a confession in the eyes of the jury. In light of the fact, the question of whether Nickerson's testimony influenced or attributed to the jury's verdict, is a resounding, "YES." As the Supreme Court and the Sixth Circuit have both observed, "a confession is like no other evidence." "Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. Certainly confessions have a profound impact on the jury." See ***Arizona v. Fulminante***, 499 U.S. 279, 296 (1991) (quoting ***Burton v. United States,*** 391 U.S. 123, 139-140 (1968). See also, ***Moore v. Berghuis,*** 700 F.3d 882, 889 (6th Cir. 2012).

Considering, (1) Nickerson's overall role in this case, (2) the profound impact that confessions have on juries, and (3) the fact that the jury while deliberating did not have the luxury of considering the benefit Nickerson received for testifying against Petitioner at trial, there is ample reason for this Court to find under Giglio's friendly to the accused standard, that there is a "reasonable likelihood" that Nickerson's testimony affected the jury's verdict, Giglio, 405 U.S. at 154. See also ***Rosencrantz,*** 568 F.3d at 587 ("Under Giglio's friendly to the accused standard, in most cases involuntary prejudice or its equivalent the result will likely be a finding of constitutional error.") Id.

**3. Nickerson's False Testimony Was Not Harmless, As It Was Misleading and Clearly Had a Substantial and Injurious Effect On the Jury's Verdict.**

As the Michigan Court of Appeals correctly noted, "there was other evidence to support the conviction without Nickerson's testimony." Id. However, a harmless error analysis that neglects to consider the entire record, i.e., the evidence presented by both parties during trial is contrary to the dictates of ***Chapman v. California***, 386 U.S. 19, 23 (1967). In fact, such an approach is more akin to that Court conducting the sufficiency of evidence test enunciated by the Supreme Court in ***Jackson v. Virginia***, 443 U.S. 307, 319 (1979). Therefore, by failing to consider the evidence presented by Petitioner when conducting its harmless error analysis the Michigan Court of Appeals has once again unreasonably applied clearly established law. See, ***28 USC § 2254(d)(1).***

In any event, such a finding by the Michigan Court of Appeals does not prove an absence of prejudice in this context. This is so, because the relevant inquiry on habeas review is not centered around the quality of evidence presented by the State at trial. To the contrary, the inquiry focuses solely on; whether the error has a substantial and injurious effect or influence on the jury's verdict." "And, if this Court harbors grave doubt regarding the matter, Petitioner must win." See, ***O'Neal v. McInich,*** 513 U.S. 432, 436 (1995); ***Ruelas v. Wolfenbarger,*** 580 F.3d 403, 412 (6th Cir. 2009). As explained below, this standard has been met.

Viewed objectively, the totality of the evidence against Petitioner consisted of a number of alleged eye-witnesses, whose testimony was inherently inconsistent and conflicting on material points. Subsequently, the jury naturally could have found those witnesses' testimony suspect. And the Assistant Attorney General was, most certainly, aware of such and, therefore, knew, as he explained to the Federal authorities, that Nickerson was an important witness. See, ***Appx. D.***

Again, making him important, is the fact that Nickeson's testimony, equated to a confession by Petitioner. See ***Fulminante,*** 499 U.S. at 296. And the nature of Nickerson's testimony made him virtually an unimpeachable witness. It also allowed the State to fill in the holes in their case and bolster the credibility of those other witnesses that had acute credibility defects, i.e., Michael Smith, another jailhouse snitch, whom was impeached with his attempts to curry favor in-exchange for him testifying against Petitioner and his admission that he had access to the police reports and witness statements that were associated with this case. T12, p. 188-194 and Adrienne Burnett, a self-admitted perjurer, whom the jury knew had incentive to lie to avoid being charged with murder in this case. T10, p. 57-58, 60-63, 266.

Had Nickerson's perjury been brought to light by Dennis Pheney and the jury heard that he received a sentence reduction as a result of his cooperation it is likely they would have rejected his testimony as unworthy of credence. With reasons to discount Nickerson's testimony as unreliable, it is conceivable that Petitioner's jury, just as his co-defendant's jury who did not hear Nickerson's testimony, may not have reached a unanimous verdict. In light of Brunette's inherently inconsistent testimony and the evidence presented by Petitioner. Thus, while it is possible to believe the jury would have found Petitioner guilty without the offending testimony, this Court nevertheless should have grave doubts as to whether the "uncorrected testimony" had a substantial effect on the jury's verdict. ***O'Neal,*** 513 U.S. at 436. See also, ***Holland v. United States,*** 348 U.S. 121 (1954) ("When determining whether the evidence established defendant's guilt beyond a reasonable doubt, the jury naturally weighs the probability that the evidence is true."). Id.

Under the circumstances here, it is clear that Petitioner has been deprived of his Due Process rights by the introduction of Nickerson's false testimony and Dennis Pheney's failure to

correct such testimony. Consequently, pursuant to ***28 USC § 2254(a),*** Petitioner is entitled to habeas relief, as he is being held in custody in violation of the ***United States Constitution,*** specifically ***Amendments 5*** and ***14.***

## II. PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHERE TRIAL COUNSEL FAILD TO INVESTIGATE AND CALL A KNOWN WITNESS, WHO WOULD HAVE PROVIDED KEY EVIDENCE IN SUPPORT OF THE DEFENSE'S CHOSEN THEORY

### A. Clearly Established Law

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. ***U.S. Const. Am. VI.*** Under the standard enunciated in ***Strickland v. Washington,*** 466 U.S. 668 (1984), counsel will be deemed to be ineffective where a petitioner shows, first, that "trial counsel's performance was deficient" and second, "that counsel's performance prejudiced petitioner." 466 US. at 687.

