UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ED FOSTER,

     Petitioner,

v.

CHRIS KING[1],

     Respondent.

Case No. 15-12265
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING MOTION TO HOLD PETITION IN
ABEYANCE [24], MOTION FOR GUIDANCE [25], AND
AMENDED PETITION FOR WRIT OF HABEAS CORPUS [21]**

---

Ed Foster was convicted of first-degree felony murder for the death of Debra Boothby, whose body was found in 1998 outside of the Blue Star Lounge in Covert, Michigan. A jury found that Foster and a few others beat Boothby in the Blue Star parking lot and, eventually, that same group ran her over with a car twice. Foster was sentenced to life without the possibility of parole.

After appealing his conviction—and returning to state court a second time to move for relief from judgment—Foster filed an amended petition for a writ of habeas corpus in this Court. For the reasons that follow, the Court denies the writ.

---

[1] The proper respondent in a habeas case is the warden of the facility where the petitioner is incarcerated. *See* Rule 2(a), Rules Governing § 2254 Cases; *Mahan v. Douglas*, — F. Supp. 3d —, 2022 WL 17352566, at *2 (E.D. Mich. Dec. 1, 2022). Thus, the Court substitutes Chris King as the respondent because he is the current warden of the prison where Foster is incarcerated.

# I. Background

## A. Facts

The Court primarily relies on the facts as recited by the Michigan Court of Appeals on Foster's direct appeal of his conviction with a few additional details from the state trial-court record. *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)); *Thompson v. Keohane*, 516 U.S. 99, 102 (1995) ("The statute governing federal habeas corpus proceedings, 28 U.S.C. § 2254, directs that, ordinarily, state-court fact findings 'shall be presumed to be correct.'").

"On April 26, 1998, Deborah Boothby and a friend went to the Blue Star Lounge, a bar located on the Blue Star Highway near South Haven, Michigan. By most accounts, Boothby became intoxicated and disruptive, engaging in an argument with an ex-boyfriend," Ivory Shaver, "and his girlfriend[,]" Shevolier Gill. *See People v. Foster*, No. 301361, 2013 WL 4033639, at *1 (Mich. Ct. App. Aug. 8, 2013).

The club shut down early that night and all patrons were ordered to leave the bar. *Id.* "As the patrons left the bar, several people observed a fight in the parking lot involving Boothby and several other individuals." *Id.* Those individuals included Ivory Shaver, Gill, Scottie Shaver (Ivory's nephew), and—at least according to some accounts—Ed Foster. (ECF No. 9-16, PageID.3081, 3085 (describing a fight that was "like [a] cat getting thrown in there with some pit bulls" involving Scottie, Ivory, Gill, Boothby, and other unidentified persons); ECF No. 9-15, PageID.2865, 2887 (witness testifying that she did not remember seeing Foster at the club or in the

2

parking lot but Ivory, Scottie, and Gill were hitting Boothby in the parking lot); ECF No. 9-18, PageID.3483–3484 (describing Ivory, Scottie, and Foster hitting Boothby in the parking lot); ECF No. 9-17, PageID.3226 (Adrienne Burnette stating that there was a fight in the parking lot between Boothby and Scottie, Gill, Foster, Ivory, and others).) Witnesses also remember Boothby yelling racial slurs in the parking lot. (ECF No. 9-15, PageID.2880; ECF No. 9-17, PageID.3227; ECF No. 9-18, PageID.3981.) Boothby was apparently the only white woman in the club. (*See, e.g.*, ECF No. 9-22, PageID.4419.)

There was conflicting testimony about what happened next. Some witnesses stated that Foster was either never at the Blue Star lounge, or if he was, he left by himself in his truck without getting involved in the fight. (*See* ECF No. 9-15, PageID.2865, 2887; ECF No. 9-18, PageID.3583, 3587, 3589, 3599.) Others say Foster—after helping to batter Boothby—assisted Ivory and Scottie in picking her up and putting her in Gill's car. (*See, e.g.*, ECF No. 9-17, PageID.3234.) The vehicles dispersed from the parking lot at this point.

That same night, "some time after 2:30 a.m.," police arrived at the Blue Star Lounge "in response to a 911 call reporting a woman had been hit by a car. Responders found Boothby lying on the Blue Star Highway a short distance from the lounge, bleeding and severely injured. She died from multiple injuries after being transported to the hospital." *Foster*, 2013 WL 4033639, at *1.

For several years, the case remained unsolved. *Foster*, 2013 WL 4033639, at *1. Eventually, the police "received information and tips that" Foster, Ivory, Scottie,

and Gill "were involved in the fight that was described as a brutal beating of Boothby." *Id.* At Foster's trial, a few notable witnesses testified.

Adrienne Burnette—who was dating Scottie—was perhaps most critical. Burnette was at the Blue Star Lounge on the night in question and saw Boothby go "straight up to where Ivory and [Gill] were standing" and noticed the conversation they were having "was not a happy one." (ECF No. 9-17, PageID.3222.) When the club closed early, Burnette left to go to her car in the parking lot and saw a fight "between Deborah Boothby and the others which was you know, Scottie and [Gill,] Ivory and Ed [Foster], amongst others, and they was hitting and pushing and kicking." (*Id.* at PageID.3226.) She stated that "[i]t appeared that they jumped her, it was horrible." (*Id.* at PageID.3232.) Eventually, the bouncer told everyone to leave the parking lot, and Burnette saw Scottie, Ivory, and Foster take Boothby to Gill's car. (*Id.* at PageID.3232–3234.) Ivory, Gill, and Foster got in the same vehicle they placed Boothby in. (*Id.* at PageID.3236.)