A petitioner demonstrates that counsel's performance was deficient by showing that "counsel made errors so serious that he/she was not functioning as the counsel guaranteed by the Sixth Amendment." Id., at 687. According to the Supreme Court one such example of deficient performance occurs where "counsel, neglects his duty to conduct reasonable investigations" 466 U.S. at 691. Such a duty includes the obligation to investigate ALL witnesses who may have information involving his client's guilt or innocence." ***Towns v. Smith***, 395 F.3d 251, 258 (6th Cir. 2005) (quoting ***Bryant v. Scott,*** 28 F.3d 1411, 1419 (5th Cir. 1994).

To establish prejudice in this context, Petitioner must show that, "there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would be different," 466 U.S. at 696. A reasonable probability "is one that has undermined the reliability of, and confidence in the verdict." ***McQueen v. Scroggy,*** 99 F.3d 1302, 1311 (6th Cir. 1996). In

making the relevant inquiry, Courts must consider "the totality of the evidence" both that adduced at trial, and evidence adduced in the habeas proceeding." ***Wiggins, supra***, 539 U.S. at 536 (quoting ***Williams, supra,*** 529 U.S. at 397-398)).

**B. Pertinent Facts**

Prior to trial Petitioner met with defense counsel (Jason Ronning), to discuss trial strategy and what potential witnesses, who through their testimony, could provide critical evidence to support the chosen defensive theory. During this meeting Petitioner informed counsel that his co-defendant Shevy Gill had written a letter to third party, i.e., Jennifer Loyd, inquiring about "how the heck did Petitioner become involved in the case?" See, Shevy Gill's letter, ***Appx. E***.

Given that Gill's letter contained content that implied that Petitioner had nothing to do with the offenses for which he was charged, Petitioner persistently urged trial counsel to conduct an investigation/interview with Gill to see if she possessed information that would further substantiate the defense's theory of the case. Despite the exculpatory nature of Gill's letter and the fact that she was easily accessible, as she was being held in the Van Buren County Jail on charges of murder, counsel however, failed to act in accordance with his Sixth Amendment obligations and Petitioner's request. Subsequently, counsel's reluctance to investigate and call Gill as a witness during Petitioner's trial prevented his jury from hearing, as Gill testified at her trial, that she did not recall seeing Petitioner the night Boothby was murdered. See, Shevy Gill's testimony. TT15, p. 178. See also, *infra.*

**C. The State Court's Determination**

The last reasoned court opinion to address Petitioner's failure to investigate claim comes from the Van Buren County Circuit Court. See, Order denying Motion for Relief from Judgment. Id., at p. 6-8, ***Appx. G***. In adjudicating the claim, that Court cited relevant State cases

and Supreme Court precedent that governs in this context. Id. In its analysis, that Court, however, focused solely on whether trial counsel's decision was a matter of strategy and its opinion omits any discussion that centered around whether trial counsel prior to making a strategic decision conducted reasonable investigations, as it relates to Gill. Id.

The state court further reasoned that Gill's letter, which Petitioner pointed to, as a sign of innocence was brought up at trial. Specifically, to support this finding the court noted, "trial counsel extensively pursued during trial examination the themes that Petitioner and his co-defendants were enemies, that they did not interact the night of Boothby's death, and never interacted after that night." The court then concluded, "while trial counsel may not have addressed an issue in the precise manner desired by Petitioner, this court finds neither deficient performance nor any irregularity on this ground. See, ***Appx. G***, Id., at p. 8.

**D. Discussion**

**1. Supreme Court Precedent Inescapably Supports a Finding That Defense Counsel's Failure to Investigate Gill Constituted Deficient Performance Under Strickland, And That the State Court's Adjudication of This Prong, Involved an Unreasonable Application of Supreme Court Precedent.**

Applying the framework of Strickland and its progeny in this context, this Court should find that trial counsel's failure to interview Gill is entirely inconsistent with reasonable professional judgment. As Counsel was keenly aware that Gill was not only Petitioner's co-defendant, but she also was an eye-witness to the events that led up to Boothby's beating. TT 15, p. 171-224. But most critically, it is worth reiterating that Petitioner, almost 10-months before trial, brought to trial counsel's attention that Gill had written a letter to Jennifer Loyd inquiring, "How the heck did Petitioner become involved in the case?" See, ***Appx. E.***

Based on this information, any competent attorney would have immediately understood that because Gill was an eyewitness to the crime and the contents of her letter when viewed

properly provides evidence that illustrates she possessed knowledge of the events that transpired on the night in question and knew Petitioner should not have been charged in this case. Considering that chosen defensive theory in this case, Gill's letter, surely should have prompted defense counsel to adhere to Strickland's command to conduct reasonable investigations regarding the matter. Yet, he failed to do so. See, ***Strickland***, 466 U.S. at 691 ("Counsel has a duty to make reasonable investigations."). ***Wiggins***, 539 U.S. at 522.

Consequently, as a direct result of his inactions, Petitioner's trial attorney failed to learn that, just as Gill did before her jury, she potentially would have testified and provided exculpatory evidence during Petitioner's trial, as well. See, TT 15, p. 178 ("Q. Did you see Mr. Foster that night?" A. "I don't recall seeing him." Though Petitioner and his co-defendant were jointly tried, the record reflects that Petitioner and his co-defendants had separate juries. And that Petitioner's jury, i.e., Jury (A) was excused prior to Shevy Gill testifying. See, TT 15, p. 169.

Beyond that, trial counsel's inactions also prevented him from eliciting from Gill answers that would have provided clarity on one of the most material and controversial topics discussed during Petitioner's trial, i.e., whether Petitioner was an occupant in her vehicle on the night in question. See, Burnette's testimony, TT 10, p. 36, 60, 63 268 (indicating that she observed Petitioner in Gill's vehicle) and Petitioner's testimony TT 15, p. 15-162 (explaining that he had no interaction with his co-defendants on the night in question). See also, Gill's testimony TT 15, p. 181-182, 214, 219, 222 (where she unequivocally conveyed to the jury that the only occupants in her vehicle the night Boothby was murdered was her and her co-defendant and childrens' father Ivory Shaver).