According to Burnette, she got in her car and was waiting to leave the parking lot when Scottie got in her car. (*Id.* at PageID.3239.) Scottie told Burnette to follow Gill's car or "the same thing" that happened to Boothby "would happen" to her. (*Id.* at PageID.3240–3241.) They drove to an isolated area where Gill, Ivory, and Foster took Boothby out from Gill's car and put her on the ground outside of the car. (*Id.* at PageID.3245.) Gill choked Boothby and the men hit her. (*Id.* at PageID.3248–3249.) At this point, Boothby was no longer moving, and Gill asked, "well, what are we going to do, what are we going to do with her?" (ECF No. 9-17,

PageID.3250.) Ivory "thought of the idea of putting her back in the car and dumping her on the side of the road by the bar and making it look like somebody ran over her." (*Id.*)

Burnette said that the group followed along with Ivory's plan—she and Scottie followed Gill's car back to the Blue Star Lounge. (*Id.* at PageID.3254.) Foster "and Ivory got out, pulled [Boothby] on the side of the street and got back into [Gill's] car and back up over her and rolled over her again." (*Id.* at PageID.3254–3255.) Scottie instructed Burnette to do the same, and she "reluctantly did what [she] was told and [she] ran over her." (ECF No. 9-17, PageID.3263.) Burnette pled to murder in the second degree, a lesser charge than what she would have received had she not testified against the others. (ECF No. 9-17, PageID.3212–3213.)

Keith Nickerson also testified for the prosecution. He shared a cell with Foster at the Van Buren County Jail while Nickerson awaited sentencing in federal court for a bank-robbery conviction. (ECF No. 9-19, PageID.3966–3967 (Nickerson's testimony at Foster's trial).) Nickerson testified that Foster told him that he had kicked Boothby in the head in the parking lot outside of the Blue Star Lounge and was in one of the vehicles that ran over Boothby. (ECF No. 9-19, PageID.3978–3979.) With respect to any self-interest he may have had in testifying, the Court of Appeals found, "Nickerson testified that in April 2010, he was sentenced on the federal bank robbery charge to ten years and eight months and that he is currently serving that sentence. Nickerson testified that the prosecutor in the instant case did not indicate that he would do anything for him with regard to the cases he had

pending and that the prosecutor has not done anything on his behalf. When asked
again by the prosecutor, "Have I offered to do anything on your behalf in regard to
your testifying?" Nickerson responded, 'No.'" *Foster*, 2013 WL 4033639, at *10. But
"it is clear that Nickerson received a benefit from the 5K motion [for downward
departure from the sentencing guidelines], which was based upon his cooperation in
the instant matter. In the motion, the U.S. Attorney specifically stated that
Nickerson's testimony concerning the instant matter 'proved to be instrumental in
murder charges subsequently brought against five individuals by the Michigan
Attorney General' and that '[u]ndersigned counsel has spoken to Assistant Attorney
General Dennis Pheney about the defendant's assistance and was advised that the
defendant testified at a preliminary examination and was an important witness in
the case.'" *Id.* at *11. That motion from the U.S. Attorney was granted, and
Nickerson "received a three level downward departure in his federal bank robbery
sentencing." *Id.* at *12.

Nickerson was not the only jailhouse informant who testified. Michael Smith
was a paralegal and "running the jail law library" at the Marion County Jail in
Indianapolis, where he was housed on the same block as Foster. (ECF No. 9-19,
PageID.3914, 3915, 3918.) Smith has convictions for forgery, theft, and fraud. (*Id.* at
PageID.3914.) Smith testified that Foster asked him "for representation, for advice,
and explained the nature and details of the case to" him. (*Id.* at PageID.3918.) He
continued, "Foster explained to me that his role that he played and participated in
was they were at a bar . . . and there was a white female by the name of Deborah K.

Boothby who had came to that lounge . . . [and] she had begun using a racial slur towards Ivory Shaver[]." (*Id.* at PageID.3921.) Foster then "bragged about how himself . . . and his other accomplices, had beat the victim . . . numerous of times with strikes and punches . . . . And how they had took her and placed her in a vehicle, drove from the Blue Star Lounge to a location, which was a dead-end behind the bar, and how they had ran over her." (ECF No. 9-19, PageID.3922.)

Two Indiana state troopers also took the stand. They stated that when they arrested Foster, he asked "can a person be charged with murder if he was only there with the person who committed the murder." (ECF No. 9-19, PageID.3856.) When one of the troopers answered that someone could be charged as an accomplice to murder in that scenario, Foster asked if that would be true if a vehicle was involved. (*Id.* at PageID.3890.)

In addition, Foster testified on his own behalf. He stated that he and Scottie Shaver were "enemies" and that there was a "big rift" in general among people from South Haven—like the Shavers—and people from Covert—like Foster. (ECF No. 9-22, PageID.4408–4409.) He stated he would "never" have done anything to help Scottie out. (*Id.* at PageID.4410.) And while Foster admitted he was at the Blue Star Lounge on the night in question, he claimed not to have had contact with Ivory, Scottie, or Gill that night. (ECF No. 9-22, PageID.4414.) In the parking lot, he saw Boothby and stated he saw "[w]omen fighting." (*Id.* at PageID.4418.) He said he left by himself without getting involved in the fight. (*Id.* at PageID.4424, 4428.)