Notably, like her testimony, Gill's Police Statements, omits any content suggesting that Petitioner participated in the charged offenses, or was an occupant in her vehicle the night Boothby was murdered. See, Gill's Police Statements, **Appx. J.,** TT 15, p. 181-182, 214, 219, 222. The point being made here is, even without knowledge of Gill's letter, her police statements, indicating that the only occupants in her vehicle on the relevant night was "Ivory and her," which provided a sufficient basis for any reasonable attorney in defense counsel Ronning's position to launch an investigation and interview Gill. Obviously, counsel ignored the significance of the glaring omissions in Gill's police statements and how they undergirded the chosen defensive theory. And this error when viewed in combination with his failure to act after learning of Gill's letter makes his blunders in the present case all the more inexcusable.

Under the circumstances presented here, courts have not hesitated to find that such failures by trial counsel constituted deficient performance and a deprivation of Petitioner's Sixth Amendment right to counsel. For example, in ***Wiggins***, the Supreme Court found that petitioner's attorney's performance was deficient and that he was entitled to habeas relief, because his counsel failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing. 529 U.S. at 524-529. According to the Supreme Court "counsel chose to abandon their investigation at an unreasonable juncture making a fully informed decision with respect to sentence strategy impossible." Id., at 527-528.

Consistent with ***Wiggins***, Federal Courts in this Circuit and others have held in a variety of situations, that "counsel's failure to investigate constituted ineffective assistance of counsel in violation of the Sixth Amendment." See, e.g., ***Blackburn v. Foltz,*** 828 F.2d 1137, 1183 (6th Cir. 1987) (holding that counsel's failure to investigate a known and potentially important witness was deficient performance that constituted ineffective assistance of counsel because counsel did

not attempt to investigate the known lead, nor did he even make a professional judgment that for some reason investigation was not necessary); See ***Bryant, supra,*** 28 F.3d at 1418-1419 (finding that trial counsel's failure to interview petitioner's co-defendant who admitted to committing the crime and mentioned that defendant was not involved was deficient performance); see also, ***Clinkscale v. Carter,*** 375 F.3d 430, 434 (6th Cir. 2004) (Collecting cases hold same).

As in the foregoing cases, Petitioner's trial counsel's failure to conduct a reasonable investigation into Gill, "a known and potentially important eye witness' ***Blackburn***, 828 F.2d at 1183, who was Petitioner's co-defendant, Bryant, 28 F.3d at 1419, and who could have provided evidence that corroborated the defense's theory that Petitioner had no interaction with his co-defendants, nor was he an occupant in Gill's vehicle on the night in question, was conduct that fell well below an objective standard of reasonableness. See, ***Strickland***, id.

And, without any contact with Gill, trial counsel, "was ill equipped to assess her credibility or persuasiveness as a witness," or to "evaluate and weigh the risks and benefits of putting her on the stand." See, ***Bryant, supra***, 28 F.3d at 1419. See also ***Couch v. Booker,*** 632 F.3d 241, 246 (6th Cir. 2011) (holding to make a reasonable judgment about whether evidence is worth presenting, one must know what it says). See also, ***Combs v. Coyle,*** 201 F.3d 269, 288 (6th Cir. 2001) (finding that counsel's decisions cannot be considered strategic where he failed to investigate his options and make a reasonable choice between them). ***Wiggins, supra***, 539 U.S. at 522-523 holding same.

Indeed, trial counsel's failure in this regard constituted deficient performance as defined by ***Strickland,*** and its progeny. 466 U.S. at 468. Moreover, because the State Court failed to ask whether trial counsel condcted a reasonable investigation, before categorizing his inactions here

as being strategic, its determination is "contrary to" and involved an unreasonable application of Strickland and its progeny under ***28 USC § 2254(d)(1).***

**d. Counsel's Unprofessional Errors Were Prejudicial and Because the State Court Did Not Properly Adjudicate the Merits of This Prong, It Is Reviewed De Novo**

Viewed properly, the State Court opinion reflects that it never adjudicated this portion of Petitioner's Strickland claim on the merits. See, Order Denying Relief from Judgment. Id. at p. 7, ***Appx. G.*** Instead, the State Court opinion indicates it presumably disposed one prong on procedural grounds. See ***MCR 6.508(D)(3)(b)(iii)*** (using no irregular language). Because the State Court merely used portions of the language contained in ***Rule D(3)(b)(iii)*** and did not specifically cite the relevant subsection of the Rule, its legal conclusion here does not clearly and expressly rest on a procedural bar. See, ***Henderson v. Palmer***, 730 F.3d 554, 561 (6th Cir. 2013) ("for Michigan Court Rule ***MCR 6.508(D)*** to operate as a bar to habeas relief such a rule must be clearly and expressly invoked."). Clearly, there is no procedural bar that exists prohibiting federal habeas review on this portion of petitioner's Strickland claim. ***Gulimette v. Howes***, 624 F.3d 286, 291 (6th Cir. 2010). Under such circumstances the presumption that the claim had been adjudicated on the merits does not apply. ***Johnson v. Williams***, 137 S.Ct. 083, 1110 (2013); see also, ***Yarborough v. Rapelje,*** 2013 WL 116343 at *6-7 (E.D. Mich.) (presumption of merits does not apply when last reasoned state court decision rests on "procedural default, not the merits.").

Alternatively, Petitioner maintains that if this Court were to conclude that this prong was adjudicated on the merits then the state court's search for an "irregularity on this ground" is not the correct legal standard to be applied in this context. See, ***Strickland***, 466 U.S. at 694 ("establishing to satisfy the prejudice prong a defendant must show a reasonable probability of a different outcome."). The state court's determination here is therefore contrary to or involved an

unreasonable application of ***Strickland. 28 USC § 2254(d)(1).*** Either way, Petitioner asserts *de novo* review applies here. See, e.g., ***Rayner v. Mills***, 685 F.3d 636, 638 (6th Cir. 2011) ("when a state court's decision relies only on one Strickland prong, the cases mandate AEDPA deference to that prong, and *de novo* review to the un-adjudicated prong." ***Wiggins,*** 539 U.S. at 534; see also ***Lafler v. Cooper***, 132 S.Ct. 1376, 1390 (2012) ("AEDPA does not apply when a state court evaluates a claim under the wrong legal standard.").