Foster was tried jointly with Ivory, Scottie, and Gill, but he had a separate jury from the other three. Gill took the stand, but only testified before her, Scottie, and Ivory's jury. As relevant here, she told her jury that though she saw Boothby talking to Ivory at the club, she did not remember seeing Foster, Burnette, or Scottie that night. (ECF No. 9-22, PageID.4564–4565.) She also testified that after the club closed, she and Ivory left in her car and went home. (ECF No. 9-22, PageID.4568.) She denied that Boothby was ever in her car, that she ever beat Boothby, or that she ever planned "with anyone to run" Boothby over or to kidnap her. (ECF No. 9-22, PageID.4576.)

Foster's jury found him guilty of second-degree murder and first-degree felony murder. (ECF No. 9-27, PageID.4986.) At sentencing, the second-degree murder conviction was vacated, and Foster was only sentenced for first-degree felony murder. *Foster*, 2013 WL 4033639, at *1. Foster received life without the possibility of parole. (ECF No. 9-30, PageID.5089.)

Foster's co-defendants had a hung jury and the court declared a mistrial. (ECF No. 9-29, PageID.5064.) Ultimately, they were re-tried and convicted. *See People v. Shaver*, Nos. 305944, 305945, 306228, 2013 WL 4864204, at *2 (Mich. Ct. App. Sept. 12, 2013).

## B. Procedural History

Foster appealed his conviction and raised several issues, including that the prosecution knowingly allowed Nickerson to give false testimony that made him more credible in the eyes of the jury. *Foster*, 2013 WL 4033639, at *10. The Court of

8

Appeals disagreed. *See id.* And the Michigan Supreme Court denied leave to appeal because it was "not persuaded that the questions presented should be reviewed by this Court." (ECF No. 9-32, PageID.5460.)

Foster next turned to this Court for relief. (ECF No. 1.) But before his original petition was decided, Foster moved to hold his petition in abeyance, return to state court to exhaust additional claims, and amend his petition. (ECF Nos. 12, 13.) The Court granted these motions in part. (ECF No. 14.) It allowed Foster to supplement his claim regarding Nickerson's false testimony and held his petition in abeyance so Foster could pursue a motion for relief from judgment in state court. (*Id.* at PageID.5806.)

In 2020, Foster returned to federal court with an amended petition, adding two claims alleging that his trial and appellate counsels were ineffective, which he raised in a motion for relief from judgment in state court. (ECF No. 21.) In 2022, after the amended petition was fully briefed, Foster moved to hold his petition in abeyance again. (ECF No. 24.) A few months later, he moved "for guidance" as to how to proceed. (ECF No. 25.)

## II. Motion to Stay and Motion for Guidance

Almost two years after Foster filed his amended habeas petition, he moved the Court to stay his case and hold his petition in abeyance—for the second time— while he exhausts new state-court remedies pertaining to an affidavit he recently received from co-defendant Ivory Shaver. (ECF No. 24, PageID.6267.) The affidavit apparently states that Foster was "not inside the vehicle that has been associated in

the death of the victim." (*Id.*) Foster plans to use this information to challenge the charging affidavit and the fact that he was arrested prior to the issuance of the charging affidavit. (*Id.*)

As this Court has already stated in this case, and as the Sixth Circuit has long recognized, a stay and abeyance "should be available only in limited circumstances." *See McBride v. Skipper*, — F. 4th —, No. 21-1042, 2023 WL 4992815, at *3 (6th Cir. Aug. 4, 2023) (quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005)). In furtherance of this rule, "[a] court should grant a stay and abeyance only when (1) 'the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court'; (2) where the unexhausted claims are not 'plainly meritless'; and (3) where 'there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.'" *Id.* at *3 (quoting *Rhines*, 544 U.S. at 277–78).

Foster's motion fails at the first factor—good cause for failure to exhaust his claims first in state court. "Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines*, 544 U.S. at 277. Foster offers no explanation as to why he waited almost 12 years to seek an affidavit from Ivory. (ECF No. 24, PageID.6270 (Ivory's affidavit dated August 22, 2022); ECF No. 9-30, PageID.5072 (Foster's sentencing on November 17, 2010).) Indeed, Foster does not say why he was unable to obtain this affidavit in the last

decade, and he certainly does not explain why he was unable to do so during the three years this Court gave him to exhaust additional claims. (ECF Nos. 14, 19.) Thus, a stay is not warranted.

Foster also filed a motion for guidance in which he asks the Court to grant his motion to stay or, in the alternative, appoint counsel and grant an evidentiary hearing regarding Ivory's affidavit. (ECF No. 25, PageID.6272–6273.) As explained, the Court denies Foster's motion to stay.

Further, as the amended petition before the Court does not raise claims related to Ivory's affidavit, there is no need for an evidentiary hearing to adjudicate the petition. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). And as will be explained more thoroughly below—to whatever extent the affidavit proves Foster's innocence—a freestanding claim of factual innocence is not for this Court to review. *See Herrera v. Collins*, 506 U.S. 390, 400–01 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. . . . This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.").

And the Court also denies Foster's motion for appointment of counsel as nothing further is needed from Foster to adjudicate the amended petition.

So his motion to stay and his motion for guidance are both denied.

### III. AEDPA Standard

Before the Court considers the substance of Foster's petition, a word on the standard.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") (and 28 U.S.C. § 2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). So to obtain relief in federal court, habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' [must] show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101. And a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), with review being "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). But if the state courts did not adjudicate a claim "on the

merits," "AEDPA . . . does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

So before proceeding, the Court must determine if the state courts adjudicated Foster's claims on the merits.