Turning to the merits of this prong, the facts of this case sufficiently demonstrate, that "but for counsel's ineffectiveness, there is a reasonable probability of a different outcome." 466 U.S. at 694. As Gill's letter supports the proposition that Petitioner had no involvement in the crimes for which he was convicted and her trial testimony provides evidence that she potentially would have been willing to testify to that effect during Petitioner's trial. TT 15, p. 178, 181-182, 219, 222. Had counsel interviewed Gill, he would have discovered as much. And, he would have been compelled to put her on the stand, given that her testimony provided corroborating support for the Defense's theory and could have been the determining factor on central and hotly contested issues in this case.

Nevertheless, counsel's incompetence prevented the jury from evaluating Gill's testimony along with Petitioner's and prohibited it from making a "fully informed" decision as to Petitioner's guilt or innocence while deliberating. In turn, counsel's ineffectiveness also deprived Petitioner of a reasonable shot at an acquittal. See, ***Avery v. Prelesnik***, 548 F.3d 434, 438-439 (6th Cir. 2008) ("we do not ask whether Petitioner was ultimately innocent, but whether he was deprived of a reasonable shot at an acquittal."). Id.

Furthermore, though the trial court reasoned in so many words that Gill's testimony would have been cumulative or insignificant, in light of Petitioner's testimony. See, Order

denying Relief from Judgment. Id., at p. 8, ***Appx. G***, Precedent in this Circuit and others establishes that the state court got it wrong. See, e.g., ***English v. Romanowski,*** 602 F.3d 714, 726-727 (6th Cir. 2010) ("undoubtedly the testimony of a second person to corroborate the defendant's version of events would not have been cumulative, but rather could have critically added to the strength of the defense."). See also ***Mosely v. Atchison***, 689 F.838, 845 (7th Cir. 2012) ("evidence that provides corroborating support to one side's witness on a central and hotly contested issue cannot be described as cumulative."). Surely, the absence of Gill's testimony during Petitioner's trial has undermined the reliability of, and confidence in the verdict. ***McQueen***, 99 F.3d at 1311.

Petitioner's claim of prejudice is further exacerbated by the noticeable weakness of the prosecution's case. See, ***Strickland,*** 466 U.S. at 696 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by the error than one with overwhelming record support."). As explained during the materiality discussion under (**ISSUE I**), the verdict here rests on the contradictory and conflicting testimony of alleged eyewitnesses, the bargained for testimony of two jailhouse snitches, and the admitted perjurer Burnett. Id., supra. And the fact that at one point the jury was deadlocked exemplifies that at least one or some of the jurors did not find the state's witnesses totally credible and were not convinced that the prosecutor had proven Petitioner's guilt beyond a reasonable doubt.

Given the tenuous nature of the State's case "there is a reasonable probability," that had Gill testified at Petitioner's trial, at least one juror would have struck a different balance between the competing stories." See, ***Ramanez v. Berghuis,*** 490 F.3d 482, 491 (6th Cir. 2007); ***Strickland,*** 466 U.S. at 696. Accordingly, there is no reasonable argument to be made that supports a finding that counsel satisfied his Sixth Amendment obligations in this case.

***Harrington v. Richter,*** 502 U.S. 86, 96 (2012). Due to Trial Counsel's ineffectiveness, Petitioner is being held in custody in violation of the United States Constitution and therefore, he is entitled to habeas relief. ***28 USC § 2254(a).***

**III. PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, WHERE APPELLATE COUNSEL FAILED TO INVESTIGATE GILL AND LITIGATE TRIAL COUNSEL'S INEFFECTIVENESS ON DIRECT REVIEW**

**A. Clearly Established Law**

The Sixth Amendment of the United States Constitution entitles a criminal defendant to the effective assistance of counsel, not only at trial, but also during his appeal as of right. ***Evitts v. Lucey***, 468 U.S. 257 (1985). Supreme Court precedent also dictates, "that the two-part test outlined in Strickland applies in this context." 466 U.S. at 696.

Specifically, appellate counsel will be deemed ineffective where a Petitioner demonstrates, (1) counsel performed deficiently by ignoring a significant and obvious issue while pursuing weaker claims. ***Matthews v. Abramajtys***, 92 F.Supp2d 615 (E.D. Mich. 2000), and (2) that here is a "reasonable probability that the inclusion of the issue would have changed the appeal." ***Wade v. Timmeron-Cooper,*** 783 F.3d 1059, 1077 (6th Cir. 2004) (quoting ***McFarland v. Yukins,*** 356 F.3d 688, 699 (6th Cir. 2004).

**B. Pertinent Facts**

Prior to direct review being initiated, Petitioner, via written correspondence with Appellate Attorney, Michael Mittlestat, discussed significant issues that he wanted appellate counsel to litigate during direct review. Among the issues brought to appellate counsel's attention by Petitioner in those written correspondences were allegations of trial counsel's were allegations of trial counsel's ineffectiveness for failing to investigate and call co-defendant Gill

as witness during Petitioner's trial. See Petitioner's correspondence letter to appellate counsel. ***Appx. F.***

As it was with trial counsel, Petitioner, during the correspondence's informed appellate counsel that he has in his possession a hand written letter from co-defendant Gill containing content that corroborated the defense's theory, that Petitioner had no interaction with his co-defendants nor was he an occupant in Gill's vehicle on the night Boothby was murdered. Because of the nature of the evidence, Petitioner believed appellate counsel would find the issue significant that Gill was reasonable under the circumstances, and that the underlying ineffective assistance claim was meritorious and worth litigating on direct-review. Nevertheless, appellate counsel ignored Petitioner's request and clearly established law establishing the error and, thus, proceeded to brief far weaker issues.