Foster's due-process claim was raised in his direct appeal, and the Michigan Court of Appeals issued a decision on the merits. (*See* ECF No. 9-31, PageID.5101.) So the Court must defer to that decision.

Foster's ineffective-assistance-of-counsel claims were raised in his motion for relief from judgment after his direct appeal and adjudicated on the merits by the trial court. (ECF No. 23-1, PageID.6085, 6090.) But in its order, the trial court also referenced Michigan Court Rule 6.508(D)(3), which states that "[t]he court may not grant relief to the defendant if the motion . . . alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates . . . good cause" or "actual prejudice[.]" The rule goes on to state that "[t]he court may waive the 'good cause' requirement . . . if it concludes that there is a significant possibility that the defendant is innocent of the crime." *Id.* The trial court stated that it did "not conclude that there is a significant possibility that Defendant is innocent, so the court will not waive the 'good cause' requirement." (ECF No. 23-1, PageID.6082.) But later—as the Warden concedes—the trial court evaluated both claims on the merits. (*Id.* at PageID.6085, 6090; *see also* ECF No. 22, PageID.5953.) The Michigan Court of Appeals later denied leave to appeal, stating

13

"defendant has failed to establish that the trial court erred in denying the motion for relief from judgment." (*Id.* at PageID.5976.)

Supreme Court precedent is clear that such a denial should be presumed to be on the merits, and thus, AEDPA's deferential standard of review applies to the ineffective-assistance-of-counsel claims as well. *See Harrington*, 562 U.S. at 99 (considering a summary denial and holding that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary"). Though the trial court referenced a Michigan Court Rule that could have justified a ruling on procedural grounds, it also went on to address the claim on the merits. It does not appear to have decided anything under the rule. And the Michigan Court of Appeals did not indicate that its dismissal was procedural, as it does not cite any procedural rules and the decision states that it was based on lack of error by the trial court. (*See* ECF No. 23-1, PageID.5976.)

So in considering Foster's petition, the Court will focus on whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law[.]" *See* 28 U.S.C. § 2254. And because the Michigan Supreme Court did not provide reasons for its holding on direct appeal, and the Michigan Court of Appeals did not provide reasons for its holding as to the motion for relief from judgment, the Court will "look through the unexplained decision" to

14

the Michigan Court of Appeals' and Michigan trial courts' decisions which "provide a relevant rationale[.]" *See Wilson*, 138 S. Ct. at 1192.

## IV. Petition for Writ of Habeas Corpus

### A. Due-Process Claim

Foster argues that his right to due process was violated when the prosecutor failed to correct Keith Nickerson's false testimony. (ECF No. 21, PageID.5877.)

A conviction obtained through the use of false evidence violates a defendant's due-process rights. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. To prove that the prosecutor's failure to correct false testimony resulted in a violation of due process, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009).

Prior to trial, Nickerson shared a cell with Foster at the Van Buren County Jail while Nickerson awaited sentencing in federal court for a bank-robbery conviction. (ECF No. 9-19, PageID.3966–3967 (Nickerson's testimony at Foster's trial).) Nickerson testified that Foster told him that he had kicked Boothby in the

head in the parking lot outside of the Blue Star Lounge and was in one of the vehicles that ran over Boothby. (ECF No. 9-19, PageID.3978–79.)

However, Foster takes issue with an earlier portion of Nickerson's testimony. Likely to blunt the inevitable cross-examination on bias, the prosecutor asked Nickerson, "in March [2010,] did I indicate to you that I would do nothing for you in regard to any cases that you had pending?" (ECF No. 9-19, PageID.3965–3966.) Nickerson responded, "Nothing." (*Id.* at PageID.3966.) The questioning went on, "Have I done anything on your behalf?" (*Id.*) Nickerson again responded, "Nothing." (*Id.*) Nickerson also testified that the prosecutor had not "offered to do anything" on his behalf for testifying and that he knew of no benefit that he "could receive for testifying[.]" (*Id.* at PageID.3981.) But he also stated that his attorney had mentioned Nickerson's "involvement in [Foster's] case" to the sentencing judge in his bank-robbery case. (*Id.* at PageID.3981–3982.)

At first, cross-examination evoked similar denials from Nickerson. Though Nickerson agreed that the U.S. Attorney's office filed what is known as a "5K" or cooperation motion for a downward departure from the sentencing guidelines in his bank-robbery case, and that he received a below-guidelines sentence, he testified that the departure from the guidelines' range was not because of the 5K motion. (ECF No. 9-19, PageID.3984.) But Nickerson also stated that he had not seen the U.S. Attorney's 5K motion. (*Id.* at PageID.3985.)

When asked whether he heard "the federal Judge mention a number of times that based upon [his] substantial assistance in a state murder case, along with some

dispute about a definition of career criminal, that he was going to give [him] a three-level departure below [his] original guidelines," Nickerson responded, "The departure was because of the close proximity of my previous offenses." (*Id.* at PageID.3985.) When asked again whether the federal judge stated he was going to give Nickerson a "benefit," Nickerson stated, "No, I don't remember specifically what you are saying. I got credit for this, but I didn't get credit for this. That is not what has happened." (*Id.* at PageID.3985–3986.) But Nickerson admitted that his attorney "may" have told the federal judge that Nickerson "should be given a break because of [his] cooperation in a murder case[.]" (*Id.* at PageID.3986.) And he conceded that the federal government "didn't put up an argument" when defense counsel made that request. (*Id.* at PageID.3986.)