**C. The State Court's Determination**

The last reasoned opinion to address Petitioner's ineffective assistance of appellate counsel claim comes from the Van Buren County Circuit Court. See, Order denying Relief from Judgment. Id., at p. 10-13, ***Appx. G.*** When adjudicating the claim that Court cited the appropriate legal standard to be applied in this context. And, in doing so, it properly noted that Petitioner was arguing that appellate counsel was ineffective for failing to investigate Gill, to litigate trial counsel's ineffectiveness for failing to the same, and call Gill as a witness at trial. Id.

That Court, nevertheless, denied relief on the basis that appellate counsel may be selective as a matter of discretion and strategy when deciding which meritorious issues raised on appeal. Alternatively, the court pointed to its conclusion that trial counsel was not ineffective to find that appellate counsel was under no duty to raise the relevant issue on appeal. And, for those reasons, the court found the claim to be without merit. See, ***Appx. G,*** id., at p. 13.

**D. Discussion**

**1. Appellate Counsel's Failure to Conduct Any Investigation into Gill and Subsequently Litigate Trial Counsel's Ineffectiveness Was Deficient Performance That Prejudiced Petitioner's Appeal of Right, And The State Court's Decision Holding Otherwise Was "Contrary to" Or "Involved an Unreasonable Application of Supreme Court" Under 28 USC § 2254(d)(1).**

**a. Appellate Counsel Performed Deficiently by Omitting a Significant Issue That Was Obvious**

Let the State Court tell it. Any performance by appellate counsel whether it reflects incompetence or an unreasonable judgment, can she shielded as a strategic decision. See, Order Denying Relief from Judgement, Id., at p. 13, ***Appx. G***. However, an attorney's gross incompetence cannot be defended simply by invoking case law that mirrors language from the Supreme Court's holding in ***Jones v. Barnes***, 463 U.S. 743, 751-752 (1983). As Jones does not absolve appellate counsel from his duty to conduct reasonable investigations before making strategic judgments regarding what claims to present on direct review. See, ***Wiggins,*** 539 U.S. at 522-523.

Nor does Jones absolve appellate counsel of his Sixth Amendment obligation to provide adequate representation. See ***Strickland***, 466 U.S. at 696 ("reasonable effective assistance is the standard for appellate counsel."). See, ***Hardwick v. Crosby***, 320 F.3d 1127, 1186 (11th Cir. 2003) ("Attorney strategy is not a shield or panacea for the failure to provide adequate representation."). See also, ***Fisher v. Gibson,*** 282 F.3d 1283, 1296 (10th Cir. 2002) ("the mere incantation of strategy does not insulate attorney behavior from review."). Hence, without appellate counsel's judgments being shielded as strategy his failures here cannot survive Sixth Amendment scrutiny. As the record in the present case and Supreme Court precedent makes it readily apparent that appellate counsel performed deficiently by failing to conduct any

reasonable investigation concerning Gill and when omitting a claim that was significant and should have been obvious. ***Wiggins,*** 539 U.S. at 522-523; ***Matthews***, 92 F.Supp 2d at 642-643.

To be specific, appellate counsel failed to comprehend the contents of Gill's letter, police statements, and her trial testimony provided sufficient evidence that underscored trial counsel's ineffectiveness. See (**ISSUE II**). Even worse, counsel's duty to investigate, at the time of Petitioner's 2010 trial, had been clearly established under Strickland for nearly 26-years. And since the Supreme Court decided Strickland, that principle has been reiterated on numerous occasions. See, e.g., ***Williams, supra*** (decided in 2002), and ***Wiggins, supra*** (decided in 2003). If the record in the present case and Supreme Court precedent were not enough to draw appellate counsel's attention to trial counsel's ineffectiveness. Petitioner's correspondence letter to appellate counsel surely sufficed to do so. See ***Appx. F.***

In light of the above mentioned, it cannot be questioned whether the omitted failure to investigate claims was significant and should have been obvious to appellate counsel. Moreover, contrary to the State Court holding otherwise, Strickland and its progeny illustrates that the underlying ineffective assistance claim is fully meritorious. Even this Court has confirmed such. See Order Granting Petitioner's Request to Hold the Initial Habeas Petition in Abeyance. DKT #14, Id., at p. 5 (Finding the underlying failure to investigate claim not be plainly meritless). See also, ***Johnson v. Horton,*** 2018 U.S. Dist. LEXIS 20711 *6 ("Explaining that the failure to investigate and call alibi witnesses' claims have merit.") (citing ***Hickey v. Hoffner,*** 701 Fed.Appx. 422, 426 (6th Cir. 2017).

Thus, appellate counsel's failure to conduct any reasonable investigation concerning Gill and litigate the underlying failure to investigate claim constituted deficient performance. See, ***Matthews***, supra, 92 F.Supp2d at 642-643. Given that Petitioner has established that appellate

counsel's performance was deficient cause to excuse any purported default for Petitioner's failure to raise the underlying ineffective assistance claim on direct review has likewise, been established, as well. **McFarland**, 356 F.3d at 699 (6th Cir. 2004).

**b. The Omitted Failure to Investigate Claim Is Clearly Stronger Than the Other Issues Presented by Appellate Counsel During Petitioner's Direct Review, And, There Is a Reasonable Probability That Inclusion of the Issue Would Have Changed the Outcome of the Appeal**

Though Appellate Counsel presented a number of issues on direct review, "none were stronger than the omitted failure to investigate claim." For example, a review of the Michigan Court of Appeals Opinion reflects that the majority of the claims raised by appellate counsel either lacked a factual basis, were not preserved, or were reviewed for plain error.