Foster's attorney also asked Nickerson whether the federal judge left open the possibility of a future modification for Nickerson's continued cooperation, to which Nickerson responded, "I'm not sure" and "I have no control over anything like that." (*Id.* at PageID.3987.) But he did eventually say he remembered the federal judge saying that and it "is possible" that his sentence could be reevaluated. (*Id.* at PageID.3987–3988.) Nickerson also admitted that he wrote a letter to the federal judge—which was first sent to his attorney—where he described Foster's confession. (ECF No. 9-19, PageID.3990–3992.) And Foster's attorney was also able to elicit some inconsistencies between Nickerson's letter and the testimony he provided in court. (*See id.* at PageID.3997–3998, 4008.)

Foster argues that this amounted to a violation of the Due Process Clause because the prosecutor knowingly allowed Nickerson to give false testimony.

The falsity of Nickerson's testimony is somewhat supported by documents from Nickerson's federal criminal case. As elicited by defense counsel on cross-examination, the U.S. Attorney in Nickerson's bank-robbery case filed a motion for downward departure, which stated,

> While in custody, the defendant heard a cellmate named Edward Foster discussing his role in the 1998 beating death of a young woman named Debra Boothby. The defendant related this information to his attorney, who passed it on to the FBI. The FBI turned it over to the Michigan State Police detective who was investigating this cold case. . . . The defendant's testimony proved to be instrumental in murder charges subsequently brought against five individuals by the Michigan Attorney General in *People v. Ivory Shaver et al*, No. 10-17030-FC (36 Cir. 2010). Undersigned counsel has spoken to [the prosecuting attorney in Foster's criminal case] about the defendant's assistance and was advised that the defendant testified at a preliminary examination and was an important witness in the case. The trial is scheduled to commence in June, where the defendant is expected to testify again.

Mot. for Downward Departure under 5K1.1, *United States v. Johnson*, 1:09-cr-00311 (W.D. Mich. Apr. 7, 2010) (available on this docket at ECF No. 1-1, PageID.99). And during the April 2010 sentencing hearing, the federal judge stated,

> As far as the 5K motion is concerned, the Court intends to grant it. I have considered only the defendant's cooperation to date, as I am required to do. I have not factored in any future cooperation the defendant may lend to the prosecution of others. . . . Given the fact that Mr. Nickerson decided to cooperate, in light of potential harm to himself and to his family, I think the three level 5K motion is appropriate based on his live testimony at the state preliminary examination. As I've said before, I have only considered Mr. Nickerson's cooperation to date. It does not contemplate any further potential of a Rule 35 [reduction of sentence] as I adjudicate this case today.

18

Sentencing Tr., p. 20, 25, *United States v. Johnson*, 1:09-cr-00311 (W.D. Mich. Aug. 5, 2010) (available on this docket at ECF No. 1-2, PageID.147). So Nickerson's testimony that he did not receive a downward departure because of the U.S. Attorney's motion—which was based on his cooperation against Foster—was false. Less clear is the technical accuracy of his testimony that he received "nothing" from the prosecutor in Foster's case. *See Foster*, 2013 WL 4033639, at *12 ("However, while the U.S. Attorney did state in its 5K motion that it spoke to the prosecutor in this case, it does not state that the prosecutor in this case promised Nickerson anything for his testimony or did anything other than provide information to the U.S. Attorney. It is not clear who initiated the contact between the two or that the prosecutor was advised that a 5K motion would be filed. And, there is no indication that the state prosecutor promised Nickerson any benefit for his cooperation or testimony."). And Nickerson's testimony that he did not get credit for "this" may have intended to convey that the sentencing judge did not consider his future trial testimony against Foster, which appears to be an accurate reflection of the federal sentencing judge's reasoning.

Nickerson's testimony that the downward departure was due to the proximity of his previous offenses appears to be accurate, too. The sentencing court stated that:

> The career offender guideline calls for Criminal History Category VI. Mr. Nickerson would have been Career History Category VI, even without the application of the career offender guideline. What is relevant to an assessment of whether the career offender guideline overstates the seriousness of Mr. Nickerson's prior behavior is the application of the career offender guideline in the levels that are

19

assigned to his offense as opposed to him moving to Career History Category VII, so to that extent, I think the defense has an argument, because indeed, it is a six level difference . . . jumping from Level 25 to Level 19. So I believe the defendant is entitled to some consideration for that fact, and I'm going to grant the request for a variance on that ground.

Sentencing Tr., p. 23, *United States v. Johnson*, 1:09-cr-00311 (W.D. Mich. Aug. 5, 2010). But at bottom, Nickerson was not stating the whole truth, as he did receive a downward departure for his cooperation against Foster as of April 2010.

The Michigan Court of Appeals agreed with Foster—indeed, it found that it was "abundantly clear" that portions of Nickerson's testimony were false. *Foster*, 2013 WL 4033639, at *12. It stated that "[Nickerson] did, indeed, receive a benefit from the 5K motion (which was based on his cooperation in the instant matter) in the form of a reduced sentence and yet unequivocally testified that he did not receive a reduction in his sentence because of his assistance in the instant matter." *Id.*

So this Court's review of Foster's due-process claim comes down to whether the Michigan Court of Appeals acted contrary to federal law in finding that "[i]t cannot . . . be concluded that defendant's conviction was thus obtained through perjured testimony." *Foster*, 2013 WL 4033639, at *12. The state court reasoned that although the prosecutor did not clarify or correct Nickerson's false testimony, defense counsel "cross-examined Nickerson extensively on this issue and elicited the pertinent information." *Id.* The court ultimately held that "the jury heard what defendant ultimately sought to have them hear—that Nickerson received a benefit for his cooperation and testimony and thus had a motive to testify as he did against

20

defendant." *Id.* The state court further noted that other significant evidence connected Foster to Boothby's death, so it was unlikely that Nickerson's false testimony as to his credibility would have changed the outcome. *Id.* at *13.