The plain error standard of review was enunciated in ***United States v. Olano,*** 507 U.S. 725 (1993), and has been defined by one federal court in this circuit, as being a highly deferential standard to put it mildly. See, ***Carver v. Straub***, 344 F.3d 340, 348 (6th Cir. 2003). Thus, Carver demonstrates that attorneys and courts on both the State and Federal levels have recognized the difficulty a defendant faces in obtaining relief when his claims are reviewed for plain error. In addition, in each instance where the Michigan Court of Appeals applied the plain error standard of review to Petitioner's direct review claims, it either found no error, or that Petitioner could not demonstrate that his substantial rights were affected by the error. Id. Such a determination by the Michigan Court of Appeals supports a finding that those claims and the ineffective assistance claims associated with them were relatively weak. Id.

The Deck issues also stands on the same footing as those claims reviewed for plain error. Because the Michigan Court of Appeals found that there was no factual basis to support the claim. Id. Beyond that, when reviewing the Deck issue that Court went on to hold, "even assuming there was evidence to support the claim it would find no prejudice based on the

evidence produced by the prosecutor at trial." See, Michigan Court of Appeals Opinion, Id., at p. 89; ***Appx. A.*** It goes without saying that a claim that lacks a factual basis in its trust form is weak and that for an appellate attorney to litigate such a claim speaks volumes about their professional judgment.

This leaves the failure to correct perjured testimony issue. That it was supported by the record makes it a fairly strong issue. But when considering that Gill's letter, police statements, and her trial testimony provides un-refutable proof that had Gill testified during Petitioner's trial her testimony would have corroborated the chosen defensive theory coupled with the fact that the absence of her testimony has undermined the reliability of, and confidence in the verdict, the omitted failure to investigate claim is undoubtedly, as strong as, or possibly stronger than the ***Napue*** claim. In fact, a casual survey of recent Michigan Supreme Court and Court of Appeals decisions confirm as much.

As those Courts, for at least the past decade, or more have been consistently confronted with allegations of trial counsel's failure to investigate and have reversed more convictions in that context than they have on any other constitutional ground. See, e.g., ***People v. Johnson,*** 451 Mich 115 (1996) (finding ineffective assistance of counsel where trial counsel failed to investigate and present eye witnesses who could have testified that defendant did not shoot the victim.); ***People v. Ackley***, 497 Mich 481, 489 (2015) (finding that defense counsel's deficiency by failing to investigate or secure an expert witness who would both testify in support of the defendant's theory and prepared counsel to counter the prosecutor's theory of the case); ***People v. Pippen***, 501 Mich 902 (2017) (finding deficient performance that prejudiced defendant where counsel failed to interview a witness who may have had information concerning his client's innocence prior to trial).

Because the issue Appellate Counsel failed to raise is constitutional in nature, and given that Michigan State Courts have not hesitated to grant Defendant's relief in this context, there is, certainly a "reasonable probability" that inclusion of the issue could have changed the outcome of Petitioner's direct appeal. ***Wade, supra,*** 783 F.3d at 1077. Thus, establishing prejudice in this context also suffices to establish prejudice for purposes of excusing any purported default of the underlying failure to investigate claim. See, **(ISSUE II)**, ***McFarland,*** 356 at 699.

Accordingly, this Court should find the State Court's determination that appellate counsel did not provide ineffective assistance in this regard to be contrary to and involved an unreasonable application of the Supreme Court precedent under ***28 USC § 2254(d)(1).*** And that the deprivation of Petitioner's Sixth Amendment right to the effective assistance of counsel during direct review warrants habeas relief pursuant to ***28 USC § 2254(a).***

## IV. CONCLUSION

It is undeniable that the Assistant Attorney General's (Dennis Pheney) failure to correct Nickerson's false testimony corrupted the truth seeking process. It is further undeniable that defense counsel's failure to investigate and call Shevy Gill, a key eye witness who could have corroborated the defense's theory of the case, prevented the jury from making a fully informed decision when determining Petitioner's guilt or innocence.

In all, the combined effect of those errors, rendered Petitioner's trial void of the guarantees provided by the Sixth Amendment and Due Process Clause of the U.S. Constitution. ***U.S. Const, Ams. V, VI*** and ***XIV***, and subsequently created extreme malfunctions in the State Court proceedings. ***Harrington,*** 560 U.S. at 102-103. For these reasons, Petitioner is entitled to habeas relief to vindicate the constitutional rights that were lost at trial. ***28 USC § 2254(a).***

## ACTUAL INNOCENCE CLAIM

**THIS HONORABLE COURT CAN AND SHOULD ADDRESS THE MERITS OF THE UNDERLYING ISSUES BECAUSE:**
**(A) TRIAL COUNSEL IS INEFFECTIVE,**
**(B) APPELLATE COUNSEL IS INEFFECTIVE.**
**(C) PETITIONER IS ACTUALLY INNOCENT,**

### STANDARD OF REVIEW

Pursuant to ***28 USC 2254(A)*** this Court "shall entertain an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgments of a state court only on the grounds that he is in custody in violation of the Constitution of laws or treaties of the United States. A claim of actual innocence can constitute the basis for habeas relief when combined with an independent Constitutional error that occurred in the underlying state proceedings." ***Herrera v. Collins***, 506 U.S. 390 (1993).

### STATUTORY AUTHORITY

To be credible, a claim of innocence requires Petitioner to support his allegations of Constitutional error with *new reliable* evidence that was not presented at trial. See ***Schlup v. Delo***, 513 U.S. at 324 under actual innocence exception to procedural bar rule, habeas petitioner's asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. ***Schlup,*** 514 U.S. at 327, 115 S.Ct. 851. [Emphasis added].