The Court concludes that, at the very least, reasonable jurists could debate whether Nickerson's false testimony would have changed the jury's verdict. *See Harrington*, 562 U.S. 86, 101 (2011). Thus, it will deny habeas relief on this issue as the false testimony was harmless.

To "prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that . . . the statement was material[.]" *McNeill v. Bagley*, 10 F.4th 588, 604 (6th Cir. 2021), *cert. denied sub nom. McNeill v. Shoop*, 142 S. Ct. 1377 (2022) (citing *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009)). Though similar to the standard used in *Brady*, a false-testimony claim has a slightly different materiality standard: "We weigh the materiality of *Brady* withholding claims by asking whether 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' By contrast, for *Brady/Giglio* claims, we ask only 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' The distinction matters here, because while a traditional *Brady* materiality analysis obviates a later harmless-error review . . . courts may excuse [false-testimony] violations involving known and materially false statements as harmless error." *See Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009); *see also Wise v. Horton*, No. 20-1507, 2020 WL7048691, at

*4 (6th Cir. Oct. 1, 2020) ("[O]rdinarily, claims of perjury must also survive a harmless-error analysis."). So the Court will assume materiality in favor of Foster and focus its analysis on whether the materially false statements were harmless. *See Rosencrantz*, 568 F.3d at 588 ("Having assumed materiality and therefore assumed a constitutional error, we now consider the harmlessness of that error.").

The Court agrees with the Michigan Court of Appeals that defense counsel raised the falsity of Nickerson's testimony before the jury, which decreased the likelihood that "the result of the proceeding would have been different" had the false testimony been corrected. *See Rosencratz*, 568 F.3d at 584. Indeed, it appears that much of the false testimony was corrected by defense counsel. Though the point perhaps would have been more effective if Nickerson had never testified that he had received "nothing" for his cooperation or that the U.S. Attorney's 5K motion did not impact his sentence, defense counsel was able to elicit Nickerson's agreement that he may be eligible for a future reduction in sentence for his trial testimony, that his attorney made arguments regarding his cooperation in this case during sentencing and the U.S. attorney did not disagree, and that he did indeed receive a below-guidelines sentence. And the Court cannot find that the weight of this evidence was impacted in any way by it being elicited on cross, rather than direct, examination. *See Brooks v. Tennessee*, 626 F.3d 878, 896 (6th Cir. 2010) (finding lack of materiality under the *Brady-Napue-Giglio* standard because "both the prosecution and the defense apparently had access to the TBI reports during trial, and therefore both parties were in equal positions to clarify Agent Phillips's testimony").

22

And Nickerson's credibility has little impact on the other substantial testimony and evidence against Foster. This included testimony from two Indiana state troopers that, when they arrested Foster, he asked "can a person be charged with murder if he was only there with the person who committed the murder." (ECF No. 9-19, PageID.3856.) When one of the troopers answered that someone could be charged as an accomplice to murder in that scenario, Foster asked if that would be true if a vehicle was involved. (*Id.* at PageID.3890.) Disbelief in Nickerson's testimony does nothing to undermine the testimony from state troopers where Foster implied that he was involved with Boothby's murder.

To this point, Foster also argues that Nickerson's testimony made him "unimpeachable" and that it "allowed the State to fill in holes in their case and bolster the credibility of other witnesses that had acute credibility defects," like Adrienne Burnette. (ECF No. 21, PageID.5887.) Burnette testified that she witnessed Foster "hit" Boothby when she was on the ground in the parking lot. (ECF No. 9-17, PageID.3231.) She also testified that she saw Foster help carry Boothby to the car, and eventually, that he "pulled [Boothby] on the side of the street and got back into [the] car and [Gill] backed up over her and rolled over her again." (*Id.* at PageID.3234, 3254–3255.)

But as the Court explained, Nickerson was impeached. Indeed, Foster's counsel elicited several responses from Nickerson acknowledging how he could be benefitted from testifying against Foster and drew out other inconsistencies with his testimony. Further, it is unclear how Nickerson—who admittedly was not

involved with this case other than being Foster's cellmate—would influence the jury's decision to believe Burnette, who was an eyewitness. As Foster admits, any credibility issues with Burnette's testimony were raised in front of the jury, and presumably, the jury believed her despite those issues given the verdict. And Burnette was not the only eyewitness that testified about Foster's involvement in the assault on Boothby. Such eyewitness testimony has been held to be especially persuasive. *See Strickler v. Greene*, 527 U.S. 263, 293 (1999) ("We recognize the importance of eyewitness testimony[.]"); *see also McNeill*, 10 F.4th at 602 ("The testimony of numerous eyewitnesses . . . is unusually powerful."). So even if Nickerson's testimony was treated as completely untrustworthy, there was plenty of other evidence for the jury to rely on in convicting Foster—including his own incriminating statements to the troopers—such that he cannot show the error was harmful.

Thus, in light of Foster's counsel's effective cross-examination of Nickerson and the substantial other evidence against him, the Court does not find that the state court unreasonably applied federal law in concluding that Nickerson's false statements were immaterial or that any error was harmless. As such, this claim is denied.

## B. Ineffective Assistance of Trial Counsel

Foster's second claim concerns trial counsel's performance. He maintains that counsel was ineffective for failing to investigate and to call co-defendant Shevolier Gill to testify in Foster's trial.