### A. CLEARLY ESTABLISHED LAW

The "cause" standard in procedural default cases requires the petitioner to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in the state court. Such factors may include interference by officials, attorney error rising to the level

of ineffective assistance of counsel and a showing that the factual or legal basis for a claim was not reasonably available. See ***Murray v. Carrier,*** 477 U.S. 478, 488. See also, ***McCleskey v. Zant***, 499 U.S. 467, 493 (1991). Actual prejudice is defined in sub-rule (1)(3)(b), in the case of a trial, it means that but for the error the defendant would have a reasonably likely chance of acquittal.

**B. PERTINENT FACTS**

Here, Foster's trial and appellate counsels failed to consider or adhere to Petitioner's continued insistence for the necessity to interview co-defendant, Shevy Gill's "third party" letter written by Gill to Jennifer Loyd. This "new" and "reliable" evidence not presented at trial, and under the guise of ineffective assistance of both trial and appellate counsels, establishes that some Constitutional error probably resulted in the conviction of an innocent person. See ***Schlup v. Delo***, 513 U.S. 298, 324-327, 115 S.Ct. 851, 130 L.Ed2d 808 (1995). It is Foster's contention that the evidence will show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." ***Id.***, at 326-327, and that he is actually innocent. See **ISSUES II** and **III** in this Petition and ***Attachment E & J*** of this Petition.

**C. DISCUSSION**

To establish prejudice from counsel's failure to investigate or call a potential witness, a witness, a petitioner must show that had the witness testified "the result of the proceeding would have been different." ***Landrum v. Mitchell,*** 625 F.3d 905, 921 (6th Cir. 2010), quoting ***Strickland v. Washington***, 466 U.S. at 690.

Under Michigan Law, to prevail on a motion for a new trial ***(MCR 6.508(D))*** a prisoner must show "the substance of the evidence, and not merely its materiality, must have been discovered after trial." See ***People v. Lo Presto***, 9 Mich App 318; 156 NW2d 586 (1961). By

contrast, to support a claim of actual innocence, a petitioner must support his arguments **"with new reliable evidence ... that was not presented at trial."** ***Schlup,*** 514 U.S. at 324. [Emphasis added].

To implement the general principle that "comity and finality ... must yield to the imperative of correcting a fundamentally unjust incarceration," ***Murray v. Carrier,*** 477 U.S. 478, 495. The Supreme Court has ruled in ***Howe v. Bell***, 547 U.S. 518, 165 L.Ed2d 1 (2006) that prisoners asserting innocence as a "gateway" to defaulted claims must establish that in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. ***Schlup,*** 513 U.S. at 327.

### 1. THE SCHLUP STANDARD

Here, several features of Schlup's standards bear emphasis in Foster's claim. First, while a gateway claim requires "new reliable evidence ... not presented at trial," id., at 324, this Court must assess the likely impact of all the evidence on reasonable jurors, Id., at 327-329. Second, rather than requiring absolute certainty about guilt or innocence, a defendant's burden at the "gateway" stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt. Finally, this standard is not equivalent to the standard set forth in ***Jackson v. Virginia***, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed2d 560 (1979), which governs insufficient evidence claims. As previously stated here, because a Schlup claim involves evidence the jury did not have before it, the inquiry requires this Court to assess how reasonable jurors would react to the newly supplemented record concerning the new reliable evidence.

#### a. Co-Defendant Gills's Handwritten Letter and Trial Testimony Represents Schlup's Trustworthy Eyewitness Account Prong

Here, the Gill letter and trial testimony represents critical "trustworthy eyewitness accounts" that were not presented at trial because Petitioner's trial counsel's failure to conduct an investigation and interview Gill, which would have been valuable in securing his client's release and therefore, constitutes" negligence and sound trial strategy." See ***Workman v. Tate***, 957 F.2d 1339, 1345 (6th Cir. 1992).

In direct contradiction of testimony given by Adrienne Burnett, the State's "Star" key witness, who testified after pleading guilty to second degree murder for her role in Boothby's death, as well as perjury for repeatedly lying while under oath about material facts surrounding this case. See TT 10, p. 17-22. Gill's Supplemental Police Reports, handwritten letter and subsequent trial testimony, establishes new reliable evidence that was not presented to the fact finder in this case. See ***Connelly v. Howes***, 304 F.3d at 596, n.9.

Burnett testified that there was one continuous motion of the crime and that once back inside Gill's vehicle, Foster never exited the car after driving over Boothby. In review of all Supplemental Police Reports, there is no mention of Foster by investigators or Gill. See Attachment J. Gill reportedly has mentioned only two occupants inside her vehicle the night of Boothby's death herself and then boyfriend, Ivory Shaver.

The handwritten letter addressed to Gill's long-time friend, Jennifer Loyd was written a month after her arrest and before Petitioner had been extradited from Indiana to Michigan. See ***Attachment E***. In the letter to Loyd, Gill asks, "How in the heck did he [Foster] come into play with all of this?" Which strongly suggests that Foster was not involved in the crime and certainly was not a passenger in Gill's vehicle that night. See Also, **GROUND II** of Petition.

This assertion of facts are substantiated and supported by Gill's testimony during trial where during direct examination, Gill is asked by her trial counsel, "What about Mr. Foster?"

And Gill testified that she did not recall seeing Petitioner the night Boothby was murdered. See Gill's testimony, TT 15, p. 171, 172, 178. Gill was a key eyewitness who would have provided exculpatory evidence during trial in Petitioner's defense and a key witness Foster's jury was deprived of that could clarify that he had in fact not been inside the alleged "murder weapon" prior to, during, or after Boothby's death. See **GROUND II** and ***Attachments E*** and ***J.*** Surely such statements and evidence support Schlup's "trustworthy eyewitness accounts" prong as Gill had front seat inside her vehicle and has made it quite apparent who was inside her vehicle that night.