24

## 1. Procedural Default

Before the Court analyzes the merits, it will address the Warden's procedural-default argument. *See Sheffield v. Burt*, 731 F. App'x 438, 441 (6th Cir. 2018) ("[W]here a straightforward analysis of settled state procedural default law is possible, federal courts cannot justify bypassing the procedural default issue."). To conclude that a claim is procedurally defaulted—and thus not entitled to federal review—the state court must have "enforce[d]" a state procedural rule against the petitioner. *See id.*

Here, the Court finds that the state court did not do so. As a reminder, Michigan Court Rule 6.508(D)(3) states that the court "may not grant relief to the defendant if the motion . . . alleges grounds for relief . . . which could have been raised on appeal from the conviction or sentence . . . unless the defendant demonstrates . . . good cause for failure to raise such grounds on appeal or in the prior motion, and . . . actual irregularities that support the claim for relief." Good cause may be waived if the court finds that there is a "significant possibility" the defendant is innocent. *Id.* Though, as the Warden argues, the state trial court referenced Michigan Court Rule 6.508(D)(3), it stated that the "claims appear to be posited under MCR 6.508(D)(3) and generally assert ineffective assistance of both trial and appellate counsel as well as actual innocence." (ECF No. 23-1, PageID.6082.) The court then found that it would not waive the good-cause requirement for such claims based on actual innocence. (*Id.*)

25

But the rest of the opinion says nothing about whether the trial court found lack of good cause under Michigan Court Rule 6.508(D)(3). The only mention of good cause was that the requirement would not be waived. And the court went on to analyze the claims on the merits without indicating this was done in the alternative. (*See* ECF No. 23-1, PageID.6085 ("[T]his court finds neither deficient representation nor any irregularity on this ground."). Since it is unclear whether a procedural rule was invoked, and the state court also found counsel's decisions to be a matter of trial strategy, the Court finds no procedural bar was enforced. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("If an earlier opinion 'fairly appear[s] to rest primarily upon federal law,' we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place."). So the Court finds that, because the trial court did not enforce a procedural bar, Foster did not procedurally default his ineffective-assistance-of-trial-counsel claim.

## 2. Merits of Ineffective-Assistance-of-Counsel Claim

Now to the merits. Foster's co-defendant, Gill, penned a letter to her friend Jennifer Lloyd while Gill was awaiting trial. Gill maintains her own innocence in the letter. (*See* ECF No. 23-1, PageID.6145.) She also writes, "And wuz up with Malik? How in the heck did he come into play with all of this?" (*Id.*) The Michigan Department of Corrections recognizes that "Malik" is one of Foster's aliases. *See* Offender Tracking Information System, *Foster, Edward*, (last accessed Aug. 11,

2023), available at https://mdocweb.state.mi.us/otis2/otis2profile.aspx?
mdocNumber=226862.

Gill also testified before the jury in her own trial but said very little about
Foster. Specifically, she testified that she did not remember seeing Foster,
Burnette, or Scottie at the club that night. (ECF No. 9-22, PageID.4564–4565.) She
also testified that after the club closed, she and Ivory left in her car and went home.
(ECF No. 9-22, PageID.4568.)

Foster argues that Gill's letter implied he had nothing to do with Boothby's
murder and so counsel was ineffective in failing to investigate the exculpatory
nature of Gill's letter and the possibility that she could testify in his defense. Even
assuming counsel did not investigate Gill—an assertion Foster provides no evidence
for—Foster's claim fails.

To prevail on habeas corpus review on an ineffective-assistance-of-counsel
claim, Foster must show that the state court's denial of his claim was contrary to, or
an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984).
*Strickland* established a two-prong test for claims of ineffective assistance of
counsel: (1) that counsel's performance was deficient, and (2) that the deficient
performance prejudiced the defense. *Id.* at 687.

As Gill testified in front of her own jury about this same incident, the Court
has a good understanding of what she likely would have said if Foster's counsel
called her as a witness. And the Court focuses on this testimony—rather than the
letter—because the letter would have to be admitted through her. So if defense

27

counsel reasonably did not call Gill to testify because of potential issues with what she would say, it follows that it was not unreasonable for counsel to not seek admission of the letter. *See Fitchett v. Perry*, 644 F. App'x 485, 490–491 (6th Cir. 2016) (finding no ineffective assistance of counsel where potential evidence was inadmissible). However, the Court also notes that Gill's letter is not necessarily exculpatory. Gill only asks her friend how Foster "come[s] into play with all of this." (ECF No. 23-1, PageID.6145.) This could either mean—as Foster argues—that Gill was confused about Foster's involvement because he was not involved or—as the prosecutor would likely argue—that she does not know how he was identified after so much time. (Putting aside, of course, the other alternative that the letter was written for purely self-serving purposes.) And, because Gill maintained her innocence in the letter, it is unclear how she would have any knowledge of Boothby's true killers. So even if the letter did suggest that Foster was innocent, it would only do so in a very particular circumstance—namely if Gill lied about her own involvement but told the truth about Foster's.

The same can be said about Gill's testimony. If Foster's jury were allowed to hear Gill's testimony, the jury may have believed that she and Ivory "went home" right after the club shut down (ECF No. 9-22, PageID.4568), but still found that Foster was involved in the murder. Put differently, if Gill was not involved with Boothby's murder as she claimed, she would have no knowledge of who committed Boothby's murder and thus could not absolve Foster. And if that is the case, her testimony would do little to convince the jury that Foster was not in fact involved

with the murder—especially because Foster took the stand and said he was at the club on the night in question. In short, many of Foster's arguments for why Gill would have been an important witness to investigate and potentially call assume that Gill "was an eyewitness to the crime[.]" (*See* ECF No. 21, PageID.5890–5891.) But the very letter he relies on indicates that she was not. So either the jury would have disbelieved Gill's testimony that she was not involved—thus casting doubt on her testimony that she did not see Foster—or they would have believed that she was not involved, and thus, had no knowledge of what occurred between Foster and Boothby.