**II. Counsel's Failure to Investigate/Interview Was Prejudicial and Establishes That There Is a Reasonable Probability That the Result Would Have Been Different but for Counsel's Errors; Resulting in The Conviction of an Innocent Person.**

Petitioner argues his claim of ineffective assistance of counsel's failure to interview or investigate and call at least one critical witness who would have provided exculpatory evidence and impeach the only eyewitness tying him to the murder and the alleged "murder weapon." Such exculpatory impeachment testimony from the occupant of the alleged vehicle involved in Boothby's death would have undermined the totality of the State's case against Petitioner and provided solid evidence that he was not involved in Boothby's death and more importantly, he as not present.

The letter by Gill was written and presented to counsel almost a year prior to trial (approximately 12 months). Had trial counsel utilized the one sentence in Gill's letter to start an investigation, other facts surrounding Petitioner's claim of innocence would have unfolded, and at a minimum, provided sufficient doubt of Foster's guilt and undermined the confidence in his conviction, which is the test for "reasonable probability." See ***Rompilla v. Beard,*** 545 U.S. at 393, 125 S.Ct. 2456, 162 L.Ed2d 360 (2005). See also **GROUND II** of Petition.

Moreover, Mr. Ronning was asked to inquire about Gill potentially testifying on Petitioner's behalf in which Ronning replied that "he didn't know what she [Gill] would say on the stand." Here, Ronning failed to "make all reasonable efforts" to learn what he could about his client's case. Id. at 385. Counsel did not make the necessary effort afforded a purportedly "strategic decision" not to conduct an investigation. It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover. See ***Dickerson v. Bagley***, 453 F.3d 690, 696 (6th Cir. 2006).

Prejudice in this context means there is a reasonable probability that the result would have been different but for counsel's errors. See ***Strickland,*** 466 U.S. at 687, 694. Furthermore, to prove prejudice, Petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." ***Lundgren v. Mitchell***, 440 F.3d 754, 770 (6th Cir. 2006), quoting Strickland, 466 U.S. at 694. The "prejudice prong is satisfied if there is a reasonable probability that at least one juror would have struck a difference balance.' Id., (quoting ***Wiggins v. Smith***, 539 U.S. 510 523-528, 123 S.Ct. 2527, 156 L.Ed2d 471 (2003).

In addition, where the jury is already on the fence and the case against the defendant depends on the credibility of a witness, it is objectively unreasonable to conclude that failing ot investigate or call a favorable witness to provide exculpatory evidence does not prejudice the defendant. See ***Hodgson v. Warren,*** 622 F.3d 591, 600-601 (6th Cir. 2020). In fact, "the likelihood of a different result is substantial." See ***Couch v. Booker***, 632 F.3d 241, 247 (6th Cir. 2011).

**MISCARRIAGE OF JUSTICE**

The fundamental miscarriage of justice exception remains "rare" and only applies to the "extraordinary case," while as the same time ensuring that the exception extends relief to

defendants, such as Mr. Foster, who are truly deserving, because he is truly innocent of the crime for which he is incarcerated for.

Petitioner has attempted to link for this Honorable Court the miscarriage of justice standard along to the actual innocence claim, that the Constitutional error, ineffective assistance of trial counsel's failure to conduct an investigation into his client's innocence, resulted in the conviction of an innocent man. He has also put before this Honorable Court, but a "fair probability" that the new reliable presented in this Petition would have entertained a reasonable doubt of his guilt. ***Schlup v. Delo,*** 513 U.S. at 323.

In an extraordinary, complex case such as this, where a Constitutional violation has probably resulted in the conviction of one who is actually innocent, it is evidence of factual innocence coupled with a Constitutional violation which triggers the actual innocence exception. Id.

**Therefore, Defendant-Appellant Foster**
**Seeks All Afforded Relief**
**Sought Within This**
**Petition.**

Respectfully submitted,

Dated: January _____, 2020

Edward Foster
LRF 226862
E.C. Brooks Correctional Facility
2500 South Sheridan Drive
Muskegon Heights, MI 49444

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

EDWARD FOSTER,
Petitioner,

-vs-

THOMAS WINN, Warden,
Respondent.

Case No. 15-CV-12265
Hon. Laurie L. Michelson
Magistrate Judge Michael J. Hluchaniuk

______________________________/

Edward Foster
Petitioner in Pro Per
LRF 226862
E. C. Brooks Correctional Facility
2500 South Sheridan Drive
Muskegon Heights, MI 49444

______________________________

Michigan Attorney General
Attorney for Defendant
Habeas Corpus Division
P.O. Box 30212
Lansing, MI 48909

______________________________/

# EXHIBITS

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

EDWARD FOSTER,
Petitioner,

-vs-

THOMAS WINN, Warden,
Respondent.
_______________________________/

Case No. 15-CV-12265
Hon. Laurie L. Michelson
Magistrate Judge Michael J. Hluchaniuk

**CERTIFICATE OF SERVICE**

NOW COMES, Edward Foster, Petitioner in pro per, and says: That on January _____, 2020, he mailed 1 copy of his Motion to Life the Stay and Reopen the Habeas Proceedings, Motion to Amend the Initial Petition for Writ of Habeas Corpus and the Revised/Amended Memorandum of Law in Support of Petition for Writ of Habeas Corpus, to the Michigan Attorney General's Office by first class mail to:

Michigan Attorney General
Attorney for Defendant
Habeas Corpus Division
P.O. Box 30212
Lansing, MI 48909

Under the penalty of perjury, I declare that the statements above are true to the best of my information, knowledge and belief.

Respectfully submitted,

Dated: January _____, 2020

Edward Foster
LRF 226862
E.C. Brooks Correctional Facility
2500 South Sheridan Drive
Muskegon Heights, MI 49444

E.D. Foster #226862 A-9T
E.C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon Heights, Mi 49444

11/20/20

Office of the Clerk
United States District Court
Eastern Dist. Southern Div.
231 West Lafayette Blvd. 5th floor
Detroit, Mi 48226

RECEIVED
DEC - 3 2020
CLERK'S OFFICE
U.S. DISTRICT COURT