This issue with Gill's testimony infects both prongs of the *Strickland* test. On the deficiency prong, he cannot overcome "the presumption that the challenged conduct might be considered sound trial strategy." *See Haight v. Jordan*, 59 F.4th 817, 832 (6th Cir. 2023). The Court agrees with the state trial court that defense counsel's decision not to call Gill was not deficient (ECF No. 23-1, PageID.6085), but rather "within the wide range of reasonable professional assistance[.]" *See Haight*, 59 F.4th at 832. A reasonable attorney may not risk calling a co-defendant to the stand who claims they did not see their client (when their client testified that he was at the scene) and who claims they had no involvement with the crime. Crediting Gill's testimony may not have helped Foster at all and could have led to a situation where Foster's testimony was pitted against Gill's if there were any inconsistencies. This is especially true because Foster's defense at trial was that there was a feud between South Haven and Covert such that he would have never

helped the Shavers or Gill with a murder, lending credence to a jury contrasting Foster to the other three defendants. *See* (ECF No. 9-22, PageID.4405–4410 (Foster testifying regarding the rivalry between the two communities and testifying that he and Scottie Shaver were "enemies" at the time of the murder)); *see also Fitchett v. Perry*, 644 F. App'x 485, 491 (6th Cir. 2016) ("The Supreme Court has held that counsel is not ineffective for failing to investigate if 'further investigation would have been fruitless,' because the additional evidence 'would be of little help,' 'can reasonably be expected to be only cumulative,' or carries 'serious risks' of 'expos[ing defendant's story] as an invention[.]'" (internal citations omitted)).

Further, other witnesses testified that they had not seen Foster at the club, so Gill's testimony added nothing more to the evidence before the jury. *See* (ECF No. 9-15, PageID.2865, 2887 (witness testifying that she did not remember seeing Foster at the club or outside in the parking lot while Ivory Shaver, Scottie Shaver, and Gill are hitting her); ECF No. 9-18, PageID.3583, 3587, 3589, 3599 (witness stating she only saw Scottie and Ivory hitting Boothby and taking her to the car, that she saw a woman in the car with Scottie and Ivory, and that Foster "went and got in his vehicle and left"); ECF No. 9-16, PageID.3081, 3085 (witness only identifying Scottie, Ivory, and Gill in the parking lot)); *see also Fitchett*, 644 F. App'x at 491. So the trial court did not err in finding that Foster's trial counsel performed within reason by not calling Gill.

As for prejudice, the trial court did not make any clear finding on that prong as to the issue involving Gill. (*See* ECF No. 23-1, PageID.6085 ("Thus, while trial

counsel may not have addressed the issue in the precise manner desired by Defendant, this court finds neither deficient representation nor any irregularity on this ground.").) So the Court will review this prong de novo. *See Haight*, 59 F.4th at 832.

Even so, Foster has failed to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 831. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). Gill's testimony was not exculpatory as to Foster—she merely denied seeing him that night, even though he was at the club, which could still mean that he was involved in the crime without her knowledge. True, the testimony could have corroborated Foster's own testimony that he did not see Gill or Shaver that night. But it also could have led the jury to believe that Gill would not have known about Foster's whereabouts and conclude that Foster simply acted outside of Gill's presence given the other incriminating evidence against him. In short, Gill's testimony was not so favorable to Foster that this Court would now have reason to believe that the jury's verdict would have changed.

So Foster's ineffective-assistance-of-trial-counsel claim is denied.

### C. Ineffective Assistance of Appellate Counsel

Foster claims his appellate counsel was ineffective for failing to raise the ineffective-assistance-of-trial-counsel claim and for failing to investigate Gill as a witness on his direct appeal. (ECF No. 21, PageID.5899.) Because "[c]ounsel is not

ineffective for failing to raise a meritless defense or issue," this claim also fails. *See Springer v. Howard*, No. 21-1022, 2021 WL 3868316, at *3 (6th Cir. June 4, 2021) (citing *Sutton v. Bell*, 645 F.3d 752, 755 (6th Cir. 2011)).

### D. Innocence

Foster also asserts his innocence, arguing that the Court should address the merits of his ineffective-assistance claims as to trial and appellate counsel as well as his actual innocence. (ECF No. 21, PageID.5904.)

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. . . . This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400–01 (1993). So to the extent Foster asks this Court to evaluate his factual innocence, it declines to do so.

On the other hand, showing actual innocence can provide "a 'gateway' for the habeas petitioner to have his [or her] otherwise barred constitutional claim considered on the merits." *Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (internal citation omitted). This type of claim "is procedural, rather than substantive, meaning that it does not by itself provide a basis for relief." *Id.*

But there is no need for Foster to make a showing of actual innocence as the Court addressed all of his habeas claims on the merits. So the Court also declines to

evaluate any actual-innocence arguments as "gateway" claims, as such claims are unnecessary here.

## V. Conclusion

For the foregoing reasons, Foster's amended habeas petition (ECF No. 21) is DENIED. A separate order on the certificate of appealability and proceeding in forma pauperis on appeal and judgment will follow.

SO ORDERED.

Dated: August 28, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE